# EXHIBIT 1

CIRCUIT COURT FOR FAIRFAX COUNTY, VIRGINIA

FILED
CIVIL INTAKE
2016 JUN -2 PM 3: 29
JOHN T. FREY
CLERK, CIRCUIT COURT
FAIRFAX, VA

DAVID E. HARVEY BUILDERS, INC. d/b/a )
HARVEY-CLEARY BUILDERS )
207A Perry Parkway, Suite 1 )
Gaithersburg, MD 20877 )
)
     **Plaintiff,** )
)
v. )
)
TYSONS CORNER HOTEL I LLC )
401 Wilshire Blvd, Suite 700 )
Santa Monica, CA 90401 )
)
     <u>SERVE</u>: )
)
     CT Corporation System )
     4701 Cox Road, Suite 285 )
     Glen Allen, VA 23060 )
)
     **Defendant.** )
)

2019 - 07826

CASE NO. _____

## COMPLAINT

Plaintiff, David E. Harvey Builders, Inc. d/b/a Harvey-Cleary Builders ("Harvey-Cleary"), for its Complaint against Defendant, Tysons Corner Hotel I LLC ("Tysons Corner"), states as follows:

### JURISDICTION AND PARTIES

1.    Plaintiff Harvey-Cleary is a Texas corporation with its principal place of business in Houston, TX. At all times relevant hereto, Harvey-Cleary was engaged in the construction contracting business and was properly licensed and registered to do business in the Commonwealth of Virginia.

2.    Upon information and belief, Defendant Tysons Corner is a Delaware limited liability company, with its principal place of business in the State of California.

3.     This Court has jurisdiction over this matter pursuant to Va. Code § 8.01-328.1(A)(1) and (6). Venue is appropriate in this Court pursuant to Va. Code § 8.01-262(4).

### FACTUAL BACKGROUND

#### Project and Disputes

4.     This dispute arises out of the construction of a 17-story hotel in McLean, VA known as the Tysons Corner Center Hotel (the "Project").

5.     The Project was plagued with Tysons Corner-caused delays throughout.  Harvey-Cleary brings the present action against Tysons Corner as a result of Tysons Corner's failure to appropriately compensate Harvey-Cleary for base contract work, changed work and Tysons Corner's delays and acceleration directions which significantly impacted Harvey-Cleary's cost and time of performance on the Project.

#### The Contract

6.     On or about February 27, 2013, Harvey-Cleary entered into a contract (the "Contract") with Tysons Corner for Harvey-Cleary to serve as the general contractor to construct the Project.  A true and accurate copy of the Contract is attached hereto and incorporated by reference as Exhibit 1.

7.     Harvey-Cleary's construction of the Project was to be based on Tysons Corner's design that was prepared by RTKL Associates, Inc. ("RTKL"). Tysons Corner's Construction Manager and representative for the Project was Woodbine Development Corporation ("Woodbine").

8.     The Contract provides the following regarding the Contract Price: "[Harvey-Cleary] agrees to accept, as its sole, exclusive and total compensation for the complete and satisfactory performance of its obligations under the Contract Documents, reimbursement of the

2

Costs of Work and payment of the Contractor Fee." Exhibit 1, Agreement, Paragraph 2.1.

9.      The Contract allows for adjustments to the Contract Price "by Prime Contract

Change Order or Provisional Prime Contract Change Order for Compensable Change,

Compensable Delay, or Deleted Work." Exhibit 1, Agreement, Paragraph 2.2.

10.     The Contract defines Compensable Delay as follows:

"Compensable Delay" means a Delay to the critical path of activities affecting [Harvey-Cleary's] ability to achieve Substantial Completion of the entirety of the Work within the Contract Time: (1) that is the result of (a) a Compensable Change, (b) the active negligence of [Tysons Corner], [Tysons Corner's] Representative, Construction Manager, [a Tysons Corner] Consultant or a Separate Contractor, (c) a breach by [Tysons Corner] of an obligation under the Contract Documents or (d) other circumstances involving Delay for which [Harvey-Cleary] is given under the Contract Documents a specific and express right to a Contract Adjustment to the Contract Price and General Conditions Costs Maximum; (2) that is not caused, in whole or in part by, (a) an act or omission of [Harvey-Cleary] or a Subcontractor, of any Tier, constituting negligence, willful misconduct, or a violation of an Applicable law, or (b) a failure by [Harvey-Cleary] to comply with the Contract Documents; and (3) for which an adjustment to the Contract Time is nether prohibited nor waived under the terms of the Contract Documents.

Exhibit 1, General Conditions, Paragraph 1.1.23.

11.     The Contract provides the following regarding Harvey-Cleary's right to

compensation for Compensable Delay:

Compensable Delay.  In the event [Harvey-Cleary] or any Subcontractor, of any Tier, experiences a Delay for which [Harvey-Cleary] is entitled under the terms of the General Conditions to a Contract Adjustment of the Contract Time for Substantial Completion due to Compensable Delay, the Contract Price and General Conditions Costs Maximum shall be adjusted by Contract Adjustment.

Exhibit 1, Agreement, Paragraph 3.5.2. (Emphasis added).

12.     In the event Tysons Corner does not grant Harvey-Cleary a time extension for

Compensable Delay and instead directs Harvey-Cleary to accelerate its performance to overcome

Compensable Delay, the Contract provides the following regarding Harvey-Cleary's right to an

adjustment:

3

> If, instead of granting [Harvey-Cleary] a Contract Adjustment extending the Contract Time for Substantial Completion due to Compensable Delay, [Tysons Corner] directs in writing an acceleration of performance of the Work to overcome the effects of the Compensable Delay, then [Harvey-Cleary] shall be entitled to a Contract Adjustment to the Contract Price and General Conditions Cost Maximum . . .

Exhibit 1, Agreement, Paragraph 3.5.2.2(1). (Emphasis added).

13.    The Contract contains a set of procedures for changes in scope on the Project and the requisite Contract Adjustments as a result of such changes:

> Contract Adjustments shall only be permitted as follows: (1) the Contract Price shall only be adjusted pursuant to this Article 7 by means of a Prime Contract Change Order or Provisional Prime Contract Change Order for Compensable Change, Deleted Work or Compensable Delay; (2) the General Conditions Costs Maximum shall only be adjusted pursuant to this Article 7 by means of a Prime Contract Change Order or Provisional Prime Contract Change Order for Compensable Delay or Deleted Work as permitted by this Article 7, Article 8, below, and Section 3.5 of the Construction Contract; and (3) the Contract Time shall only be adjusted pursuant to this Article 7 by means of a Prime Contract Change Order or Provisional Prime Contract Change Order for Excusable Delay, Compensable Delay or Deleted Work as permitted by this Article 7 and Article 8, below.

Exhibit 1, General Conditions, Paragraph 7.1.2.

14.    The Contract provides that "a Prime Contract Change Order shall be executed by and between [Tysons Corner] and [Harvey-Cleary]. A Provisional Prime Contract Change Order shall be executed by [Tysons Corner]. Construction Change Directives shall be executed in accordance with Section 7.5, below." Exhibit 1, General Conditions, Paragraph 7.2.1.

15.    The Contract further provides that the "purpose of a Prime Contract Change Order is to establish the terms of [Tysons Corner's] and [Harvey-Cleary's] mutual agreement to a Contract Adjustment." A Prime Contract Change Order is a "written instrument, prepared by [Tysons Corner], stating: (1) a Compensable Change or Deleted Work; (2) a Compensable Delay or Excusable Delay; (3) the amount of the Contract Adjustment, if any, to the Contract Price;

4

and/or (4) the extent of the Contract Adjustment, if any, to the Contract Time and General

Conditions Costs Maximum." Exhibit 1, General Conditions, Paragraphs 7.3.1 and 7.3.2.

16.     Regarding Construction Change Directives, the Contract provides:

> The purpose of a Construction Change Directive is to: (1) direct the performance of a Minor Change; (2) direct performance of Work or a Change with respect to which there exists a dispute or question regarding the terms of a Contract Adjustment; or (3) establish a mutually agreed basis for compensation to [Harvey-Cleary] for a Compensable Change under circumstances where performance of the Compensable Change needs to proceed in advance of complete substantiation and evaluation of the Contract Adjustment therefor.

Exhibit 1, General Conditions, Paragraph 7.5.1.

17.     The Contract also provides for adjustments in the event of delays not caused by

Harvey-Cleary, providing that "[s]ubject to the limitations set forth in this Article 8 and

elsewhere in the Contract Documents, the Contract Time shall be extended for Compensable

Delays and Excusable Delays . . ." Exhibit 1, General Conditions, Paragraph 8.1.3.

18.     The Contract provides for time extensions to the Contract Time as follows:

> [I]f, as a result of Excusable Delay or Compensable Delay to the actual, as-built critical path of activities leading to achievement of a Key Milestone, Tenant-Ready Completion, Substantial Completion, Final Completion or Close-Out Completion, [Harvey-Cleary] is unable to achieve a Key Milestone, Tenant-Ready Completion, Substantial Completion, Final Completion or Close-Out Completion in accordance with the requirements of the Contract Time applicable thereto, then the Contract Time for each, some or all, as appropriate, of the agreed dates or time periods for Key Milestones, Tenant-Ready Completion, Substantial Completion, Final Completion or Close-Out Completion shall be extended, either by Prime Contract Change Order or Provisional Prime Contract Change Order, for the length of the proven, resulting Delay to [Harvey-Cleary's] ability to so complete the Work.

Exhibit 1, General Conditions, Paragraph 8.2.1.1. (Emphasis added).

19.     As to the recovery of attorneys' fees and costs associated with this litigation, the

Contract provides:

> . . .the prevailing party shall be entitled to recover its actual costs, expenses, and attorney's fees (both outside and in-house counsel), court costs (statutory and non-

5

statutory), professional, expert and consultant fees, paralegal fees, investigative costs, postage costs, document copying costs, telecopy costs and any and other all other costs and expenses, of mediation, arbitration, trial and appeal.

Exhibit 1, Agreement, Paragraph 13.4.

Harvey-Cleary's Subcontractors

20.   In order to perform its scope of work under the Contract, Harvey-Cleary entered into subcontracts with various subcontractors, including but not limited to: Pillar Construction ("Pillar") (framing, drywall and exterior façade installation), Inspiration Plumbing ("Inspiration") (plumbing); Blackwood of DC ("Blackwood") (concrete); Helix Electric ("Helix") (electrical); Precision Doors & Hardware ("Precision") (doors); Gate Precast ("Gate") (precast concrete); American Iron Works ("AIW") (structural steel and specialty metals); Capital Sprinkler Contracting ("Capital Sprinkler") (sprinklers); Strait Steel ("Strait") (steel); Cochran & Mann ("Cochran") (painting and wallcoverings) and Johnson Architectural Metals ("Johnson Architectural") (architectural metals).

Commencement of Construction on the Project

21.   Tysons Corner issued the Notice to Proceed with Construction for the Project on or around March 3, 2013. Harvey-Cleary commenced construction on the Project shortly thereafter.

22.   During the early stages of construction, Tysons Corner and Harvey-Cleary were able to work together to mutually resolve appropriate adjustments to the Contract arising out of Tysons Corner's delays and changes and extended the substantial completion date for the Project from October 22, 2014 to January 15, 2015.

23.   As the Project progressed however, Tysons Corner failed and refused to continue to work with Harvey-Cleary to resolve outstanding issues related to Tysons Corner's delays and

6

changes.

<u>Tysons Corner's Delays</u>

24.     As construction continued, Tysons Corner-caused delays arose that impacted Harvey-Cleary's performance of work on the Project.  Harvey-Cleary provided Tysons Corner and Woodbine with contemporaneous notice of these delay events and the impacts of these delays.

25.     Despite Harvey-Cleary's notices, requests and acceleration efforts to overcome these delays, Tysons Corner failed and refused to provide Harvey-Cleary the time extensions and compensation it was contractually entitled to as a result of these delays.

26.     As a result of Tysons Corner's delays and refusal to grant Harvey-Cleary time extensions and/or compensation, in August 2014 Harvey-Cleary issued a monthly schedule update that reflected an extension to the substantial completion date of the Project beyond January 15, 2015, the then-current substantial completion date for the Project.

27.     Harvey-Cleary's extension of the substantial completion date in its monthly schedule update was the result of a number of delays for which Tysons Corner and/or its consultants were responsible.  These delays were the result of *inter alia*: (1) a deficiency in the design for the demising walls for the guest rooms on the Project that required a significant design revision; (2) a deficiency in the design of the layout for the fire alarm devices and sprinkler heads in the bulkhead of the guest rooms that created a coordination conflict and required a significant design revision; (3) a deficiency in the design for the electrical outlets in the shafts in the unit bathrooms, as the design did not meet required code as identified by the Fairfax County Building Authority; and (4) Tysons Corner's and/or its consultants' failure to timely get the fire sprinkler permit issued for the Project and the impacts this delay had on the required County Fire

Marshal inspections for the Project.

Tysons Corner's Acceleration Direction to Meet January 15, 2015 Substantial Completion Date

28.     In late August 2014, Tysons Corner, through Woodbine, requested that Harvey-Cleary provide a revised schedule update that reflected a January 15, 2015 substantial completion date.  Tysons Corner also directed Harvey-Cleary to accelerate its performance to achieve substantial completion of the Project by January 15, 2015.

29.     In response to Tysons Corner's acceleration direction, Harvey-Cleary immediately began meeting with its critical subcontractors, working to develop an acceleration schedule and taking efforts to accelerate its performance to meet the January 15, 2015 substantial completion date.

30.     Harvey-Cleary provided Tysons Corner with timely notice that it was continuing to work on an accelerated basis, that it believed the delays on the Project incurred to date to be Compensable Delays, and that it would be submitting a claim in response to Tysons Corner's acceleration direction.

31.     In late August 2014, as requested by Woodbine, Harvey-Cleary submitted a revised schedule update incorporating a January 15, 2015 substantial completion date.

Tysons Corner's Acknowledgement that it would Compensate Harvey-Cleary for its Acceleration Efforts

32.     Harvey-Cleary and Tysons Corner were both aware that Tysons Corner's acceleration direction would impact Harvey-Cleary's cost to perform the work.  Tysons Corner communicated to Harvey-Cleary that it would be compensated for its acceleration efforts.

33.     Harvey-Cleary and Tysons Corner met on or around August 27, 2014 to discuss these impacts, the Project schedule and the need to accelerate work in order to overcome critical

8

path delay. At this meeting, Tysons Corner and Woodbine representatives including Robert

Jones, Don Foster, Thomas Seybold and Dana Swope confirmed Tysons's Corner's intent to

compensate Harvey-Cleary for the costs associated with Tysons Corner's acceleration direction

to overcome Compensable Delay on the Project. This understanding for Tysons Corner to

compensate Harvey-Cleary for its accelerations efforts was further memorialized in multiple

meetings and communications between the parties throughout September 2014.

34.     Based on Tysons Corner's and Woodbine's representations at the August 27

Project meeting and in subsequent meetings and communications, Harvey-Cleary began working

with Tysons Corner and Woodbine to provide the requested information regarding Harvey-

Cleary and its subcontractors' anticipated costs required to meet the January 15, 2015 substantial

completion date. Specifically, Harvey-Cleary provided Tysons Corner with information

regarding its costs and the various subcontractors impacted by the acceleration direction and the

proposed staffing levels and additional hours to be worked by these subcontractors to accomplish

the directed acceleration.

35.     Tysons Corner did not take exception to Harvey-Cleary's submission of its

potential cost impacts. In fact, Harvey-Cleary's submission of this information was consistent

with the parties' agreement at the August 27 Project meeting and the subsequent meetings and

communications between the parties as well as Tysons Corner's request that Harvey-Cleary

provide such information.

36.     Woodbine, on behalf of Tysons Corner, reviewed and analyzed Harvey-Cleary's

cost and subcontractor information and continued to work with Harvey-Cleary on these costs. In

early September 2014, Woodbine specifically requested that Harvey-Cleary provide additional

information regarding its costs and its subcontractors' costs to accelerate performance so that

Tysons Corner could assess its acceleration direction. Harvey-Cleary immediately provided Woodbine with the requested additional information.

### Harvey-Cleary's Acceleration Efforts and Tysons Corner's Further Acknowledgment that it would Compensate Harvey-Cleary for such Efforts

37.    In reliance on Tysons Corner's and Woodbine's representations and apparent continued good faith negotiations, and based on Tyson's Corner's acceleration direction, Harvey-Cleary ramped up its acceleration efforts in late August 2014 and continued these acceleration efforts.

38.    Harvey-Cleary took actions to accelerate its performance as of late-August 2014, including but not limited to: (1) significantly increasing on-site manpower; (2) working weekends and overtime; (3) paying subcontractors to work in multiple areas simultaneously; (4) adding management and supervision, including site superintendents and project managers to ensure appropriate supervision/management for increased manpower and work areas; (5) performing work out of sequence and in pieces made available by inspections to work to overcome delays/changes caused by others; (6) providing additional protection and temporary measures to overcome delays/changes caused by others; and (7) paying certain trades bi-weekly to allow them to maintain increased manpower on the Project. Tysons Corner and Woodbine were aware of these efforts.

39.    In mid-September 2014, Harvey-Cleary requested that Tysons Corner provide an update regarding its promise to compensate Harvey-Cleary, reminding Tysons Corner that Harvey-Cleary was spending significant amounts of money on its acceleration efforts.

40.    Tysons Corner responded and requested additional information regarding Harvey-Cleary and its subcontractors' acceleration costs. Tysons Corner did not take exception to Harvey-Cleary's submission of acceleration costs or give any indication that Tysons Corner held

Harvey-Cleary responsible for the need to accelerate or the costs to accelerate. In an e-mail response to Harvey-Cleary's submission, Woodbine's Development Manager, Thomas Seybold, provided his thoughts on certain subcontractor proposals and how such proposals could be negotiated downward and finalized.

41.     Harvey-Cleary continued its acceleration efforts through September 2014 and into October 2014 in reliance on the parties' mutual understanding and agreement that Harvey-Cleary would be compensated for these efforts.

<u>Tysons Corner's Reversal of its Position and Direction to Continue and Maintain Acceleration</u>

42.     The parties met again on or around October 1, 2014 to discuss the Project schedule and Harvey-Cleary's on-going acceleration efforts. At this meeting, Tysons Corner took the position, for the first time, that Harvey-Cleary was responsible for Project delays and all costs associated with Tysons Corner's acceleration direction.

43.     Harvey-Cleary immediately rejected Tysons Corner's abrupt reversal. Harvey-Cleary reminded Tysons Corner that its reversal came after previously agreeing to compensate Harvey-Cleary for its acceleration efforts and after weeks of the parties working together to gather additional information and negotiate the specific level of compensation for these acceleration efforts.

44.     Following this meeting and apparently based on Harvey-Cleary's concerns about Tysons Corner's reversal of its position, Woodbine issued CCD #51, which directed Harvey-Cleary to maintain and continue its acceleration efforts to meet the January 15, 2015 substantial completion date with no additional compensation to be paid to Harvey-Cleary.

45.     Along with CCD #51, Tysons Corner notified Harvey-Cleary that its failure to meet the January 15, 2015 substantial completion date would cause Tysons Corner to incur

11

damages in excess of $4,000,000, which Tysons Corner would withhold from Harvey-Cleary under the Contract.

### Harvey-Cleary's Request for Equitable Adjustment

46.     Harvey-Cleary provided timely notice that it would be submitting a Claim seeking compensation for Tysons Corner-caused delays and Harvey-Cleary's and its subcontractors' acceleration efforts.

47.     Harvey-Cleary submitted a Claim and Request for Equitable Adjustment (the "Claim") to Tysons Corner to recover Harvey-Cleary's and its subcontractors' cost and time impacts associated with Tysons Corner-caused delays and Tysons Corner's acceleration directions.

48.     Despite Harvey-Cleary's and its subcontractors' acceleration efforts, as a result of continuing delays for which Tysons Corner was responsible, the substantial completion date for the Project continued to slip.  Harvey-Cleary and its subcontractors continued to spend significant resources to accelerate their work through January 15, 2015.

### Continuing Tysons Corner-Caused Delays and First Claim Supplement

49.     Harvey-Cleary submitted a Supplement to its Claim on January 15, 2015 to account for continuing and additional Tysons Corner-caused delays that prevented Harvey-Cleary from meeting the January 15, 2015 substantial completion date and pushed the substantial completion date for the Project back into February 2015.

50.     These additional Tysons Corner-caused delays included:  (1) continued delays associated with the fire sprinkler permit and required inspections by the Fairfax County Fire Marshal; (2) delays associated with the Fairfax County Mechanical Inspector's code interpretation to require access panels beneath Variable Air Volume Units; (3) delays associated

with Tysons Corner's provision of information required to remove and replace metal panels in

the North Hotel drop off area to reroute storm drainage; (4) continuing delays associated with the

Fairfax County Building Authority's approval of sprinkler permits for fire protection system for

the Project; and (5) delays associated with a design omission by RTKL regarding a structure to

be built at the South entrance vestibule.

51.    As these delays continued and additional Tysons Corner-caused delays occurred,

the substantial completion date of the Project slipped further. As directed, Harvey-Cleary and its

subcontractors continued their acceleration efforts.

Continued Tysons Corner-Caused Delays and Second Claim Supplement

52.    The Project reached substantial completion on or around April 1, 2015 when the

Certificate of Occupancy was issued for the Project.

53.    As directed by Tysons Corner and in order to overcome Compensable Delay,

Harvey-Cleary and its subcontractors continued their acceleration efforts through substantial

completion of the Project. Harvey-Cleary and its subcontractors continued such acceleration

efforts into the Fall of 2015 in completing their punchlist work.

54.    Harvey-Cleary submitted a second Supplement to its Claim on November 24,

2015, to account for continuing and additional Tysons Corner-caused delays that prevented

Harvey-Cleary from meeting the February 2015 substantial completion date for the Project. This

included Harvey-Cleary and its subcontractors' costs related to Tysons Corner's delays and the

required acceleration on the Project.

55.    These additional delays for which Tysons Corner was responsible included: (1)

the continuing delays associated with the sprinkler permit and the required hydro-testing for the

Project; (2) a water event arising out of a burst pipe on or around January 31, 2015 that caused

13

significant damage to work in-place and required remediation; (3) a second water event arising out of a separate pipe burst on or around February 13, 2015 that caused additional damage to work in-place and required remediation; and (4) delays associated with the County Fire Marshal Pre-Final inspections.

56. As a result of Tysons Corner-caused delays and acceleration directions, Harvey-Cleary and its subcontractors have incurred approximately $7,100,000 in additional costs. These costs represent acceleration efforts and extended performance costs and are reflected in Harvey-Cleary's Second Supplement to its Claim.

57. Tysons Corner has denied Harvey-Cleary's Claim and failed and refused to compensate Harvey-Cleary and its subcontractors for the cost and time impacts associated with Tysons Corner-caused delays and the required acceleration on the Project.

58. In response to Harvey-Cleary's requests for additional compensation for itself and its subcontractors arising out of Tysons Corner-caused delays and the required acceleration, Tysons Corner again threatened Harvey-Cleary with damages exceeding $4,000,000 for Tysons Corner's alleged lost hotel revenues.

<u>Other Harvey-Cleary Proposed Change Orders and Tysons Corner CCDs</u>

59. Throughout Harvey-Cleary's performance of work on the Project, Tysons Corner issued numerous other directions requiring Harvey-Cleary to perform extra work on the Project and to incur additional costs.

60. Harvey-Cleary has submitted Proposed Changes Orders ("PCOs") seeking compensation from Tysons Corner under the Contract for the cost and time impacts associated with these Tysons Corner-directed changes.

61. To date, Tysons Corner has failed and refused to compensate Harvey-Cleary for

14

many of these other Tysons Corner-directed changes on the Project, which total approximately
$8,000,000.

Status of the Project, Tysons Corner's Withholding of Retention and Tysons Corner's
Threatened Claim

62.     Tysons Corner has been utilizing the Project as a hotel since April 2015 when the
Certificate of Occupancy for the Project was issued.

63.     Despite Tysons Corner's use of the Project since April 2015, and the fact that
minimal punchlist work remains, Tysons Corner is wrongfully withholding approximately
$5,800,000 in retention for base contract work from Harvey-Cleary.

64.     Harvey-Cleary provided Tysons Corner with timely and proper notice and
substantiation of the Claim and for its outstanding PCOs.  The parties have exhausted all of the
contractual claims and disputes procedures of the Contract required prior to Harvey-Cleary
initiating the present litigation.

65.     All conditions precedent to bringing this Complaint, if any, have been satisfied
and/or waived or been made impossible by the actions and/or omissions of Tysons Corner.

## COUNT I
### (BREACH OF CONTRACT)

66.     Harvey-Cleary incorporates the allegations in Paragraphs 1-65 by reference.

67.     The Contract constitutes a valid and enforceable contract between Tysons Corner
and Harvey Cleary.  The Contract requires, among other things, that Tysons Corner timely and
fully compensate Harvey-Cleary for base contract work, including retention, and through
adjustments to the Contract Price and/or Contract Time for changed work and for Tysons Corner-
caused delays and/or acceleration that impact Harvey-Cleary's cost and time of performance on
the Project.

68. Tysons Corner materially breached the Contract by, *inter alia,*:

(a) Causing significant delay to the Project schedule as a result of design deficiencies, coordination conflicts and failures, code issues and permitting failures;

(b) failing to grant Harvey-Cleary adjustments to the Contract Time for Excusable Delay and/or Compensable Delay;

(c) failing to grant Harvey-Cleary adjustments to the Contract Sum for Compensable Delay;

(d) forcing Harvey-Cleary to accelerate its performance on the Project as a result of Compensable Delay and subsequently failing and refusing to compensate Harvey-Cleary for the cost and time impacts associated with its extended performance costs and acceleration efforts on the Project;

(e) failing and refusing to compensate Harvey-Cleary for the Claim;

(f) failing and refusing to compensate Harvey-Cleary for the cost and time impacts associated with other PCOs and/or CCDs issued by Tysons Corner;

(g) failing and refusing to acknowledge that the Project has reached final completion under the Contract; and

(h) failing and refusing to release Harvey-Cleary's retention for base contract work and changed work.

69. As a direct and proximate cause of Tysons Corner's material breaches of the Contract, Harvey-Cleary has suffered damages in the amount of at least $20,900,000, which it is pursuing on its behalf and on behalf of its subcontractors, including but not limited to, Pillar, Inspiration, Blackwood, Helix, Precision, Gate, AIW, Capital Sprinkler Strait, Cochran and Johnson Architectural.

## COUNT II
### (BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

70. Harvey-Cleary incorporates the allegations in Paragraphs 1-65 by reference.

71. Harvey-Cleary and Tysons Corner entered into the Contract, which is a valid and

16

enforceable agreement between the parties.

72.     Under Virginia law, every contract contains an implied covenant of good faith and

fair dealing between the parties.

73.     Tysons Corner breached its implied covenant of good faith and fair dealing by,

*inter alia*,:

> (a) representing to Harvey-Cleary that it would compensate Harvey-
>     Cleary for its acceleration efforts and associated costs in response to
>     the required acceleration on the Project when Tysons Corner did not
>     intend to do so;
>
> (b) inducing Harvey-Cleary to commence and continue its acceleration
>     efforts on the Project when it did not intend to compensate Harvey-
>     Cleary for such efforts;
>
> (c) failing to compensate Harvey-Cleary for Tysons Corner-caused delays
>     and Harvey-Cleary's required acceleration efforts on the Project;
>
> (d) failing to release or reduce approximately $5,800,000 in retention due
>     to Harvey-Cleary's pursuit of its delay and acceleration costs in the
>     Claim; and
>
> (e) threatening Harvey-Cleary on multiple occasions with over $4,000,000
>     in damages in the form of alleged lost hotel revenues in response to
>     Harvey-Cleary's reasonable requests for compensation due to Tysons
>     Corner-caused delays and the associated required acceleration.

74.     As a result of Tysons Corner's material breaches of its implied covenant of good

faith and fair dealing, Harvey-Cleary and its subcontractors have been damaged in the amount of

at least $20,900,000.

## COUNT III
### (QUANTUM MERUIT – IN THE ALTERNATIVE)

75.     Harvey-Cleary incorporates the allegations in Paragraphs 1-5, 20-65 by reference.

76.     During the course of Harvey-Cleary's performance of work on the Project,

Harvey-Cleary performed services and provided labor and materials to the Project, including

17

base contract and change order work, and performed work on an accelerated and extended basis, all of which conferred a benefit upon Tysons Corner.

77.     Harvey-Cleary had a reasonable expectation of being paid for such services, labor and materials as base and changed contract work and for performing work on an accelerated and extended basis on the Project.

78.     At all relevant times, Tysons Corner was aware of, appreciated and had knowledge of the benefits conferred upon it by Harvey-Cleary. This benefit included overcoming significant Tysons Corner-caused delay to allow the hotel to open in April 2015.

79.     Tysons Corner's acceptance and retention of the services, labor, materials for base and changed contract work and Harvey-Cleary's extended performance and acceleration efforts make it inequitable for Tysons Corner to retain the benefit of such services, labor, materials and efforts.

80.     As a result of Tysons Corner's failure to pay Harvey-Cleary for the value of such services, labor, materials and efforts, Harvey-Cleary has suffered damages in the amount of at least $20,900,000.

## COUNT IV
### (ACTUAL FRAUD)

81.     Harvey-Cleary incorporates the allegations in Paragraphs 1-65 by reference.

82.     Tysons Corner made false and material representations to Harvey-Cleary regarding its intent to compensate Harvey-Cleary for Harvey-Cleary's acceleration efforts in response to Tysons Corner's August 2014 acceleration direction on the Project.

83.     Tysons Corner's representations were material and were made intentionally, knowingly and with the intent to mislead Harvey-Cleary to work to negotiate its costs for acceleration and to commence and continue its acceleration efforts on the Project.

18

Dated: June 2, 2016

Respectfully submitted,

DAVID E. HARVEY- BUILDERS, INC. D/B/A
HARVEY-CLEARY BUILDERS

By Counsel:

_____

Charlie C.H. Lee (VA Bar No. 30410)
Jason C. Constantine (VA Bar No. 68053)
MOORE & LEE, LLP
1751 Pinnacle Drive, Suite 1100
McLean, Virginia  22102
Telephone: (703) 506-2050
Facsimile: (703) 506-2051
Email:   c.lee@mooreandlee.com
         j.constantine@mooreandlee.com

VIRGINIA:

## IN THE CIRCUIT COURT FOR FAIRFAX COUNTY

|  |  |
|---|---|
| DAVID E. HARVEY BUILDERS, INC. d/b/a HARVEY-CLEARY BUILDERS, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No.: CL-2016-07826 ) |
| TYSONS CORNER HOTEL I LLC, | ) ) |
| Defendant. | ) ) ) |

## PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT

Pursuant to Virginia Supreme Court Rule 4:9, Plaintiff, David E. Harvey Builders, Inc. d/b/a Harvey-Cleary Builders ("Harvey-Cleary" or "Plaintiff"), by counsel, hereby requests that the Defendant, Tysons Corner Hotel I LLC ("Tysons Corner Hotel" or "Defendant"), serve written responses to the requests set forth below within twenty-eight (28) days of service of the Complaint. Harvey-Cleary further requests that the documents responsive to these requests be produced at the offices of its counsel, MOORE & LEE, LLP, 1751 Pinnacle Drive, Suite 1100, McLean, Virginia 22102, or at such other location as may be agreed upon. In responding to these requests, you shall be guided by the instructions and definitions set forth below.

### INSTRUCTIONS

1.      The requests which follow are to be regarded as continuing and, in accordance with Virginia Rule 4:1(e), you shall supplement your responses with such additional documents as you, or any other person acting on your behalf, may hereafter obtain which will augment the documents initially produced in response to the requests below.

2.      In producing the requested documents, furnish all documents which are available to you, your officers, directors, representatives, consultants, employees, agents or affiliates, including documents in the possession of your attorneys or investigators for your attorneys.

3.      Unless otherwise noted, the period of time covered by each Request herein is from January 1, 2012 to the present.

4.      The Requests set forth herein shall be construed so as to make your responses inclusive rather than exclusive.

5.      If any document called for by these requests is withheld because you claim that such document is privileged, identify as to each such document:

      a.      its date;

      b.      its author(s);

      c.      the business or position of its author(s);

      d.      its recipient(s);

      e.      the business or position of its recipient(s);

      f.      its number of pages;

      g.      its subject matter;

      h.      the basis of the claimed privilege; and

      i.      the number of the request to which the document is responsive.

6.      If you encounter any ambiguity in construing a Request, or a definition or instruction relevant to a Request, you shall make your best effort to interpret the Request, definition or instruction within the context of this litigation and shall set forth the matter deemed ambiguous and the construction or interpretation chosen or used in responding.

2

7.     To the extent you consider any Request to be objectionable, respond to that portion of the Request to which you have no objection and separately state the portion of the Request to which you lodge an objection, stating the specific grounds on which you object.

<u>**DEFINITIONS**</u>

1.     "Defendant", "Tysons Corner Hotel", "you" or "your" shall refer to Tysons Corner Hotel I LLC and its officers, directors, partners, co-venturers, members, employees, agents, attorneys, accountants, assigns, predecessors in interest, successors in interest, representatives, all former and present subsidiaries, divisions, affiliates, parent corporations or other related corporate entities, and any other person acting or purporting to act on its behalf.

2.     "Harvey-Cleary" or "Plaintiff" shall refer to David E. Harvey Builders, Inc. d/b/a Harvey-Cleary Builders, and its officers, directors, partners, co-venturers, members, employees, and agents.

3.     "Complaint" shall refer to the Complaint filed by Harvey-Cleary against Tysons Corner Hotel on June 2, 2016.

4.     "Hotel Project" shall refer to the construction of a 17-story hotel in McLean, Virginia, and which is the subject of the Contract.

5.     "Contract" shall refer to the contract entered into by Harvey-Cleary and Tysons Corner Hotel on or about February 27, 2013 regarding Harvey-Cleary's services as the general contractor for the construction of the Hotel Project.

6.     "Delay/Acceleration Claim" shall refer to Harvey-Cleary's claim for additional compensation arising out of Tysons Corner Hotel's delay and/or acceleration directions on the Hotel Project that was submitted in November 2014, supplemented in January 2015 and finalized in November 2015.

3

7.     "RTKL" shall refer to RTKL Associates, Inc., and its officers, directors, partners, co-venturers, members, employees, representatives, and agents.

8.     "Woodbine" shall refer to Woodbine Development Corporation, and its officers, directors, partners, co-venturers, members, employees, representatives, and agents.

9.     "Alaska Permanent" shall refer to the Alaska Permanent Fund Corporation, and its officers, directors, partners, co-venturers, members, employees, representatives, and agents.

10.     "Macerich" shall refer to the Macerich Company, and its officers, directors, partners, co-venturers, members, employees, representatives, and agents.

11.     The term "document(s)" shall include any document in the possession, custody or control of you and/or your employees, agents, attorneys, accountants, representatives, and any other person acting or purporting to act on your behalf. The term "document(s)" is used in its customary and broad sense to include, without limitation, any graphic or written matter, however produced or reproduced, of any kind or description, and also includes electronically stored information ("ESI") and any written, printed, typed, photocopied, photographed, recorded (including but not limited to magnetic, mechanical, or electronic recordings), or otherwise reproduced communication or representation. By way of illustration, the term "document(s)" includes, but is not limited to, the following: writings, files, electronic-mail ("e-mail"), contracts, agreements, notes and notations, memoranda, telegrams, reports, records, schedules, daily reports, daily summaries, correspondence, communications, telex messages, cables, transcripts, text messages, notes and minutes of telephone or other conversations, letters of any kind, drafts, tweets, interdepartmental and intra-departmental and other office communications, diaries, invoices, purchase orders, billing reports, requisitions, minutes of meetings, appraisals, manuals, standard and nonstandard forms, written statements or reports either signed or unsigned,

recorded or taped interviews or statements, audio tapes, video tapes, sound recordings, maps, photographs, plats, deeds, moving or still pictures, diagrams, plans, drawings, specifications, measurements or other descriptions, advertising or marketing materials or brochures, purchase orders, computer tapes or printouts, electronic models and all other records kept by electronic, photographic or mechanical means, and papers and things similar to any of the foregoing. This definition includes all documents for which privilege is claimed. If copies, reproductions or facsimiles of a document are not identical by reason of handwritten notations, initials, identification marks or other modification, each such non-identical copy is a separate "document" within the meaning of this definition.

12.    "Communication" means any transfer or exchange between two or more persons of any information whether by written or oral means, including but not limited to letters, memoranda, personal conversations, correspondence, telephone calls, e-mail or computer messages and telegrams. This definition includes all communications for which Tysons Corner Hotel claims privilege.

13.    The term "each" includes the word "every" and "every" includes the word "each." "Any" includes the word "all" and "all" includes the word "any." "And" includes the word "or" and "or" includes the word "and."

14.    Terms in the plural include the singular, and terms in the singular include the plural.

15.    The term "include" or "including" means including but not limited to.

16.    The terms "refer," "relate" or "regarding" means constituting, analyzing, describing, discussing, reporting or commenting on, inquiring about, setting forth, explaining, considering, referring to, relating to, pertaining to, mentioning, or alluding to, in whole or in part.

5

17.   The term "concerning" includes referring to, relating to, embodying, connected with, commenting on, responding to, showing, describing, analyzing, reflecting or constituting.

18.   Terms referring to a gender include all genders.

19.   "Person" shall mean any individual, corporation, partnership, proprietorship, joint venture or other legal entity, as well as any and all officers, directors, agents, servants, employees, legal representatives, experts and consultants of the entity, however denominated.

20.   "Date" means the exact day, month and year if ascertainable; if not, the closest approximation that can be made thereto.

21.   "Describe" means to set forth in detail all known facts and circumstances related to the subject of the Request, including, without limitation, (1) the date, time and place of any oral or written statement, conversation, report, study or meeting; (2) the identity of the participants; and (3) the substance and purpose of the events or communications so described.

22.   "Identify" or "State the identity of" means:

   a.   When referring to a document, to state the type of document (*e.g.*, letter, memorandum, etc.), the date of the document, the present location and custodian of the original and every draft or copy thereof, the author, the sender, the addressee, and every recipient of such document or a copy thereof.

   b.   When referring to a meeting, communication, whether written or oral, or act, to state the substance thereof, the person or persons involved, the date, the location and the circumstances of such meeting, communication or act, and documents referring or relating thereto.

   c.   When referring to an individual, to state his or her full name and present or last

6

known work address (or residence address if a work address is unavailable) and present and/or past relationship to you.

d. When referring to a corporation, to state the corporation's full name, state of incorporation, and address of its principal place of business.

e. When referring to a department, agency, office, or other subpart of the Government, to state the full name of the subpart and its location or address.

f. When referring to a person other than an individual or corporation (*e.g.*, a partnership, department, agency, or office), to state the full name and address of all persons constituting or related to the entity in question.

<u>REQUESTS</u>

Please produce the following documents:

1. All documents constituting, referring or relating to the Contract, including, without limitation, all documents evidencing, reflecting or relating to any negotiations between Tysons Corner Hotel and Harvey-Cleary, and any amendments, modifications or changes to the Contract.

2. All documents evidencing, reflecting or relating to Tysons Corner Hotel's decision to enter into the Contract with Harvey-Cleary, including, without limitation, any correspondence, meeting minutes, notes or internal memoranda regarding any pre-Contract meetings or deliberations.

3. All documents evidencing, reflecting or relating to the financing or the anticipated financing for the construction of the Hotel Project.

4.      All documents evidencing, reflecting or relating to the estimated or anticipated cost of construction of the Hotel Project and/or the actual cost of construction of the Hotel Project.

5.      All documents evidencing, reflecting or relating to any financial analysis regarding or relating to the Hotel Project, including the decision to ultimately construct the Hotel Project and any assessments or evaluations of the anticipated profitability of the Hotel Project.

6.      All documents evidencing, reflecting or relating to any agreement entered into by Tysons Corner Hotel with any consultant on the Hotel Project, including but not limited to Woodbine and RTKL.

7.      All documents evidencing, reflecting or relating to any communications by or between Tysons Corner Hotel and Harvey-Cleary regarding the Hotel Project and/or the Contract.

8.      All documents evidencing, reflecting or relating to any communications by or between Tysons Corner Hotel and Woodbine regarding the Hotel Project and/or the Contract.

9.      All documents evidencing, reflecting or relating to any communications by or between Tysons Corner Hotel and RTKL regarding the Hotel Project and/or the Contract.

10.     All documents evidencing, reflecting or relating to any communications by or between Tysons Corner Hotel and Macerich regarding the Hotel Project and/or the Contract.

11.     All documents evidencing, reflecting or relating to any communications by or between Tysons Corner Hotel and the Alaska Permanent regarding the Hotel Project and/or the Contract.

12.    All documents evidencing, reflecting or relating to any communications by or between any of the individual members of Tysons Corner Hotel regarding the Hotel Project, the Complaint and/or the Contract.

13.    All documents comprising agreements for the formation of Tysons Corner Hotel, including, but not limited to, any and all formation documents, operating agreements, and management agreements, and any amendments thereto.

14.    All documents evidence, reflecting or relating to any communications by or between Tysons Corner Hotel and any other third party regarding the Contract and/or the Hotel Project.

15.    All logs, notebooks, diaries, daytimers, field notes, field reports, phone notes, calendars or the like maintained by any person employed by or associated with Tysons Corner Hotel that relate or refer in any way to the Hotel Project and/or the Contract.

16.    All reports, analyses, evaluations, updates, and/or assessments issued by Tysons Corner Hotel or Woodbine related to the Contract, the Hotel Project or Harvey-Cleary's work on the Hotel Project.

17.    All documents evidencing, reflecting or relating to the progress of the work on the Hotel Project, including, without limitation, progress reports, weekly reports, daily reports, meeting minutes, meeting notes, inspection reports, test reports, site visit reports, off-site reports and other reports of work performed or to be performed.

18.    All schedules or analyses evidencing, reflecting or relating to the timeliness of any work performed on or for the Hotel Project, or the time when work was performed or was scheduled to be performed (whether or not proposed or actual) including, but not limited to, as-

planned schedules, schedule updates, as-built schedules, delay analyses or evaluations, all of which schedules should be produced in their original electronic format.

19.    All documents evidencing, reflecting or relating to any delays to the Hotel Project schedule Tysons Corner Hotel contends were caused by Harvey-Cleary or any Harvey-Cleary subcontractors on the Hotel Project.

20.    All documents related to Harvey-Cleary's acceleration of its performance of work on the Hotel Project, including, but not limited to, any and all internal memos or meeting minutes, revised schedules, directions, communications, notices or other documents regarding the potential or actual impact of the acceleration efforts and/or the potential or actual cost of Harvey-Cleary's acceleration efforts.

21.    All documents evidencing, referring or relating the Harvey-Cleary's Delay/Acceleration Claim, including, without limitation, Tysons Corner Hotel's and/or Woodbine's analysis or investigation of Harvey-Cleary's Delay/Acceleration Claim.

22.    All documents evidencing, reflecting or relating to internal Tysons Corner Hotel meetings or discussions, or meetings or discussions between Tysons Corner Hotel and Harvey-Cleary or any third-party, regarding estimates, costs, schedules, progress of work, changes in the work and/or delays on the Hotel Project.

23.    All documents evidencing, reflecting or relating to any change, modification or adjustment to the scope of work or schedule under the Contract, including, without limitation, any investigation or analysis of any change, modification or adjustment to the scope of work or schedule claimed by Harvey-Cleary or its subcontractors, whether or not such change, modification or adjustment was actually made or was actually agreed to.

24.     All documents related to Proposed Changes ("PCs"), Change Orders,

Construction Change Directives ("CCDs") and/or claims for additional compensation or time

submitted by Harvey-Cleary in relation to the Contract and/or the Hotel Project, including any

and all documents and communications discussing, analyzing, and/or evaluating PCs, Change

Orders, CCDs and/or claims for additional compensation or time.

25.     All documents evidencing, reflecting or relating to requests for payment by

Woodbine and RTKL for services performed on the Hotel Project and any payments made by

Tysons Corner Hotel to Woodbine and RTKL.

26.     All documents evidencing, reflecting or relating to Harvey-Cleary's applications

for payment on the Hotel Project or Tysons Corner Hotel's payments to Harvey-Cleary on the

Hotel Project.

27.     All documents evidencing, reflecting or relating to any Tysons Corner Hotel

backcharges against Harvey-Cleary and any decision by Tysons Corner Hotel to withhold

monies from Harvey-Cleary under the Contract and the rationale for any such backcharge or

withholding.

28.     All documents evidencing, reflecting or relating to Tysons Corner Hotel's efforts

to obtain funding in order to compensate Harvey-Cleary for Harvey-Cleary's Delay/Acceleration

Claim on the Hotel Project or any of Harvey-Cleary's outstanding PCs, Tysons Corner Hotel's

CCDs or Harvey-Cleary's other claims for additional compensation on the Hotel Project.

29.     Any and all insurance policies held by Tysons Corner Hotel related to the Hotel

Project.

30.     All documents related to the water event that occurred on around January 31,

2015 at the Hotel Project, including, but not limited to, all communications, meeting minutes,

reports or analyses regarding the event, the damage incurred as a result of the event, the remediation of the water damage associated with the event and the costs associated with the event.

31.    All documents or communications constituting, referring or relating to any claim or submission by Tysons Corner Hotel to its insurance carrier related to the water event that occurred on or around January 31, 2015 at the Hotel Project and any response, analysis, report or investigation performed by Tysons Corner Hotel and/or its insurance carrier regarding this event.

32.    All documents related to the water event that occurred on around February 13, 2015 at the Hotel Project, including, but not limited to, all communications, meeting minutes, reports or analyses regarding the event, the damage incurred as a result of the event, the remediation of the water damage associated with the event and the costs associated with the event.

33.    All documents or communications constituting, referring or relating to any claim or submission by Tysons Corner Hotel to its insurance carrier related to the water event that occurred on or around February 13, 2015 at the Hotel Project and any response, analysis, report or investigation performed by Tysons Corner Hotel and/or its insurance carrier regarding this event.

34.    All documents evidencing, reflecting or relating to reports, correspondence, meeting minutes or memoranda to or concerning the Alaska Permanent and regarding the Hotel Project and/or the Contract.

35.    All documents evidencing, reflecting or relating to Tysons Corner Hotel's budget for construction of the Hotel Project, funding for construction of the Hotel Project or funding for any changes or proposed changes on the Hotel Project.

36.    All documents relating to the nature, quality, scope or extent of Harvey-Cleary's performance of work on the Hotel Project, including, but not limited to, any reports regarding Harvey-Cleary's and/or Harvey-Cleary's subcontractor's work or performance.

37.    All documents relating to Woodbine's performance on the Hotel Project, including any deficiencies or problems with Woodbine's performance.

38.    All documents that evidence, reflect or relate to any deficiencies, or alleged deficiencies, in all or any part of RTKL's performance of services for the Hotel Project or RTKL's design, plans, or specifications for the Hotel Project.

39.    All documents related to the design of the demising walls for the guest rooms on the Hotel Project, including, but not limited to, all documents discussing, analyzing, and/or commenting on any deficiencies or required changes in the design of the demising wall on the Hotel Project.

40.    All documents related to the design of the fire alarm devices and sprinkler heads in the bulkhead of the guest rooms at the Hotel Project, including, but not limited to, all documents discussing, analyzing, and/or commenting on any deficiencies or required changes in the design of the fire alarm devices and sprinkler heads on the Hotel Project.

41.    All documents related to the design for the electrical outlets in the shafts in the unit bathrooms at the Hotel Project, including, but not limited to, all documents discussing, analyzing, and/or commenting on any deficiencies in the design of the electrical outlets on the Hotel Project.

42.    All documents related to the fire sprinkler permit for the Hotel Project, including, but not limited to, all documents related to the acquisition of the fire sprinkler permit and all

documents discussing, analyzing, and/or commenting on delays in the acquisition of the fire sprinkler permit.

43.     All documents related to hydro-testing required for the Hotel Project, including the timing of such testing and the results of such testing.

44.     All documents related to inspections by the Fairfax County Fire Marshal at the Hotel Project, including, but not limited to, all documents discussing, analyzing, and/or commenting on the timing of such inspections and any delays to the construction schedule for the Hotel Project associated with such inspections.

45.     Any and all documents, communications or meeting minutes by and between Tysons Corner Hotel, RTKL, Woodbine, Harvey-Cleary or any permitting authority regarding the submission of the design for the Hotel Project and the approval of the design for the Hotel Project.

46.     Any and all documents relating to permitting for the Hotel Project, including, without limitation, all permits issued for the Hotel Project, all applications for permits on the Hotel Project, and all communications by and between Tysons Corner Hotel, Woodbine, RTKL, Harvey-Cleary and/or any permitting authority related to the Hotel Project.

47.     All photographs or videos of all or any part of the Hotel Project, including, without limitation, all photographs or videos showing the progress of the work on the Hotel Project and any inspections of any aspect of the work on the Hotel Project.

48.     All documents that Tysons Corner Hotel intends to rely on or may rely on at trial, including, without limitation, any and all documents upon which Tysons Corner Hotel intends to rely on to attempt to defend against Harvey-Cleary's claims.

14

49.    Any and all documents relating to the allegations in the Complaint, Tysons Corner Hotel's response and defenses to such allegations, and any allegations contained in any counterclaims, cross-claims or third party claims for relief, if any, Tysons Corner Hotel asserts or intends to assert in this action.

50.    All documents relating to any alleged breach of the Contract and/or failure by Harvey-Cleary to perform its duties or obligations under the Contract.

51.    All documents relating to any costs, fees, expenses, and/or lost profits, revenues or income Tysons Corner Hotel claims to have incurred which Tysons Corner Hotel contends were or are the responsibility of Harvey-Cleary.

52.    Any and all documents consisting of, or relating to, any report or analysis regarding the Hotel Project by any expert, outside consultant and/or any other person.

53.    All documents referring or relating in any way to witnesses, potential witnesses or persons contacted in connection with this lawsuit, including, without limitation, all witness statements obtained by or on behalf of Tysons Corner Hotel that concern all or any part of the Hotel Project, the Contract or this lawsuit.

54.    All documents reflecting the qualifications, conclusions and opinions of any expert retained by Tysons Corner Hotel in connection with this action.

55.    All documents that you provided to, or obtained from, each person whom Tysons Corner Hotel intends to call to testify as an expert at trial, including, without limitation, articles, studies, evaluations, reports and correspondence.

56.    All organizational charts or other documents that identify employees, consultants, and agents of Tysons Corner Hotel assigned to, performing work for or with knowledge of the

Hotel Project, including their title/position and duties and/or responsibilities relating to the Hotel Project.

57.     All indices, logs or other documents that identify or refer to the volume, categories, types or locations of any files or documents maintained by Tysons Corner Hotel that relate in any way to the Hotel Project.

58.     To the extent not covered by the preceding Requests, any and all electronic documents, including, without limitation, e-mails referring or relating to the Hotel Project, the Contract, the Complaint, or the performance of Harvey-Cleary on the Hotel Project.

59.     All documents that you relied upon in formulating your answers to any interrogatories issued to you by Harvey-Cleary including, but not limited to, all documents that you referenced or identified in your answers to any interrogatories issued to you by Harvey-Cleary.

Respectfully submitted,

Dated: June 15, 2016

_____

Charlie C.H. Lee (VA Bar No. 30410)
Jason C. Constantine (VA Bar No. 68053)
MOORE & LEE, LLP
1751 Pinnacle Drive, Suite 1100
McLean, Virginia  22102
Telephone: (703) 506-2050
Facsimile: (703) 506-2051
Email: c.lee@mooreandlee.com
        j.constantine@mooreandlee.com
*Counsel for David E. Harvey Builders, Inc. d/b/a Harvey-Cleary Builders*

16

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of June, 2016, I caused a copy of the foregoing to be

served via private process server on:

      Tysons Corner Hotel I LLC
      c/o CT Corporation System
      4701 Cox Road, Suite 285
      Glen Allen, VA 23060

                  Jason C. Constantine

17

**VIRGINIA:**

### IN THE CIRCUIT COURT FOR FAIRFAX COUNTY

|  |  |
|---|---|
| **DAVID E. HARVEY BUILDERS, INC. d/b/a HARVEY-CLEARY BUILDERS,** | ) ) ) |
| **Plaintiff,** | ) ) ) |
| **v.** | ) ) **Case No.: CL-2016-07826** |
| **TYSONS CORNER HOTEL I LLC,** | ) ) ) |
| **Defendant.** | ) ) ) ) |

## PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT

Pursuant to Virginia Supreme Court Rule 4:8, Plaintiff, David E. Harvey Builders, Inc. d/b/a Harvey-Cleary Builders ("Harvey-Cleary" or "Plaintiff"), by counsel, hereby requests that the Defendant, Tysons Corner Hotel I LLC ("Tysons Corner Hotel" or "Defendant"), serve written responses, under oath, to the Interrogatories set forth below within twenty-eight (28) days of service of the Complaint.

### INSTRUCTIONS

1.    The interrogatories which follow are to be regarded as continuing and, in accordance with Rule 4:1(e), you shall supplement your responses with such additional information as you, or any other person acting on your behalf, shall obtain.

2.    If you refuse to provide any information called for by these Interrogatories because you claim that such information is privileged, please state the basis of the claimed privilege.

3.      If any requested information was contained in a document that no longer exists, is no longer within your possession, custody or control, or cannot be located, describe the contents of the document in as much detail as possible.

4.      If you encounter any ambiguity in construing an Interrogatory, or a definition or instruction relevant to an Interrogatory, please make your best effort to interpret the Interrogatory, definition or instruction within the context of this litigation and set forth the matter deemed ambiguous and the construction or interpretation chosen, or used in responding.

5.      To the extent you consider any Interrogatory to be objectionable, respond to that portion of the Interrogatory to which you have no objection and separately state the portion of the Interrogatory to which you lodge an objection, stating the specific grounds on which you object.

## DEFINITIONS

1.      "Defendant", "Tysons Corner Hotel", "you" or "your" shall refer to Tysons Corner Hotel I LLC and its officers, directors, partners, co-venturers, members, employees, agents, attorneys, accountants, assigns, predecessors in interest, successors in interest, representatives, all former and present subsidiaries, divisions, affiliates, parent corporations or other related corporate entities, and any other person acting or purporting to act on its behalf.

2.      "Harvey-Cleary" or "Plaintiff" shall refer to David E. Harvey Builders, Inc. d/b/a Harvey-Cleary Builders, and its officers, directors, partners, co-venturers, members, employees, and agents.

3.      "Complaint" shall refer to the Complaint filed by Harvey-Cleary against Tysons Corner Hotel on June 2, 2016.

2

4.   "Hotel Project" shall refer to the construction of a 17-story hotel in McLean, Virginia, and which is the subject of the Contract.

5.   "Contract" shall refer to the contract entered into by Harvey-Cleary and Tysons Corner Hotel on or about February 27, 2013 regarding Harvey-Cleary's services as the general contractor for the construction of the Hotel Project.

6.   "Delay/Acceleration Claim" shall refer to Harvey-Cleary's claim for additional compensation arising out of Tysons Corner Hotel's delay and/or acceleration directions on the Hotel Project that was submitted in November 2014, supplemented in January 2015 and finalized in November 2015.

7.   "RTKL" shall refer to RTKL Associates, Inc., and its officers, directors, partners, co-venturers, members, employees, representatives, and agents.

8.   "Woodbine" shall refer to Woodbine Development Corporation, and its officers, directors, partners, co-venturers, members, employees, representatives, and agents.

9.   "Alaska Permanent" shall refer to the Alaska Permanent Fund Corporation, and its officers, directors, partners, co-venturers, members, employees, representatives, and agents.

10.   "Macerich" shall refer to the Macerich Company, and its officers, directors, partners, co-venturers, members, employees, representatives, and agents.

11.   The term "document(s)" shall include any document in the possession, custody or control of you and/or your employees, agents, attorneys, accountants, representatives, and any other person acting or purporting to act on your behalf. The term "document(s)" is used in its customary and broad sense to include, without limitation, any graphic or written matter, however produced or reproduced, of any kind or description, and also includes electronically stored information ("ESI") and any written, printed, typed, photocopied, photographed, recorded

(including but not limited to magnetic, mechanical, or electronic recordings), or otherwise reproduced communication or representation. By way of illustration, the term "document(s)" includes, but is not limited to, the following: writings, files, electronic-mail ("e-mail"), contracts, agreements, notes and notations, memoranda, telegrams, reports, records, schedules, daily reports, daily summaries, correspondence, communications, telex messages, cables, transcripts, text messages, notes and minutes of telephone or other conversations, letters of any kind, drafts, tweets, interdepartmental and intra-departmental and other office communications, diaries, invoices, purchase orders, billing reports, requisitions, minutes of meetings, appraisals, manuals, standard and nonstandard forms, written statements or reports either signed or unsigned, recorded or taped interviews or statements, audio tapes, video tapes, sound recordings, maps, photographs, plats, deeds, moving or still pictures, diagrams, plans, drawings, specifications, measurements or other descriptions, advertising or marketing materials or brochures, purchase orders, computer tapes or printouts, electronic models and all other records kept by electronic, photographic or mechanical means, and papers and things similar to any of the foregoing. This definition includes all documents for which privilege is claimed. If copies, reproductions or facsimiles of a document are not identical by reason of handwritten notations, initials, identification marks or other modification, each such non-identical copy is a separate "document" within the meaning of this definition.

12.   "Communication" means any transfer or exchange between two or more persons of any information whether by written or oral means, including but not limited to letters, memoranda, personal conversations, correspondence, telephone calls, e-mail or computer messages and telegrams. This definition includes all communications for which Tysons Corner Hotel claims privilege.

4

13.    The term "each" includes the word "every" and "every" includes the word "each." "Any" includes the word "all" and "all" includes the word "any."  "And" includes the word "or" and "or" includes the word "and."

14.    Terms in the plural include the singular, and terms in the singular include the plural.

15.    The term "include" or "including" means including but not limited to.

16.    The terms "refer," "relate" or "regarding" means constituting, analyzing, describing, discussing, reporting or commenting on, inquiring about, setting forth, explaining, considering, referring to, relating to, pertaining to, mentioning, or alluding to, in whole or in part.

17.    The term "concerning" includes referring to, relating to, embodying, connected with, commenting on, responding to, showing, describing, analyzing, reflecting or constituting.

18.    Terms referring to a gender include all genders.

19.    "Person" shall mean any individual, corporation, partnership, proprietorship, joint venture or other legal entity, as well as any and all officers, directors, agents, servants, employees, legal representatives, experts and consultants of the entity, however denominated.

20.    "Date" means the exact day, month and year if ascertainable; if not, the closest approximation that can be made thereto.

21.    "Describe" means to set forth in detail all known facts and circumstances related to the subject of the interrogatory, including, without limitation, (1) the date, time and place of any oral or written statement, conversation, report, study or meeting; (2) the identity of the participants; and (3) the substance and purpose of the events or communications so described.

22.    "Identify" or "State the identity of" means:

    a.  When referring to a document, to state the type of document (*e.g.*, letter,

5

memorandum, etc.), the date of the document, the present location and custodian of the original and every draft or copy thereof, the author, the sender, the addressee, and every recipient of such document or a copy thereof.

b.  When referring to a meeting, communication, whether written or oral, or act, to state the substance thereof, the person or persons involved, the date, the location and the circumstances of such meeting, communication or act, and documents referring or relating thereto.

c.  When referring to an individual, to state his or her full name and present or last known work address (or residence address if a work address is unavailable) and present and/or past relationship to you.

d.  When referring to a corporation, to state the corporation's full name, state of incorporation, and address of its principal place of business.

e.  When referring to a department, agency, office, or other subpart of the Government, to state the full name of the subpart and its location or address.

f.  When referring to a person other than an individual or corporation (*e.g.*, a partnership, department, agency, or office), to state the full name and address of all persons constituting or related to the entity in question.

<u>**INTERROGATORIES**</u>

<u>**INTERROGATORY NO. 1:**</u>

Identify each person who participated in and/or provided information for the preparation of your answers to Harvey-Cleary's interrogatories. For each such identified person, state the

6

particular interrogatory answer in which that person participated and/or for which they provided information.

**ANSWER:**

**INTERROGATORY NO. 2:**

Identify all persons that you believe have knowledge and/or information relating to the allegations set forth in the Complaint and/or Tysons Corner Hotel's defenses thereto. For each such person whom you identify, state the specific matter, defense and/or claim about which they have knowledge and/or information.

**ANSWER:**

**INTERROGATORY NO. 3:**

Identify each person whom you expect to call as a witness at trial, state the subject matter on which the witness is expected to testify, state the substance of the facts and opinions to which the witness is expected to testify, and a summary of the grounds for each opinion.

**ANSWER:**

**INTERROGATORY NO. 4:**

Describe in detail any conversations, discussions or statements (oral, written, and/or recorded) by Harvey-Cleary, and/or any agent, servant or employee of Harvey-Cleary which you contend could be construed as, or admitted as a party admission and/or admission against interest. As to each such statement, state its substance, the place and date when the statement is

made, and identify the person making the statement, the person to whom it was made, and all documents concerning the statement.

**ANSWER:**

**INTERROGATORY NO. 5:**

Identify each member of Tysons Corner Hotel I LLC.  For each member identified, identify the member or members of that entity, if applicable.

**ANSWER:**

**INTERROGATORY NO. 6:**

Describe the authority of each member identified in response to Interrogatory No. 5 to bind Tysons Corner Hotel I LLC.

**ANSWER:**

**INTERROGATORY NO. 7:**

Identify each person that participated in fulfilling Tysons Corner Hotel's duties under the Contract and for each such person, identify his/her employer, the date range on which he/she participated, the specific role he/she played, his/her title, his/her duties and responsibilities, his/her education and experience, his/her employment history, and last known address, phone number, email address, and current employer.

**ANSWER:**

**INTERROGATORY NO. 8:**

If you contend that Harvey-Cleary or any of Harvey-Cleary's subcontractors, caused any delay or concurrent delay to the Hotel Project schedule, identify and describe in detail the specific cause of the delay, the duration of the delay, whether such delay impacted the critical path of the Hotel Project schedule and any notice, whether written or oral, Tysons Corner Hotel provided to Harvey-Cleary regarding any such delay.

**ANSWER:**


**INTERROGATORY NO. 9:**

State whether Tysons Corner Hotel ever performed a schedule analysis as to the cause of delays on the Hotel Project or potential concurrent delay on the Hotel Project, and, if so, state the results of that analysis and identify any and all documents evidencing, reflecting or relating to that analysis.

**ANSWER:**


**INTERROGATORY NO. 10:**

Describe in detail the factual basis for Tysons Corner Hotel's assertion in an October 7, 2014 letter issued on your behalf by Woodbine and that accompanied Construction Change Directive #51, that Harvey-Cleary was responsible for the need to accelerate its performance on the Hotel Project and that Harvey-Cleary was responsible for all costs associated with such acceleration efforts.

**ANSWER:**


9

**INTERROGATORY NO. 11:**

Describe in detail the factual basis for your denial of Harvey-Cleary's Delay/Acceleration Claim.

**ANSWER:**

**INTERROGATORY NO. 12:**

State the factual basis for every defense you have asserted or intend to assert in response to the Complaint in this action and identify all documents that you rely upon in support of each such defense.

**ANSWER:**

**INTERROGATORY NO. 13:**

If you contend that Harvey-Cleary breached the Contract, or in any way failed to perform its obligations with respect to the Contract, describe in detail each and every act or omission which you contend constitutes a breach, identify with specificity any and all terms or provisions of the Contract which you contend were breached, and identify all documents that support your contentions.

**ANSWER:**

**INTERROGATORY NO. 14:**

Set forth Tyson Corner Hotel's accounting of the Contract, including identifying, itemizing and describing: (i) the original Contract Sum; (ii) a summary of and the amounts of each and every agreed upon Change Order; (iii) a summary of and the amounts of each and every

10

pending Proposed Change ("PC"); (iv) a summary of and the amounts of each and every rejected PC; (v) the total Contract Sum; (vi) retainage being withheld by Tysons Corner Hotel; (vii) total payments made by Tysons Corner Hotel to Harvey-Cleary and dates paid; and (viii) any balance owed to Harvey-Cleary under the Contract.

<u>**ANSWER:**</u>

**INTERROGATORY NO. 15:**

To the extent that Tysons Corner Hotel alleges that it has been damaged by Harvey-Cleary, including any assertion that Harvey-Cleary was responsible for delay to the schedule for the Hotel Project or the delayed opening of the Hotel Project, describe in detail the damages incurred by Tysons Corner Hotel, including the amount of such damages, and describe the factual basis for your assertion that Harvey-Cleary is responsible for such damages.

<u>**ANSWER:**</u>

**INTERROGATORY NO. 16:**

If Tysons Corner Hotel has issued any backcharges to Harvey-Cleary under the Contract and/or withheld any monies under the Contract from Harvey-Cleary, identify and describe in detail the rationale for any such backcharge or withholding, the contractual justification for any such backcharge or withholding and any documents constituting notice of any such backcharge or withholding.

<u>**ANSWER:**</u>

**INTERROGATORY NO. 17:**

Describe in detail any assertion by Tysons Corner Hotel that RTKL failed to meet the applicable standard of care or its contractual obligations in performing its work on the Hotel Project and/or that there were any errors or omissions in RTKL's design for the Hotel Project.

**ANSWER:**

**INTERROGATORY NO. 18:**

Identify and describe in detail any claim or submission by Tysons Corner Hotel to its insurance carrier related to the water event that occurred on or around January 31, 2015 at the Hotel Project and any response, analysis, report or investigation performed by Tysons Corner Hotel and/or its insurance carrier regarding this event.

**ANSWER:**

**INTERROGATORY NO. 19:**

Identify and describe in detail any claim or submission by Tysons Corner Hotel to its insurance carrier related to the water event that occurred on or around February 13, 2015 at the Hotel Project and any response, analysis, report or investigation performed by Tysons Corner Hotel and/or its insurance carrier regarding this event.

**ANSWER:**

**INTERROGATORY NO. 20:**

Describe in detail any impacts or delays to the Hotel Project schedule that occurred as a result of required changes to the design of the demising walls on the Hotel Project to allow for

12

the electrical rough in, including the duration of such delay and the party responsible for such

delay.

**ANSWER:**


**INTERROGATORY NO. 21:**

Describe in detail any impacts or delays to the Hotel Project schedule that occurred as a

result of required changes to the locations of the fire alarms and fire sprinkler devices on the

guestroom bulkhead walls on the Hotel Project, including the duration of such delay and the

party responsible for such delay.

**ANSWER:**


**INTERROGATORY NO. 22:**

Describe in detail any impacts or delays to the Hotel Project schedule that occurred as a

result of required changes to the electrical boxes on the bathroom shaft walls of the Hotel

Project, including the duration of such delay and the party responsible for such delay.

**ANSWER:**


**INTERROGATORY NO. 23:**

Describe in detail any impacts or delays to the Hotel Project schedule that occurred as a

result of the delayed issuance of the sprinkler permit for Hotel Project, including the duration of

such delay and party responsible for such delay.

**ANSWER:**


13

**INTERROGATORY NO. 24:**

Identify and describe in detail Tysons Corner Hotel's and/or its consultants', including

Woodbine's, role in obtaining the Site Development Permit for the Hotel Project.

**ANSWER:**

Dated:  June 15, 2016                    Respectfully submitted,

Charlie C.H. Lee (VA Bar No. 30410)
Jason C. Constantine (VA Bar No. 68053)
MOORE & LEE, LLP
1751 Pinnacle Drive, Suite 1100
McLean, Virginia  22102
Telephone: (703) 506-2050
Facsimile: (703) 506-2051
Email:  c.lee@mooreandlee.com
          j.constantine@mooreandlee.com
*Counsel for David E. Harvey Builders, Inc. d/b/a*
*Harvey-Cleary Builders*

14

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of June, 2016, I caused a copy of the foregoing to be served via private process server on:

> Tysons Corner Hotel I LLC
> c/o CT Corporation System
> 4701 Cox Road, Suite 285
> Glen Allen, VA 23060

Jason C. Constantine

15

# STANDARD FORM OF CONSTRUCTION CONTRACT BETWEEN OWNER AND CONTRACTOR

## (COST PLUS FEE WITH GMP AMENDMENT)

### (Virginia)

by and between

**HARVEY-CLEARY BUILDERS**

(the "Contractor")

and

**TYSONS CORNER HOTEL, I LLC**

(the "Owner")

FOR:

**CONSTRUCTION OF HOTEL @ TYSONS CORNER CENTER**

**7901 TYSONS ONE PLACE
TYSONS CORNER, VA  22102**

Contract Code:  DEV:Tysons Hotel Bldg
Task Codes: See Exhibit "F" Schedule of Values

INITIALS ___ INITIALS ___
Edition: February, 2010/Rev.4.11

**Exhibit 1**

## STANDARD FORM OF CONSTRUCTION CONTRACT
## BETWEEN OWNER AND CONTRACTOR

### (COST PLUS FEE WITH GMP AMENDMENT)

### (Virginia)

◆

### PREAMBLE

THIS STANDARD FORM OF CONSTRUCTION CONTRACT BETWEEN OWNER AND CONTRACTOR is entered into on this 27th day of February, 2013 by and between Tysons Corner Hotel I LLC ("Owner") and Harvey-Cleary Builders ("Contractor").

### RECITALS

A.      WHEREAS, Owner is the legal owner of the property described more particularly in Exhibit "A" – "Property Description" attached hereto, which property and the improvements thereon are commonly known as the Tysons Corner Center shopping center located in Tysons Corner, Virginia.

B.      WHEREAS, Contractor is a Corporation duly organized under the laws of and in good standing in the State of Texas and has represented that it has the requisite background, knowledge, experience and expertise to fulfill the obligations of the Contractor that are contained in this Construction Contract and the other Contract Documents hereinafter described.

C.      WHEREAS, Owner and Contractor enter into this Construction Contract for the purpose of setting forth the terms of Owner's retention of Contractor to construct certain improvements to and for the Tysons Corner Center shopping center, which improvements generally consist of Construction of Hotel, pursuant to Drawings and Specifications prepared, or to be prepared, by or under the supervision of RTKL Associates, Inc. ("Architect").

### TERMS AND CONDITIONS

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein and other valuable consideration receipt of which is hereby acknowledged, it is mutually agreed by and between the undersigned as follows:

### ARTICLE 1
### GENERAL PROVISIONS

**1.1     DEFINITIONS AND RECITALS**

Capitalized terms used in the Construction Contract or the General Conditions shall have the meanings assigned to them in Article 1 of Exhibit "B" – "General Conditions" attached hereto, or, if not there defined, firstly, as defined elsewhere in the Contract Documents, or, secondly, as reasonably appears to have been intended given the context in which such terms are used in the Contract Documents. The provisions

INITIALS _____ INITIALS _____
Edition: February, 2010/Rev.4.11

of the Preamble and Recitals set forth above are incorporated by this reference as part of this Construction Contract.

**1.2     STANDARD OF PERFORMANCE**

Without intending to limit, lower or reduce Contractor's express and implied obligations under the Contract Documents, it is agreed that with respect to all of Contractor's express and implied obligations under the Contract Documents, such obligations shall be performed at all times in such a manner so as to, at a minimum, conform to the following general standards of performance that require Contractor to:

    **1.2.1**    comply with the requirements of the Contract Documents;

    **1.2.2**    comply with Applicable Laws;

    **1.2.3**    conform to the standard of care applicable to those who provide construction for projects of a scope and, complexity, and in a location, that are comparable to the scope, complexity and location of the Project;

    **1.2.4**    act in a manner consistent with a duty of utmost trust and loyalty to Owner, including, without limitation, making full and open disclosure of matters pertinent to Owner's exercise and receipt of the benefit of its rights under the Contract Documents, such as, without limitation, disclosing as part of Contractor's pricing quotations for Changes and any request by Contractor for payment all information known to Contractor that is pertinent to the Owner's determination of the appropriateness of amounts so quoted or requested;

    **1.2.5**    furnish efficient business administration of the Work, utilizing sufficient senior level management and other qualified personnel to manage the Work; and

    **1.2.6**    . apply its best and highest skill and attention to completing the Work in an expeditious and economical manner, consistent with the expressed best interests of the Owner and within the limitations of the Contract Price, General Conditions Costs Maximum and Contract Time.

**1.3     CONTRACTOR'S KEY PERSONNEL**

    **1.3.1     Agent With Binding Authority.** Contractor hereby designates .Kevin Rogge as Contractor's agent with full authority to act on behalf of Contractor, including, without limitation, the express authority to contractually bind Contractor with respect to any matters involving Contract Adjustments.

    **1.3.2     Agent for Authorized Communications.** Contractor hereby designates Kevin Rogge as Contractor's agent principally responsible for coordinating, scheduling and supervising the Work and authorized to communicate with Owner with respect to all matters pertaining to the Project.

    **1.3.3     Other Key Personnel.** Contractor shall provide management of the Work utilizing the Key Persons identified in Paragraph 1.3.1, above, and Paragraph 1.3.2, above, and the other Key Personnel listed in Exhibit "C" – "Key Personnel List" attached hereto.

    **1.3.4     Transfer, Replacement.** No Key Person shall, for so long as he/she is employed by Contractor, be transferred to any other project nor shall any of his/her responsibilities be reassigned at any time during performance of the Work without the written approval of Owner, which approval may be granted or withheld in Owner's sole and absolute discretion. Any Key Person shall, without Owner assuming any risk or responsibility therefor, be replaced if Owner determines in good faith that he/she

INITIALS ᒲ INITIALS WᗺM
Edition: February, 2010/Rev.4.11

has failed to perform to Owner's reasonable expectations. Any individual designated by Contractor as a replacement to a Key Person shall require the prior written approval of Owner, which approval will not be unreasonably withheld, delayed or conditioned.

### 1.4    OWNER'S AGENT

This Construction Contract may be executed by an entity, separate from Owner, acting as Owner's Agent for Owner. If so executed, such execution by Owner's Agent shall have the same legal and binding effect as if this Construction Contract were executed by Owner. Owner's Agent shall be deemed to have full authority to act on behalf of Owner with respect to all matters relating to this Construction Contract and its performance, including, without limitation, contractually binding Owner to amendments and modifications of the Contract Documents, authorizing Changes, and issuing approvals and consents on behalf of Owner.

### 1.5    OWNER'S REPRESENTATIVES

The individuals authorized to act as Owner's Representative are Mark McEwen, Robert R. Jones and Don Foster.   They are the sole individuals with authority on behalf of Owner and Owner's Agent (if any) to contractually bind Owner with respect to matters pertaining to the Project, including, without limitation, Contract Adjustments. An individual authorized to act as an Owner's Representative is authorized to act individually, without the concurrence of any other such individuals. Upon written notice to Contractor, Owner may, in its sole and absolute discretion, substitute another person, or add persons, to act as Owner's Representative.

### 1.6    CONSTRUCTION MANAGER

The Construction Manager is Woodbine Development Corp. The Construction Manager's authority is limited to that authority provided for by the Contract Documents. Notwithstanding any statement in the Contract Documents to the contrary, the Construction Manager does not have the authority to contractually bind Owner, which authority is reserved exclusively to Owner's Representative as provided in Section 1.5, above. The Construction Manager may, upon written notice to Contractor, be replaced by Owner with another individual or firm, which may be either an employee of Owner or an independent contractor. If there is at any time no Construction Manager for the Project, then the references to Construction Manager in the Contract Documents shall mean the Owner's Representative or such other person(s) as Owner's Representative may designate in writing.

### ARTICLE 2
### COMPENSATION

### 2.1    CONTRACT PRICE

Contractor agrees to accept, as its sole, exclusive and total compensation for the complete and satisfactory performance of its obligations under the Contract Documents, reimbursement of the Costs of Work and payment of the Contractor Fee; provided however, and without limitation to any other provisions of the Contract Documents limiting Contractor's right to compensation, reimbursement or payment for specific categories of costs or expenses, that:

> 2.1.1    the total sum of General Conditions Costs listed in Exhibit "K" - "General Conditions Costs" attached hereto that is reimbursable to Contractor shall not exceed the General Conditions Costs Maximum to be hereafter mutually agreed to in the GMP Amendment, as adjusted in the manner permitted by Section 3.5, below; and

INITIALS \_\_\_\_\_ INITIALS \_\_\_\_\_
Edition: February, 2010/Rev.4.11

2.1.2   subject to any qualifications or exclusions set forth in the GMP Amendment or its exhibits, the total compensation to Contractor, inclusive of all Costs of Work and the Contractor Fee, shall not exceed the Guaranteed Maximum Price (hereinafter, also referred to as the "Contract Price") to be hereafter mutually agreed to in the GMP Amendment, as adjusted in the manner permitted by Section 2.2, below.

## 2.2   CONTRACT ADJUSTMENTS

There shall be no Contract Adjustments to the Contract Price except as authorized, without duplication, by Prime Contract Change Order or Provisional Prime Contract Change Order for Compensable Change, Compensable Delay, or Deleted Work.   There shall be no Contract Adjustments to the General Conditions Costs Maximum except as authorized, without duplication, by Prime Contract Change Order or Provisional Prime Contract Change Order for Compensable Change, Compensable Delay, or Deleted Work; provided, however, that in the case of a Contract Adjustment related to an extension of the Contract Time or acceleration to overcome the effects of Delay the Contract Adjustment shall be limited to that which is permitted by Section 3.6, below.

## 2.3   CONTINGENCY

2.3.1   Contingency Amount. The Contract Price set forth in the GMP Amendment shall, when the GMP Amendment is executed by Owner and Contractor, include a sum for Contingency expressed as a fixed dollar amount, typically, but not necessarily, derived by multiplying a mutually agreed percentage times the sum of the estimated Costs of Work set forth in the Schedule of Values attached to the GMP Amendment.

2.3.2   Use of Contingency. Subject to the other provisions of this Section 2.3, Contractor shall have the right to receive payments from the agreed Contingency to defray unforeseen Costs of Work incurred and paid in performing the Work for which Contractor is not entitled to a Contract Adjustment; provided, however, that if Contractor is permitted to be reimbursed under Article 5, below for gross receipts taxes or other fees payable to a Governmental Authority based on Contractor's income, billings or other business generation, such taxes and fees shall not be payable from Contingency.

2.3.3 - Owner Approval. Except in the case of emergency involving safety, Contractor shall not incur, or otherwise commit to any third party to incur, any Costs of Work to be paid from Contingency until it has obtained Owner's approval, which approval may be granted or denied in the sole, but reasonable, discretion of Owner. At the time of requesting such approval, Contractor shall submit to Owner complete documentation, including, without limitation, any change order requests from Subcontractors, substantiating the reasons for and the proposed amounts of each proposed expenditure of Contingency. If additional documentation is deemed by Owner, in the exercise of its sole discretion, to be required to substantiate a proposed expenditure of Costs of Work from Contingency, it shall be promptly submitted by Contractor to Owner before Contractor proceeds to incur, or otherwise commits to any third party to incur, same.

2.3.4   Contract Adjustments.   Except as provided in Subparagraph 2.4.2.1, below,   the amount of Contingency as mutually agreed in the GMP Amendment shall not be increased for any reason, including, without limitation, on account of Contract Adjustments.

2.3.5   Buy Out. Save and except as permitted by Paragraph 2.4.2, below, Contingency shall not be increased or otherwise adjusted as a result of Buy Out Savings.

2.3.6   GMP Savings.   Any portion of Contingency that remains unexpended upon Final Completion shall be deemed part of GMP Savings.

INITIALS⎽⎽⎽INITIALS⎽⎽⎽
Edition: February, 2010/Rev.4.11

## 2.4    BUY OUT

**2.4.1    Buy Out Losses.** Buy Out Savings that occur in the course of the Buy Out of the trade work line items in the Schedule of Values and that are properly transferred to and accounted in the Buy Out Account in accordance with Section 9.4, below, may be used, with prior written approval of Owner, to offset Buy Out Losses that have been similarly and properly accounted for in the Buy Out Account. Subject to the terms and conditions of Section 2.3, above, Contingency may be used to defray the costs of any Buy Out Loss that may exist at the conclusion of the Buy Out of all of the trade work line items that are set forth in the Schedule of Values (exclusive of Work involved in Contract Adjustments arising from Compensable Changes, Deleted Work, Compensable Delay or relating to Allowances). In all other circumstances, Buy Out Losses shall be borne by Contractor at Contractor's Own Expense.

**2.4.2    Buy Out Savings.** Buy Out Savings that occur in the course of the Buy Out of the trade work line items in the Schedule of Values shall be properly transferred to and accounted in the Buy Out Account in accordance with Section 9.4, below. If, at the conclusion of the Buy Out of all of the trade work line items set forth in the Schedule of Values (exclusive of Work involved in Contract Adjustments arising from Compensable Changes, Deleted Work, Compensable Delay or relating to Allowances), there are Buy Out Savings, then the Owner may elect, in its sole and absolute discretion, to do any of the following:

.1    add all of the Buy Out Savings to the Contingency so as to increase the amount of such Contingency available to Contractor for its use in accordance with the terms and conditions of Section 2.3, above;

.2    recapture all of the Buy Out Savings and a proportionate amount of Contractor Fee by Contract Adjustment to the Contract Price, which Contractor Fee amount shall be calculated by multiplying (1) the amount of the Buy Out Savings to be recaptured times (2) whichever of the following is applicable: (a) if the Contractor Fee stated in Article 8, below, is an agreed percentage, the percentage so agreed and stated, or (b) if the Contractor Fee is a fixed amount, the percentage for Allowable Markup that Contractor is permitted to charge pursuant to Article 7 of the General Conditions for Compensable Changes involving Self-Performed Work; or,

.3    add a portion of the Buy Out Savings to Contingency in accordance with Subparagraph 2.4.2.1, above, and recapture in accordance with Subparagraph 2.4.2.2, above, the balance of the Buy Out Savings and the amount of Contractor Fee proportionate to such balance.

**2.4.3    Buy Out Account.** In accordance with Section 9.4, below, Contractor shall include and update monthly in its Schedule of Values submitted with its Applications for Payment a Buy Out Account reflecting the on-going status of the Buy Out, Buy Out Losses and Buy Out Savings.

## 2.5    GMP SAVINGS

If there exist GMP Savings at the time all amounts comprising Final Payment, including amounts for which a withholding is permitted by the Contract Documents, are due and owing by the Owner, then such GMP Savings shall fully accrue to and be retained by Owner. Contractor shall have no interest therein or right thereto.

## 2.6    CONTRACTOR REPRESENTATIONS AND WARRANTIES

Contractor's execution of the GMP Amendment shall constitute a making by the Contractor of the following warranties and representations in respect to the Contract Price and General Conditions Costs Maximum, each of which shall be deemed a material inducement and consideration for Owner's entering into the GMP Amendment:

Page 6 of 46

INITIALS ___ / INITIALS ___
Edition: February, 2010/Rev.4.11

2.6.1   unless expressly stated otherwise elsewhere in the Contract Documents, the Contract Price includes all costs of Contractor and its Subcontractors for construction necessary to achieve Final Completion and Close-Out Completion of the Work;

2.6.2   unless expressly stated otherwise elsewhere in the Contract Documents, the Contract Price and General Conditions Costs Maximum include all overhead and general and administrative expenses, including, without limitation, both on-Site and off-Site direct job expenses and home office overhead necessary to achieve Final Completion and Close-Out Completion of the Work;

2.6.3   unless expressly stated otherwise elsewhere in the Contract Documents, the Contract Price includes all fees and assessments for permits (other than permits that are the express responsibility of Owner under the Contract Documents), licenses, inspections and fees of testing laboratories required for Final Completion and Close-Out Completion of the Work; and

2.6.4   unless expressly stated otherwise elsewhere in the Contract Documents, including, without limitation, Contractor's express rights under the Contract Documents to Contract Adjustments, Contractor assumes the risk of any additional costs and additional time needed to complete the Work that may result from or be associated with unforeseen difficulties encountered by Contractor in executing the Work, including, without limitation: (1) limited access to Work areas on the Site; (2) Delays in performance or completion of the Work; (3) unforeseen conditions at the Site or in Existing Improvements; and (4) unforeseen escalations in the costs or prices of materials, equipment, labor, services or other costs associated with performance of the Work.

### ARTICLE 3
### CONTRACT TIME

**3.1   TIME OF ESSENCE**

Time is of the essence with respect to all time limits set forth in the Contract Documents that govern the Contractor's performance of its obligations under the Contract Documents.

**3.2   COMMENCEMENT**

Contractor shall commence Preconstruction Services upon execution by Owner and Contractor of this Construction Contract. Contractor shall commence all other Work in accordance with the requirements of a written Notice to Proceed issued by Owner.  No such other Work (including, without limitation, temporary facilities or mobilization) shall commence prior to receipt by Contractor of a Notice to Proceed.

**3.3   CONTRACT TIME**

3.3.1   **Tenant-Ready Completion.** Contractor shall achieve Tenant-Ready Completion no later than the N/A (N/A) Day prior to the expiration of the Contract Time for Substantial Completion.

3.3.2   **Substantial Completion.** Contractor shall achieve Substantial Completion of the Work within the Contract Time to be hereafter mutually agreed to in the GMP Amendment, which period of time, if expressed as a number of Days, shall be measured from the Date of Commencement.

3.3.3   **Final Completion.** Contractor shall achieve Final Completion of the Work within Sixty (60) Days from and after the occurrence of Substantial Completion.

3.3.4   **Close-Out Completion.** Contractor shall achieve Close-Out Completion of the Work within fifteen (15) Days from and after the occurrence of Final Completion.

INITIALS _____ INITIALS _____
Edition: February, 2010/Rev.4.11

**3.3.5    Key Milestones.** Contractor shall achieve each Key Milestone identified in Exhibit "D" - "Preliminary Project Schedule" attached hereto on or before the date that is derived by adding to the Date of Commencement the number of Days shown in the Preliminary Project Schedule as the interval between the dates for commencement of the Work and achievement of the Key Milestone.

**3.3.6    Preliminary Project Schedule.** In the event of a conflict between the time periods or dates set forth in Exhibit "D" - "Preliminary Project Schedule" attached hereto and the time periods set forth in Paragraphs 3.3.1 through 3.3.4, above, the latter shall control.

## 3.4    ADJUSTMENTS OF CONTRACT TIME

The Contract Time shall not be adjusted except by Prime Contract Change Order or Provisional Prime Contract Change Order for extensions of time that are permitted by the General Conditions due to Excusable Delay or Compensable Delay.

## 3.5    CONTRACTOR'S COMPENSATION FOR DELAY

**3.5.1    Sole Remedy.** Contractor agrees that its sole right and remedy for Contract Adjustment to the Contract Price and General Conditions Costs Maximum for any Delay, of any kind, due to any cause and of any duration, whether foreseeable or unforeseeable and whether occurring singularly or in combination with other Delays, shall be the Contractor's right to a Contract Adjustment for Compensable Delay provided for under Paragraph 3.5.2, below.

**3.5.2    Compensable Delay.** In the event Contractor or any Subcontractor, of any Tier, experiences a Delay for which Contractor is entitled under the terms of the General Conditions to a Contract Adjustment of the Contract Time for Substantial Completion due to Compensable Delay, then the Contract Price and General Conditions Costs Maximum shall be adjusted by Contract Adjustment according to either, but not both, of the following, as applicable:

.1       **Extension Granted.**

(1)      **Contract Adjustment.** The Contract Adjustment to the Contract Price and General Conditions Costs Maximum shall be limited to reimbursement of the reasonable and necessary additional General Conditions Costs incurred and paid by Contractor as wages for additional supervision at the Site required during the period of time of the extension by the persons employed by Contractor at the levels of superintendent and project manager, with no amount added or included in such Contract Adjustment for Contractor Fee.

(2)      **Maximum Wage Rates.** The reimbursement permitted by this Subparagraph 3.5.2.1 shall include and be limited to the actual costs incurred and paid by Contractor for wages, salaries and burden to employ such persons during the period of such extension of the Contract Time that are reimbursable pursuant to Section 5.1, below, not to exceed the maximum rates set forth in Exhibit "J" – "Maximum Labor/Salary Rates" as adjusted pursuant to Paragraph 5.1.6, below, for increases occurring during the original Contract Time for Substantial Completion.

(3)      **Discretionary Rate Adjustments.** If the Contract Adjustments to the Contract Time in the aggregate result in the Contract Time for Substantial Completion being extended beyond the next annual anniversary of the GMP Effective Date occurring after expiration of such original Contract Time for Substantial Completion, then the maximum rates set forth in Exhibit "J" – "Maximum Labor/Salary Rates" shall be subject to further adjustment for any further increases in Contractor's actual costs for base wages, salaries and burden of such persons that are incurred and paid by Contractor during each 12-month period following each annual anniversary of the GMP Effective Date that occurs

INITIALS ___  INITIALS ___
Edition: February, 2010/Rev.4.11

during the period of time of such extension, not to exceed for any such person an amount (including a zero amount, if Owner so judges appropriate) that Owner judges, in its sole and absolute discretion, to be appropriate taking into consideration the Owner's relative level of satisfaction or dissatisfaction with such person's level of past performance on the Project.

.2     No Extension/Directed Acceleration.

(1)     Contract Adjustment.  If, instead of granting Contractor a Contract Adjustment extending the Contract Time for Substantial Completion due to Compensable Delay, Owner directs in writing an acceleration of performance of the Work to overcome the effects of the Compensable Delay, then Contractor shall be entitled to a Contract Adjustment to the Contract Price and General Conditions Costs Maximum for the premium time portion only of wages paid for overtime hours worked at the Site by (1) laborers of Contractor or a Subcontractor, and (2) the person or persons employed by the Contractor or a Subcontractor at the level of superintendent, with no amount added or included in the Contract Adjustment for Contractor Fee or Allowable Markup to any Subcontractor, of any Tier.

(2)     Maximum Wage Rates.  The reimbursement permitted by this Subparagraph 3.5.2.2 shall include and be limited to the actual costs incurred and paid by Contractor that are reimbursable pursuant to Section 5.1, below, not to exceed the maximum rates set forth in Exhibit "J" – "Maximum Labor/Salary Rates" (as adjusted pursuant to Paragraph 5.1.5, below, for increases occurring during the original Contract Time for Substantial Completion) for the premium time portion only of wages and burden incurred and paid to employ such laborers, person or persons.

3.5.3     Non-Compensable Delay.  No Contract Adjustment shall be permitted for any Loss resulting, directly or indirectly, to Contractor or any Subcontractor, of any Tier, from or attributable to any of the following: (1) Unexcused Delay or acceleration to overcome Unexcused Delay; (2) Excusable Delay or any acceleration not authorized by Owner in writing to overcome Excusable Delay; or (3) concurrency of a Compensable Delay with any different type or class of Unexcused Delay or Excusable Delay, whether such concurrency is a concurrency in cause or in effect.

3.5.4     Waiver of Rights.  Under no circumstances shall Owner have any liability to Contractor for, and Contractor hereby unconditionally waives its right to recover from Owner, the following as they relate to Delay, of any kind, due to any cause and of any duration, whether foreseeable or unforeseeable and whether occurring singularly or in combination with any other Delay:

.1     any General Conditions Cost related to Delay that, when added to all other General Conditions Costs incurred by Contractor and paid by Owner, would exceed the General Conditions Costs Maximum as adjusted for permissible Contract Adjustments;

.2     any Cost of Work related to such Delay that, when added to all other Costs of Work incurred by Contractor or any Subcontractor, of any Tier, would exceed the Contract Price as adjusted for permissible Contract Adjustments; and

.3     any Loss for which recovery is sought based upon a theory of liability or cause of action (including, without limitation, a cause of action based on negligence, breach of contract or other theory of liability) that would purport to recover damages for Delay from Owner in derogation of the contractual limitations set forth in this Construction Contract, including, without limitation, the Contract Price, General Conditions Costs Maximum or the other limitations of this Section 3.5, including, without limitation, damages suffered by Contractor or any Subcontractor, of any Tier, for: (a) unabsorbed indirect (i.e., home office) overhead; (b) loss of productivity and inefficiency; (c) wage, materials and equipment price escalation; (d) additional costs associated with multiplicity of Changes and their cumulative or synergistic impact upon the performance of the Work; and (e) other direct, indirect, special, incidental or

INITIALS ᴜᴜ INITIALS WYM
Edition: February, 2010/Rev.4.11

consequential damages arising from or related to Delay, or acceleration to overcome Delay, and its consequent "Impact" or "ripple effect" on the Work.

**3.5.5    Final Completion.** Under no circumstances shall the provisions of this Section 3.5 or any other provision of the Contract Documents be interpreted as entitling the Contractor to any compensation, or reimbursement of Costs of Work incurred, for Work performed after Contractor has achieved Final Completion of the Work.

**3.5.6    Exercise of Owner Rights.** Notwithstanding any other provision of the Contract Documents to the contrary, Owner's exercise in accordance with the Contract Documents of any of its rights or remedies permitted by Applicable Laws or the Contract Documents in response to a failure by Contractor or any Subcontractor to comply with the Contract Documents shall not, under any circumstances, entitle Contractor to a Contract Adjustment.

**3.5.7    Contractor and Subcontractor Liens.** Notwithstanding anything to the contrary in the Contract Documents, Contractor agrees to not file any lien that, either in whole or in part, includes Losses associated with Delay. In addition, Contractor hereby expressly waives any right it has or may have to file a lien that, in whole or in part, includes Losses associated with Delay. Contractor further agrees to include in every contract with any Subcontractor or other entity that is to supply any service or material to the Project an express waiver of that Subcontractor's or entity's right to file a lien that, in whole or in part, includes Losses associated with Delay.

## ARTICLE 4
## CONTRACTOR'S RESPONSIBILITIES

**4.1    PRECONSTRUCTION PHASE**

**4.1.1    General Provisions.**

.1    **Continuing Obligation.** Contractor shall perform as part of the Work the Preconstruction Services for the Project set forth in this Section 4.1. Although the Preconstruction Services set forth herein are anticipated to be performed prior to commencement of construction at the Site, they shall be deemed to be a continuing obligation of the Contractor that is to be performed as and when needed, whether before or during construction of the Work, in order to facilitate the complete and coordinated performance of the overall Work.

.2    **Preconstruction Meetings.** Contractor shall schedule and attend regular preconstruction meetings, no less frequently than weekly, with the Construction Manager and such others as Construction Manager deems appropriate. If requested, representatives of Subcontractors, as appropriate to the stage of the Work then being performed or as otherwise designated by the Construction Manager, shall attend.

.3    **Project Consultation.** Contractor shall consult with Construction Manager to provide continuing advice to Owner regarding the following matters affecting design and construction of the Project: (1) access and use of the Site; (2) selection of materials, building systems and equipment; (3) construction feasibility and constructability; (4) minimizing adverse effects of labor or material shortages; and (5) time and other requirements for procurement, installation and construction completion (including, without limitation, long lead-time purchases).

### 4.1.2   Cost Estimating.

.1      **Initial Cost Estimate.** Within thirty (30) Days after issuance to Contractor of Construction Documents completed to the point of their being ready for preliminary pricing, Contractor shall present to Owner and Construction Manager, for their review and approval, a detailed estimate of the cost to Owner for the construction of the Work in accordance with the most current version of the Construction Documents, including all Costs of Work that have been, or will or may be, incurred by Owner under the terms of the Construction Contract for the complete performance of the Work. Wherever possible, the Contractor's estimate of Costs of Work shall be based on competitive Subcontractor pricing from no fewer than three (3) Subcontractors, complete with such supporting data and verification as may be requested by Owner, separately reflecting Costs of Work, Contractor Fee and Contingency, including: (1) each separate category of specialty trade work; (2) Self-Performed Work; (3) on-Site supervision; and (4) other General Conditions Costs and on-Site overhead costs broken down, in such a manner as directed by and satisfactory to Construction Manager, into discrete categories.

.2      **Estimate Updates.** No less frequently than monthly, and more often if requested by Construction Manager, Contractor shall update and refine its estimate prepared pursuant to Subparagraph 4.1.2.1, above, to reflect the current status of the Construction Documents, current market prices and the status of Subcontractor competitive pricing. Preparation and submission of monthly estimate updates under this Paragraph shall be a condition precedent to Contractor's right to payment for Preconstruction Services for the month in which such estimate was due.

.3      **Estimate Overruns.** If any estimated cost (or portion of an estimated cost) submitted by Contractor to Owner exceeds a previous estimate (or a corresponding portion of a previous estimate) that has been reviewed or approved by Owner, Contractor shall, if requested by Owner, explain the reason therefor and shall submit for approval by Owner, which approval may be granted or withheld in the sole discretion of Owner, suggestions for revisions in the then-current Construction Documents to reduce such estimated costs.

### 4.1.3   Value Engineering.

.1      **Contractor Obligation.** In the interest of cost consciousness, Contractor and Subcontractors will use their best and most diligent efforts throughout the duration of their performance on the Project to identify high cost, low value items or systems and make recommendations to the Owner of alternatives thereto that would reduce costs and improve cost/benefit ratios, taking into consideration such relevant factors as the following: initial cost; availability; durability; reliability; maintenance; energy consumption; life-cycle costs; construction feasibility; access and use of the Site; selection of materials, building systems and equipment; possible adverse effects of labor or material shortages; time requirements for procurement, installation and construction completion; and future uses of facilities.

.2      **Submission to Owner.** Value engineering suggestions shall be submitted to Owner promptly and in writing. Each submission shall include a detailed description of the proposed value engineering solution and an estimate of the savings in Costs of Work and reduction in Contract Time in the event such submission were accepted and implemented by Owner. Contractor shall submit each such value engineering suggestion promptly and shall allow a reasonable and sufficient time, which shall be not fewer than ten (10) Days, for the Owner and Architect to fully evaluate the Contractor's suggestion, consider alternatives and prepare Design Documents implementing any Changes in design associated with acceptance of such suggestion.

.3      **No Owner Obligation.** Acceptance of value engineering suggestions is at the sole and absolute discretion of Owner. Under no circumstances shall Contractor be entitled to a Contract Adjustment increasing the Contract Price on account of the Owner's rejection of a value engineering

INITIALS ____ INITIALS ____
Edition: February, 2010/Rev.4.11

suggestion submitted by Contractor.  Under no circumstances shall Contractor be entitled to a Contract Adjustment extending the Contract Time on account of a Delay by Owner in responding to a value engineering suggestion that is submitted after commencement of construction at the Site, unless Owner has directed in writing that a portion of the Work that is critical to Substantial Completion be stopped pending evaluation of, and decision by Owner on, such value engineering suggestion.

.4     **Design Responsibility.**  Except with respect to portions of the Work that are specified to be designed and built by the Contractor, the design professionals retained by Owner shall remain ultimately responsible for the sufficiency of the changes in design that are required to implement the Contractor's value engineering suggestions.

.5     **Added Benefit Recommendations.** An Added Benefit Recommendation is a value engineering recommendation conceived by Contractor as a way to redesign the Project, or some portion of the Project, in a manner that will reduce costs to Owner without reducing the quality of the Work or the quality of any materials, products or equipment that comprise the Work.  Reductions in Costs of Work due to Added Benefit Recommendations initiated by Contractor that are accepted by Owner as provided in this Paragraph 4.1.3 shall be considered as part of GMP Savings.

.6     **Contract Adjustments.** In the event the Contractor submits a value engineering suggestion that (1) is not an Added Benefit Recommendation, (2) is approved, accepted and adopted by Owner, and (3) results in Deleted Work, then a Contract Adjustment to the Contract Price, General Conditions Costs Maximum and Contract Time shall be made by Prime Contract Change Order in accordance with the terms of Article 7 of the General Conditions applicable to Contract Adjustments on account of Deleted Work.

4.1.4    **Subcontractor Bidding and Contracting.**

.1     **Subcontractor List.**  Contractor shall furnish to Owner for its information and approval a list of proposed Subcontractors for performance of each trade portion of the Work. Such list shall, unless otherwise approved by Owner in writing, consist of no fewer than three (3) proposed Subcontractors for each trade portion of the Work.

.2     **Prequalification.**  Without limitation to Owner's rights under Subparagraph 4.1.4.8, below, each Subcontractor proposed by Contractor to perform or bid for any portion of the Work shall be fully experienced, qualified and properly licensed to perform its assigned portion of the Work. Further, the Contractor shall not include in, and shall disqualify from, such list of proposed Subcontractors any individual or firm:

(1)     that is debarred from contracting with the federal government or any other Governmental Authority within or outside the State in which the Project is located;

(2)     that is not properly licensed or has an existing unsatisfied judgment entered against it arising from a violation of the Applicable Laws governing the licensing of contractors;

(3)     as to which there exists reasonable evidence that the individual or firm is not qualified or is unfit to perform its assigned portion of the Work;

(4)     that has an average experience modifier over the prior five (5) years of greater than 1.0;

INITIALS _____ INITIALS _____
Edition: February, 2010/Rev.4.11

(5)　　　that is a Contractor Affiliate, unless otherwise approved by Owner in writing following full disclosure by Contractor of the relationship between the Contractor and the Contractor Affiliate; or

(6)　　　from which Contractor or a Contractor Affiliate has received, or based on any statement or action of Contractor or a Contractor Affiliate has an expectation of receiving, directly or indirectly, any contingent or non-contingent payment or other benefit as a result of its being awarded a contract for the Project.

.3　　　**Substitution.**　Contractor shall replace any proposed Subcontractor that is disqualified in accordance with Subparagraph 4.1.4.2, above, with another proposed Subcontractor as to whom there exists no basis for such disqualification.

.4　　　**Subcontractor Information.**　All information obtained by Contractor in connection with the investigation or evaluation of the qualifications of a proposed Subcontractor shall be provided to Owner prior to award of a contract to such Subcontractor. As to any such proposed Subcontractor, Contractor shall further, if requested by Owner, certify in writing that it has not received any information indicating the existence of any grounds for disqualification under the terms of Subparagraph 4.1.4.2, above.

.5　　　**Competitive Bids.**　Except as otherwise permitted pursuant to Subparagraph 4.1.4.6, below, Contractor shall obtain at least three (3) competitive bids for each trade comprising the Work (including, without limitation, for each such trade, as applicable, all costs of manlifts, hoisting, temporary power services and distribution, protection, dust/noise control, drainage and storm water control, clean up, installation and dismantling of perimeter rails and toe boards, surveying, layout, and scaffolding). If requested by Owner, such bids shall be opened in the Owner's presence.

.6　　　**Self-Performed Work.**　Self-Performed Work shall not be performed without prior written approval by Owner, which approval may be granted or withheld in the sole and absolute discretion of Owner. Requests for approval by Owner of Self-Performed Work shall be accompanied by documentation demonstrating that self-performance represents the best value to Owner, taking into consideration matters of price, experience and demonstrated quality of performance on similar projects, including, without limitation, competitive prices from at least three (3) subcontractors possessing the qualifications for bidding required by Subparagraph 4.1.4.2, above, for the proposed scope of Work. Contractor shall notify Owner in writing prior to soliciting any such competitive prices so as to afford Owner the opportunity to solicit any or all of such competitive prices directly from the Subcontractors recommended by Contractor or other subcontractors. Prior to commencing performance of the Self-Performed Work, Contractor shall submit to Owner a proposed written subcontract to be entered into between the Contractor and the legal entity performing the Self-Performed Work, which subcontract and its terms shall be subject to the approval of Owner, which approval may be granted or withheld in the sole and absolute discretion of Owner. Any Self-Performed Work that is performed without a written subcontract approved by Owner pursuant to this Subparagraph 4.1.4.6 shall be deemed performed at Contractor's Sole Expense. Owner's approval of such a subcontract shall be subject to the provisions of Paragraph 4.1.4.14, below.

.7　　　**Bidding Documentation.**　Contractor shall deliver to Owner copies of all notices to bidders, instructions to bidders, bidding documents, bids and bid tabulations relating to bidding of the Work by proposed Subcontractors. Such information shall include summaries prepared in a form that will enable easy comparison and evaluation of the bid prices, scope, labor rates and unit prices each to the other. In the event Owner determines that a bid is incomplete or unclear in any respect, Contractor shall seek clarification of same prior to award of a subcontract based on such bid.

INITIALS _____ INITIALS _____
Edition: February, 2010/Rev.4.11

.8     Objection by Owner. No proposed Subcontractor to whom Owner has a reasonable objection shall be awarded a contract. No Contract Adjustment on account of any reasonable objection taken by Owner to a proposed Subcontractor shall be permitted unless Owner instructs Contractor after execution of the GMP Amendment to reject the bid of a Subcontractor fully qualified under the provisions of Subparagraph 4.1.4.2, above, in which case Contractor shall be entitled to a Contract Adjustment to the Contract Price (without any amount included in such Contract Adjustment for additional Contractor Fee and without any Contract Adjustment to the General Conditions Costs Maximum) in an amount equal to the difference between such bid and the bid price of the Subcontractor submitting the next lowest bid price for the same Work, whether or not such next lowest bidder is awarded the Work.

.9     Licensing. Each Subcontractor shall be licensed to perform its portion of the Work in accordance with the laws of the State in which the Project is located, both at the time of the submission of its bid and at all times thereafter during performance and completion of the Work, including any warranty work.

.10    Subcontractor Proposals. Contractor shall submit to Owner in writing, at least ten (10) Days prior to executing a subcontract with a Subcontractor, a complete copy of the proposal submitted by Subcontractor for performance of its portion of the Work, including the Subcontractor's company name, address, telephone and facsimile number.

.11    Subcontract Form. Contractor shall, prior to entering into any subcontracts with Subcontractors, submit to Owner for Owner's review the Contractor's proposed standard form of subcontract agreement for construction. Owner shall have the right, but not the obligation, to request reasonable revisions to the proposed subcontracts consistent with Applicable Laws and the Contract Documents to in the form of additions, deletions or modifications thereto.

.12    Copies of Subcontracts. Contractor shall deliver a complete copy of its contract with each first-Tier Subcontractor to Owner within five (5) Days after execution thereof by Contractor and the first-Tier Subcontractor.

.13    Approved Wage Rates. Contractor shall include in each subcontract it enters into with a Subcontractor:

(1)    provisions identical to Paragraph 5.1.3, below, defining and limiting the labor burden expenses that the Subcontractor is entitled to be reimbursed for extra work performed on a time and materials basis;

(2)    a schedule approved in writing by Owner of approved maximum base wage and burden rates for extra work that is performed on a time and materials basis that do not exceed the maximum rates set forth in Exhibit "I" – "Maximum Labor/Salary Rates" attached hereto or if maximum rates are not set forth in said exhibit that do not exceed such other maximum rates as are approved by Owner in writing and provided further, that such subcontract may include a provision allowing for such maximum rates to be adjusted annually during the original Contract Time for Substantial Completion, but only if such adjustment is approved by Owner in writing in the sole and absolute discretion of Owner; and

(3)    provisions obligating such Subcontractor to require each lower-Tier Subcontractor to be bound by, and to bind its lower-Tier Subcontractors to the requirements of, this Subparagraph 4.1.4.13.

Page 14 of 48

INITIALS \|\|\|\|\|  INITIALS \|\|\|\|\|
Edition: February, 2010/Rev.4.11

.14     **Owner Approval.** Neither Owner's approval of a Subcontractor nor Owner's review or approval of a Subcontractor's proposed or actual contractual terms of retention, even if those terms conflict with the Contract Documents, shall waive any of Owner's rights, or relieve Contractor of any obligation, under the Contract Documents, and Contractor shall remain solely responsible to Owner, notwithstanding such approval by Owner, for the acts and omissions of its Subcontractors and for the content, enforceability and enforcement of all contractual terms relating to its Subcontractors' performance or nonperformance of the Work. Costs or fees charged by any Subcontractor who has not been approved by, or whose contractual terms of retention have not been submitted to and approved by, Owner pursuant to the requirements of this Paragraph 4.1.4 will be paid by Contractor at Contractor's Own Expense.

.15     **Termination.** Contractor shall notify Owner of any circumstances that constitute or give rise to a default by a Subcontractor. Except in the case of an emergency, at least ten (10) Days prior to termination of a contract between Contractor and a Subcontractor, Contractor shall notify the Owner in writing of its intention to terminate a Subcontractor's subcontract and identify to Owner in writing a replacement Subcontractor that conforms to the requirements of this Construction Contract and with respect to which Owner has no reasonable objection.

.16     **Unit Prices.** Approval by Owner of unit prices set forth in subcontracts submitted to Owner for review shall not be implied or presumed from the Owner's general approval of the subcontract and shall not be considered binding upon Owner for purposes of the pricing of Extra Work or Deleted Work unless such unit prices have been specifically approved in a writing by Owner that expressly acknowledges that such unit prices shall be used for purposes of pricing Compensable Changes or Deleted Work.

**4.1.5   Preliminary Project Schedule.**

.1     **Submission.** Contractor has prepared Exhibit "D" - "Preliminary Project Schedule" attached hereto depicting its plan for performance and completion of the Preconstruction Services and other Work. Contractor shall revise the Preliminary Project Schedule to reflect such dates as may be directed by Owner or Construction Manager for achieving Key Milestones, Tenant-Ready Completion, Substantial Completion, Final Completion, Close-Out Completion and such other revisions or additional information as required by the Contract Documents or requested by Owner or Construction Manager. Until such time as the Construction Schedule is approved by Owner, Contractor shall perform its obligations under this Construction Contract in strict accordance with the Preliminary Project Schedule.

.2     **Updating.** No less frequently than monthly, and more often if requested by Owner, Contractor shall update and refine its Preliminary Project Schedule to reflect the current status of the Construction Documents and Subcontractor scheduling information. Preparation and submission of monthly updates under this Paragraph shall be a condition precedent to Contractor's right to payment for Preconstruction Services upon its Application for Payment for the month in which such update was due.

.3     **Contractor Responsibility.** Contractor shall, notwithstanding Owner's or Construction Manager's review or approval thereof, remain solely responsible for the accuracy, adequacy and completeness of its Preliminary Project Schedule and all updates thereof, including, without limitation, the updated Preliminary Project Schedule approved by Owner and attached to the GMP Amendment.

**4.1.6   GMP Proposal.**

.1     **Submission.** Within sixty (60) Days after Architect determines that the Construction Documents are complete, the Contractor shall submit to Owner and Construction Manager

Page 16 of 48

INITIALS ___ INITIALS ___
Edition: February, 2010/Rev.4.11

its GMP Proposal setting forth a proposed Contract Price (in the form of a Guaranteed Maximum Price) that is in all respects consistent and in conformance with the requirements of the Construction Contract and the General Conditions. Contractor shall include with its GMP Proposal a written statement of its basis, which shall include at a minimum:

(1) a list (by sheet number, issuance date and last revision date) of the Construction Documents, approved by Owner, which were used in preparation of the GMP Proposal;

(2) the proposed Guaranteed Maximum Price, which shall include all costs and expenses to completely construct the Work, including a complete statement of any Allowances requested by Owner and any mutually agreed exceptions, qualifications and exclusions;

(3) a Contingency, not to exceed the agreed percent of the estimated Costs of Work as required by Section 2.3, above;

(4) the proposed General Conditions Costs Maximum and an itemized listing of General Conditions Costs, which shall not exceed the General Conditions Costs Maximum; provided, however, that the itemization of Contractor's estimated General Conditions Costs shall not be interpreted as a guarantee by the Contractor that any individual Cost of Work listed in such itemization will not exceed the estimated amounts stated nor shall such itemization be interpreted as a promise or obligation on the part of the Owner to reimburse Contractor for any General Conditions Costs, whether or not listed or covered in such itemization, that exceed the General Conditions Costs Maximum as adjusted by Prime Contract Change Order or Provisional Prime Contract Change Order;

(5) the latest updated Preliminary Project Schedule approved by Owner setting forth, among other things, dates for Key Milestones, Tenant-Ready Completion, Substantial Completion, Final Completion and Close-Out Completion of the Work, as well as other milestone events and corresponding dates critical thereto, such as, but not limited to, deliveries and installation of major equipment, fixtures and furnishings and occupancy;

(6) a proposed Schedule of Values, made out in a form approved by Owner and Construction Manager, which itemizes Costs of Work for each activity that is to be performed by Subcontractors or self-performed by Contractor (including, without limitation, Contractor's itemized on-Site overhead costs), Contractor Fee, Contingency, the total of which shall equal the proposed Guaranteed Maximum Price; and

(7) a list of the Reference Documents relied upon or referred to by Contractor in preparing its GMP Proposal; including, without limitation, those Reference Documents listed in Exhibit "E" – "Drawings, Specifications and Reference Documents" attached hereto.

4.1.7 Review by Owner. Contractor shall meet with the Owner, Construction Manager and Architect to review the GMP Proposal and the written statement of its bases.

4.1.8 Period of Irrevocability. The GMP Proposal, including any revised GMP Proposals, shall remain open and irrevocable for a period of no less than sixty (60) Days after delivery to Owner, or such longer time as may be otherwise stated in the GMP Proposal.

4.1.9. Revisions to GMP Proposal. In the event the Owner and Contractor are not able to reach agreement upon all of the terms set forth in the GMP Proposal, then Contractor shall prepare and submit, within fifteen (15) Days after request by Owner, a revised GMP Proposal for Owner's consideration.

INITIALS _____ INITIALS _____
Edition: February, 2010/Rev.4.11

**4.1.10  GMP Amendment.**  Upon approval by Owner of the GMP Proposal, the parties shall execute the GMP Amendment in the form of Exhibit "I" - "GMP Amendment Form" attached hereto.  Upon execution of the GMP Amendment, Contractor's obligations with respect to the construction of the Work shall be deemed governed by the terms and conditions of the Construction Contract, the GMP Amendment and the other Contract Documents. The Contract Price and Contract Time shall thereafter only be adjusted by Prime Contract Change Order or Provisional Prime Contract Change Order.

**4.1.11  Contractor Compensation for Preconstruction Services.**

.1      **With Execution of GMP Amendment.** In the event that Owner and Contractor execute the GMP Amendment, then Contractor shall accept, as its sole compensation for performance of Preconstruction Services, reimbursement of Costs of Work (with no additional amount added thereto or computed thereon for Contractor Fee) that are incurred and paid by Contractor for Preconstruction Services performed prior to execution of the GMP Amendment.

.2      **Without Execution of GMP Amendment.** Subject to the provisions of Article 14 of the General Conditions, in the event Owner and Contractor do not execute the GMP Amendment and the Owner terminates the Construction Contract, then Contractor shall accept as its sole and exclusive compensation such amounts as are reimbursable pursuant to Subparagraph 4.1.11.1, above, not to exceed a maximum of total compensation for Preconstruction Services of Zero dollars/no cents ($ 0.00).

**4.2      CONSTRUCTION PHASE**

**4.2.1    General Provisions.**

.1      **Contractor Performance.** Contractor shall completely perform, to Owner's satisfaction and in a first-class manner, all of the Work in accordance with this Construction Contract, the General Conditions and other Contract Documents, including, without limitation, the Drawings, Specifications and Reference Documents listed in Exhibit "E" -- "Drawings, Specifications and Reference Documents" attached hereto, and any Changes thereto authorized by the Owner in accordance with the requirements of the General Conditions.

.2      **Labor and Materials.**  Except as otherwise expressly stated in the Contract Documents to be the responsibility of Owner or its Separate Contractors, the Contractor shall provide and pay for all of the labor, services, materials, machinery, tools, equipment, supervision, coordination, scheduling, utilities, water, heat, permits, taxes, licenses (including, but not limited to, all professional and business licenses), and other work, of any kind, temporary or permanent, required to construct the entirety of the Work in accordance with the Contract Documents and Applicable Laws.

.3      **Supervision.** Contractor shall supervise and direct the Work using Contractor's best skill and attention. Contractor shall have control over and be solely responsible for all construction means, methods, techniques, sequences, procedures and the coordination of all portions of the Work.

.4      **Applicable Laws.** Contractor shall at all points in time that it is performing the Work: (1) give all notices required by, and comply with, all Applicable Laws then in effect; (2) pay all local, state and federal sales, consumer, use and similar taxes; and (3) pay all benefits, insurance, taxes and contributions for social security and unemployment insurance which are measured by wages, salaries or other remuneration paid to Contractor's employees.  Upon Owner's request, Contractor shall furnish evidence satisfactory to Owner that any and all of the foregoing obligations have been fulfilled.

.5      **Permits, Approvals.**  Owner shall obtain and pay for approvals relating to (1) planning, development, and entitlement, and (2) the general building permit. Contractor shall obtain and

INITIALS\_\_\_\_/INITIALS\_\_\_\_
Edition: February, 2010/Rev.4.11

pay for all other permits and approvals required by Governmental Authorities that are related to or required for performance of the Work.

### 4.2.2   Scheduling.

**.1   Preparation.** Within thirty (30) Days after execution by Owner and Contractor of the GMP Amendment, the Contractor shall prepare and submit a Construction Schedule for the Work, both in hard copy and electronically, for the Owner's information and approval. The Construction Schedule shall in all respects conform to and be consistent with the time requirements for the Project set forth in this Construction Contract and the updated Preliminary Project Schedule attached to the GMP Amendment.

**.2   Format.**   The Construction Schedule shall be in the form of a critical path progress schedule that shows, in graphic form, a plan for performance of the Work within the Contract Time. It shall be prepared, using Primavera P3, as a time-scaled bar chart showing: (1) continuous flow from left to right of activities and milestones that are critical to Tenant-Ready Completion, Substantial Completion, and Final Completion of the Work; (2) identification of "float"; and (3) a clearly highlighted critical path. Durations and specific calendar days shall be clearly and legibly shown for the early and late start and finish of each activity. With the exception of Owner Review Periods and Governmental Authority Review Periods, any activity having a duration of more than fifteen (15) Days will be segmented into fifteen (15) Day increments. No more than ten percent (10%) of the activities shall be shown as critical. "Float" shall be deemed owned by, and for the sole use of, Owner. Techniques or methods designed to suppress depiction of available float are strictly prohibited.

**.3   Detail.** Activities shown in the Construction Schedule shall be in sufficient detail to demonstrate a practical plan to complete the fabrication and construction within the Contract Time and shall, at a minimum, include the following:

(1)   the start and finish date of each activity;

(2)   the anticipated percentage of completion of each activity at the end of each month;

(3)   the weighted labor value expressed as a percentage of the total labor cost of the Work for each activity;

(4)   the final manpower curves by trade;

(5)   the anticipated dates for the purchase and delivery of major materials and equipment;

(6)   the Owner's occupancy requirements;

(7)   the anticipated dates for the receipt and incorporation of Owner-furnished materials, equipment or other items (if any);

(8)   Owner Review Periods and Owner Review Dates that are acceptable to and approved by Owner, in the exercise of its sole but reasonable discretion;

(9)   Governmental Authority Review Periods; and

INITIALS \_\_\_\_ INITIALS \_\_\_\_
Edition: February, 2010/Rev.4.11

**(10)**   the activities identified as being on the critical path to Tenant-Ready Completion, Substantial Completion and Final Completion of the Work.

**.4**   **Updates.**   Throughout the performance of the Work, monthly updates of the Construction Schedule shall be delivered in hard copy and, if required by Owner, in an electronic form satisfactory to Owner.

**.5**   **Look-Aheads.**   Contractor shall weekly prepare and submit to Construction Manager short term, three (3) week "look-ahead" schedules generated from the Construction Schedule approved by Owner.

**.6**   **Governing Schedule.**   The governing schedule for the Work shall be the Construction Schedule or updated Construction Schedule approved by the Owner.  Unless otherwise directed in writing by Owner, no other schedule shall be used or relied upon by the Contractor or its Subcontractors in planning or performing the construction phase of the Work or in connection with any request for a Contract Adjustment to the Contract Time. In no event shall the Contractor's updates of the Construction Schedule or its "look ahead" schedules after the dates for achievement of Key Milestones, Tenant-Ready Completion, Substantial Completion or Final Completion set forth in the Owner-approved Construction Schedule except (1) with the prior written approval of Owner, which approval may be granted or denied by Owner in its sole and absolute discretion or (2) for Contract Adjustments authorized and permitted in accordance with the requirements of the Contract Documents.

**.7**   **Coordination.**   The Contractor shall cooperate with the Owner in scheduling the Work to avoid delay in, or conflict or interference with, the work of the Separate Contractors or the construction or operations of the Owner's own forces on the Site.

**.8**   **Submittal Schedule.**   Within thirty (30) Days after execution of the GMP Amendment, the Contractor shall prepare and submit, in accordance with the Contract Documents, a Submittal Schedule for the Owner's information and approval.  The Submittal Schedule shall be coordinated with the Construction Schedule and allow the Owner such time for review of the Submittals as may be required by the Contract Documents, or, if none is required, a reasonable time for such review. Contractor shall keep the Submittal Schedule current and updated in the same manner as required for the updating of the Construction Schedule.

**.9**   **Schedule Responsibility.** The Contractor is and shall remain solely responsible, notwithstanding the Owner's review or approval thereof, for the accuracy, suitability and feasibility of the Preliminary Project Schedule, Construction Schedule, Submittal Schedule, "look ahead" schedules, recovery schedules and any updates thereof.

**.10**   **Long Lead-Time Items.** Contractor shall recommend to Owner a schedule for procurement of long lead-time items as required to meet the critical path requirements of the Owner-approved Construction Schedule and Submittal Schedule. Contractor shall expedite the delivery of such long lead-time items.

**.11**   **Weather Delay Allowance.** Owner and Contractor have agreed to a Weather Delay Allowance of <u>Zero</u> (0) Days. Contractor shall not be entitled to an extension of the Contract Time on the basis of Excusable Delay due to inclement weather unless, and if so only to the extent that, the total number of Days of Excusable Delay to which Contractor is entitled under the General Conditions due to inclement weather and its effects (including, without limitation, dry out time) occurring at the Site and actually affecting Work at the Site at any time during the entirety of Contractor's performance of the Work exceeds the number of Days in the Weather Delay Allowance. Notwithstanding anything to the contrary in the Contract Documents, it is understood that unused time remaining in the Weather Delay Allowance

Page 19 of 46

INITIALS ⟨⟩ INITIALS ⟨⟩
Edition: February, 2010/Rev.4.11

shall be considered owned solely by Owner, such that, for example, if at the time the Work is Substantially Complete there are unused Days remaining in the Weather Delay Allowance, then: (1) such unused Days shall accrue entirely to Owner's benefit; (2) such unused Days shall not constitute a basis for offsetting or reducing the Contractor's responsibility or liability to Owner for Losses due to Unexcused Delay; and (3) if requested by Owner, a Contract Adjustment of the Contract Time shall be made by Prime Contract Change Order shortening the Contract Time for Tenant-Ready Completion and Substantial Completion by the number of such unused Days.

.12    Sequencing.   Construction Manager has the right to require that Work done or material assembled on the Project be in a definite sequence. This sequence will be followed by Contractor.   If the sequence directed by Construction Manager results in a Delay, Contractor must notify Construction Manager, in the manner required by the General Conditions for providing Notice of Delay, before performing the Work affected. Failure of Contractor to give such required notice will be deemed to be an acknowledgement by the Contractor that no such Delay exists and will constitute a waiver of any right to a Contract Adjustment on account of Contractor's compliance with such sequencing direction. Provided Contractor has given such Notice of Delay, and provided further that such sequencing direction or resulting Delay is not the result of the negligence, willful misconduct or violation of Applicable Law by Contractor or any Subcontractor or the failure of Contractor to comply with the requirements of the Contract Documents, then Contractor shall be entitled to a Contract Adjustment on the grounds of Compensable Delay for the period of Delay to Substantial Completion of the Work that results from Contractor's compliance with such sequencing direction.

.13    Condition of Payment.  Compliance by the Contractor with the requirements of this Paragraph 4.2.2 and the other provisions of the Contract Documents pertaining to preparation and submission of schedules and updated schedules for the Work is a condition precedent to the Owner's obligation to make payment to the Contractor.   Failure by the Owner to assert its right to withhold payment under this Subparagraph 4.2.2.13 due to a noncompliance by Contractor shall not constitute a waiver of the right to withhold future payments on account of such prior noncompliance or on account of any subsequent noncompliance by the Contractor with its scheduling obligations.

.14    Scheduling by Owner.   Without limitation to Owner's other rights under the Contract Documents, if Contractor fails after written notice by Owner to perform any part of its obligations relating to scheduling, Owner shall have the right, but not the obligation, to retain one or more schedule consultants to perform, in whole or in part, the Contractor's obligation to supplement the scheduling services provided by Contractor and to withhold the cost to Owner of such consultant services from payments to Contractor.

4.2.3   Labor Relations.

.1    Prevailing Wages.  Unless otherwise required by Applicable Laws or applicable labor agreements, the Contractor ☐ is X is not required by the terms of this Construction Contract to pay prevailing wages for Work performed.  An indication in the preceding sentence that payment of prevailing wages is not required shall not, however, be interpreted as relieving the Contractor from the obligation to pay prevailing wages if and to the extent payment of prevailing wages is required by Applicable Laws or applicable labor agreements.

.2    Labor Agreements.  Contractor agrees to comply with all of the terms and conditions of applicable labor agreements, if any, including, without limitation, making trust fund payments into the labor trust funds and complying with the terms and provisions of said labor agreements pertaining to jurisdiction of crafts and the procedures for resolution of disputes.  In the absence of any such procedure, or if such procedure fails to promptly resolve a labor dispute, Contractor agrees upon request of Owner, at Contractor's Own Expense, to take any and all lawful steps to secure a binding and final

INITIALS ___ INITIALS ___
Edition: February, 2010/Rev.4.11

determination of said dispute (1) in accordance with said labor agreements or (2) by the National Labor Relations Board.

.3     **Payroll Records.** Upon written or verbal request from Owner, Contractor agrees to furnish Owner with: (1) certified payroll reports for Work, if any, for which the Contractor is required to pay prevailing wages; or (2) monthly trust fund reports for Work, if any, which is performed subject to the terms of an applicable labor agreement. If Contractor is listed as delinquent in the payment of fringe benefits by any labor trust fund, it shall be regarded as an Event of Contractor Default and, without limitation to Owner's other rights or remedies, Owner may, in its sole and absolute discretion, pay to the appropriate labor trust fund such amounts as Owner determines in good faith are due and owing, and such amounts shall be deducted from the amounts Owner would otherwise owe to Contractor under this Construction Contract.

.4     **Labor Action.** Contractor agrees that (1) its obligations under the Contract Documents (including, without limitation, performance of the Work within the Contract Time) shall not be excused by reason of any strikes, picketing or labor disputes that are the result of a violation by Contractor or any Subcontractor of an Applicable Law or a provision of an applicable labor agreement, regardless of whether Contractor is the primary employer in the labor dispute, and (2) any Delay associated therewith shall be deemed an Unexcused Delay and any costs associated therewith (including, without limitation, the costs of establishing and maintaining a "dual gate" system) shall be borne by Contractor at Contractor's Own Expense.

.5     **Dual Gates.** If there is picketing at or near the Site, Contractor will be responsible, without a Contract Adjustment, to set up and maintain a "dual gate" or "reserve gate" system. It shall be the obligation of Contractor in such event to continue the proper performance of its Work without Delay. Contractor agrees that it shall be responsible for ensuring that Contractor and all Subcontractors, and all of their employees, vendors, suppliers and invitees, enter and exit the Site through the appropriate gate. Contractor shall be responsible, at Contractor's Own Expense, for any Loss caused by a failure or refusal of any employee, vendor, supplier or invitee of Contractor or any Subcontractor to (1) comply with the dual gate system established by Contractor, or (2) perform Work because of picketing anywhere on the Site, regardless of whether the picketing is directed against Contractor and regardless of whether the picketing is ultimately determined to be unlawful secondary picketing or lawful primary picketing.

**4.2.4     Property Rules and Regulations.** Contractor shall comply with all rules and regulations of the Owner governing activities of persons on the Site, including, without limitation, any restrictions on hours during which Work or other activity is permitted. Contractor warrants that it has included in its Contract Price, General Conditions Costs Maximum and Contract Time sufficient monies and time to permit the Work to be performed in a manner that will cause minimal interruption, interference or discomfort to tenants, other occupants, invitees or the public by operations, noise, dust or other deleterious effects of construction activities. Contractor shall not interfere in any material respect with the on-going operations of facilities at the Site, including, without limitation, the use of common areas and parking for tenants, other occupants, invitees or the public. Contractor is responsible, at Contractor's Own Expense, for all Losses suffered by Owner and third parties that are caused, in whole or in part, by the failure of Contractor or its Subcontractors, of any Tier, to comply with the requirements of this Paragraph 4.2.4.

**4.2.5     Coordination of Work.** In addition to Contractor's responsibility to coordinate all of the various parts of the Work with all other parts of the Work, Contractor shall coordinate the performance of the Work with the other construction at the Site by Owner's own forces (including, without limitation, Owner's security personnel, if any) and Separate Contractors.

Page 21 of 48

**4.2.6   Design Services.** The Contractor shall provide professional services if such services are expressly, or by reasonable implication, required by the Contract Documents for a portion of the Work or are required in order for Contractor to carry out the Contractor's responsibilities for construction means, methods, techniques, sequences and procedures.   Professional design services or certifications so required of Contractor shall be furnished by design professionals exercising the highest standard of care and utilizing designs and engineering that comply with all systems, materials or equipment performance and design criteria set forth in the Contract Documents.  Certification by a properly licensed design professional, including such professional's signature and seal, shall appear on all drawings, calculations, specifications, certifications and other documents prepared by such professional.  Submittals related to the Work designed or certified by such professional, if prepared by others, shall bear such professional's written approval when submitted.  Owner and Architect shall be entitled to rely upon the adequacy, accuracy and completeness of the services, certifications or approvals performed by such design professionals.

**4.2.7   Performance and Payment Bonds.**

**.1   Contractor-Furnished.**  Contractor **X** is ☐ is not required to purchase a Performance Bond and a Payment Bond covering the entire Work. Performance and Payment Bonds furnished by Contractor shall conform to the requirements of <u>Section 11.1</u> of the General Conditions.

**.2   Subcontractor-Furnished.**  Contractor ☐ is **X** is not required to provide for the furnishing of Performance Bonds by the Subcontractors performing the Work of the following trade(s): <u>N/A</u>.  A Performance Bond furnished by a Subcontractor and provided by Contractor shall conform to the requirements of <u>Section 11.1</u> of the General Conditions.

## ARTICLE 5
## COSTS OF WORK

The term "Cost(s) of Work" shall mean costs listed in this <u>Article 5</u> that are necessarily and properly incurred and paid by Contractor in the proper performance of the Work.  Except as otherwise provided in the Contract Documents, the Costs of Work for which Contractor shall be entitled to reimbursement include only the items set forth in this <u>Article 5</u> and, unless otherwise approved in writing by Owner in advance of their being incurred, shall only be reimbursable under this <u>Article 5</u> at rates and amounts that: (1) in the case of Costs of Work incurred and paid for labor, materials and equipment incorporated into the Work, are not higher than those rates or amounts customarily paid in the City of <u>Tysons Corner</u>, State of Virginia, and (2) for all other Costs of Work, are consistent with amounts customarily paid by the Contractor for the same or similar expense items in the ordinary course of its business under circumstances in which the Contractor is not being reimbursed for such expenses by a third party.

**5.1   WAGES, SALARIES**

**5.1.1**   Actual wages of workers directly employed by Contractor to perform the Work at the Site or, with Owner's prior written agreement, at workshops located outside of the Site, not to exceed for any individual the applicable maximum base wage rate (union or non-union, as applicable) allowable for that individual set forth in <u>Exhibit "J" – "Maximum Labor/Salary Rates"</u> attached hereto, as adjusted in the manner permitted by <u>Paragraph 5.1.5</u>, below, and <u>Subparagraph 3.5.2.1</u>, above.

**5.1.2**   Actual wages or salaries, not to exceed for any individual the applicable maximum base salary rate allowable for that individual as set forth in <u>Exhibit "J" – "Maximum Labor/Salary Rates"</u> attached hereto (including any adjustments thereto permitted by <u>Paragraph 5.1.5</u>, below or <u>Subparagraph 3.5.2.1</u>, above), of: (1) Contractor's supervisory and administrative personnel performing the Work when

INITIALS _____ INITIALS _____
Edition: February, 2010/Rev.4.11

stationed at the Site, or on the road engaged in expediting the production or transportation of materials or equipment required for the Work; and (2) Contractor's supervisory and administrative personnel located at Contractor's local branch office; provided, however, that in cases where a portion of the time spent by such local branch office personnel involves services for other projects or for general administrative services not related exclusively to the Project, then reimbursement of such wages or salaries shall be limited to that portion of such wages or salaries allocable to the actual time spent that is devoted exclusively to the Project, as verified by contemporaneously maintained time sheets.

5.1.3   Provided that they are based on actual wages and salaries payable as Costs of Work pursuant to Paragraph 5.1.1 or Paragraph 5.1.2, above, net actual costs, not to exceed for any individual the applicable maximum burden rate (union or non-union, as applicable) allowable for that individual set forth in Exhibit "J" – "Maximum Labor/Salary Rates" attached hereto as adjusted in the manner permitted by Paragraph 5.1.5, below, and Subparagraph 3.5.2.1, above, of the following:

.1   to the extent required to be paid by Applicable Laws, payroll taxes (FICA, Medicare, SUTA and FUTA), and workers compensation insurance (as adjusted for experience modifiers, premium discounts, dividends, rebates, expense constants, assigned risk pool costs, net cost reductions due to policies with deductibles for self-insured losses, assigned risk rebates, or the like) and provided that Contractor shall reduce its standard payroll tax percentages to properly reflect the effective cost reduction due to the estimated impact of the annual maximum wages subject to payroll taxes;

.2   health and welfare, vacation, apprenticeship funds and other such benefits required by lawful collective bargaining agreements; provided, however, that (1) paid time off must be in accordance with the provisions in the Contractor's printed employee handbook, manual, or description of company-provided benefits (2) no accruals for company-paid time off are to be included in calculating the hourly rates of employees charged as a Cost of Work (rather, the actual paid time off only shall be reimbursable) and (3)  such paid time off must be clearly stated in the Contractor's payroll records provided to the Owner for review or auditing purposes;

.3   for those employees not covered by lawful collective bargaining agreements, that portion of employer-paid health, life, AD&D, short and/or long-term disability insurance, and other such insurance that is an expense of the Contractor and not passed through to the employee, provided such insurance is stated as an employer-provided benefit per the terms of the Contractor's printed employee manual, handbook, or description of company-provided benefits.

5.1.4   Any estimated rate or percentage used for billing of actual costs under any of Paragraph 5.1.1 through Paragraph 5.1.3, above, shall not exceed the corresponding maximum rate allowable under Exhibit "J" – "Maximum Labor/Salary Rates" attached hereto as adjusted in the manner permitted by Paragraph 5.1.5, below, and Subparagraph 3.5.2.1, above, and shall, without limitation to Owner's other rights of audit provided for in the Contract Documents, be subject to audit pursuant to Paragraph 11.3.2, below.

5.1.5   The maximum rates set forth in Exhibit "J" – "Maximum Labor/Salary Rates" shall be subject to adjustment for increases in Contractor's actual costs for base wages, salaries and burden of its employees that are incurred and paid by Contractor during each 12-month period following each annual anniversary of the GMP Effective Date that occurs during the original Contract Time for Substantial Completion set forth in Section 3.3.2, above ("original" meaning the Contract Time for Substantial Completion as of the GMP Effective Date and without consideration of Contract Adjustments extending the Contract Time), not to exceed for any such employee an amount (including a zero amount, if Owner so judges appropriate) that Owner judges, in its sole and absolute discretion, to be appropriate taking into consideration the Owner's relative level of satisfaction or dissatisfaction with such employee's level of past performance on the Project.

INITIALS _____ INITIALS _____
Edition: February, 2010/Rev.4.11

**5.2     SUBCONTRACTORS**

Payments that have been made by Contractor to Subcontractors; provided that:

**5.2.1**   such payments are not otherwise precluded from reimbursement by the terms of the Contract Documents;

**5.2.2**   such payments are for Work performed in accordance with the requirements of the Contract Documents;

**5.2.3**   such payments are for amounts properly due and owing by Contractor under the terms of the governing contract between Contractor and such Subcontractor;

**5.2.4**   In the case of payments for extra work performed by a Subcontractor pursuant to a change order executed between Contractor and a Subcontractor:

**.1**   the change order was executed under circumstances in which the Subcontractor was entitled under the terms of its contract with Contractor to receive the amount of additional compensation agreed to in the change order; and

**.2**   if the change order is for payment based on reimbursement of costs incurred for extra work performed on a time and materials basis that:

**(1)**   the reimbursement to Subcontractor is limited to those costs within the descriptions of Costs of Work in this Article 6 and does not include any costs that are not reimbursable under Article 6, below;

**(2)**   the reimbursement to Subcontractor for labor burden expenses is limited to the costs set forth in Paragraph 6.1.3, above;

**(3)**   the maximum base wage and burden rates charged by the Subcontractor do not exceed the maximum rates set forth in Exhibit "J" – "Maximum Labor/Salary Rates" attached hereto or (if applicable rates for the Subcontractor are not included in said exhibit) the maximum rates approved or determined by Owner pursuant to Subparagraph 4.1.4.13, above, and the amounts charged are, without limitation to Owner's other rights of audit provided for in the Contract Documents, are verifiable by audit by Owner on the same terms as set forth in Paragraph 11.8.2, below; and

**(4)**   amounts and rates charged by the Subcontractor do not include costs of any insurance that provides coverage that is different from or in addition to, or that provides coverage limits greater than, the coverages and coverage limits that the Subcontractor is required to maintain under the terms of Section 11.2 of the General Conditions; and

**5.2.5**   In the case where the Contractor has backcharged a non-performing or defaulting Subcontractor a Cost of the Work paid by Contractor for Work performed by Contractor or by another Subcontractor at Contractor's request on behalf of such non-performing or defaulting Subcontractor, Contractor shall only be reimbursed:

**.1**   the amount that was owing and payable to the non-performing or defaulting Subcontractor after reduction of its subcontract price on account of the backcharge; and

INITIALS [initials] INITIALS [initials]
Edition: February, 2010/Rev.4.11

.2      such amounts comprising the backcharge as are proven by Contractor and verified by contemporaneously prepared time and materials costs records to have been reasonably and necessarily paid by Contractor; provided, however,

.3      that under no circumstances shall Contractor be reimbursed an amount calculated as the sum of the amounts reimbursable under preceding Subparagraph 5.2.5.1 and Subparagraph 5.2.5.2 if, and to the extent that, such amount exceeds the amount that the non-performing or defaulting Subcontractor would have been entitled to receive from Contractor under the terms of its subcontract if the circumstances giving rise to the backcharge had not occurred.

**5.3     MATERIALS AND EQUIPMENT INCORPORATED INTO THE WORK**

5.3.1    Costs, including transportation, for materials and equipment incorporated or to be incorporated into the Work.

5.3.2    Costs of materials described in Paragraph 5.3.1, above, that are in excess of those actually installed but required to provide a reasonable allowance for waste and spoilage. Unused excess materials, tools, or equipment paid for by Owner, if any, shall be delivered to Owner at Final Completion of the Work or, at Owner's option, shall be sold by Contractor. Amounts realized, if any, from such sales shall be credited to Owner as a deduction from the Costs of Work; and, where the Contractor Fee is based on a percentage of Costs of Work, such credit amounts shall not be included in the computation of the Contractor Fee.

**5.4     MATERIALS, EQUIPMENT, TEMPORARY FACILITIES AND RELATED ITEMS CONSUMED IN THE WORK**

5.4.1    Costs, including transportation, of installation, maintenance, dismantling and removal, of materials, supplies, temporary facilities, machinery and equipment installed as part of the Work and hand tools not customarily owned by the construction workers, which are provided by Contractor at the Site and fully consumed in the performance of the Work; and cost less salvage value on such items if not fully consumed, whether sold to others or retained by Contractor. Salvage value for any such item having a cost at time of initial use in the Work of $1,000 or less shall be determined based on a useful life of twenty-four (24) months and calculated in accordance with the following formula: cost – (number of months of use x (cost ÷ 24)). Salvage value for any other such item shall be mutually agreed to between Owner and Contractor in writing prior to such initial use. For any such item that is not new at the time of initial use the "cost" of such item shall mean "fair market value" based on the estimated price a reasonable purchaser would pay to purchase the used item at the time of such initial use, which fair market value must be declared by Contractor and approved by Owner prior to such initial use. Small tool purchases shall be limited to those which are reasonably required for the efficient performance of Work in a manner that avoids unnecessary waste. Monthly small tool purchases having a cumulative value in excess of $500 shall be submitted to Owner for review and approval, not to be unreasonably withheld, in advance of purchase.

5.4.2    Rental charges for temporary facilities, machinery, equipment, and hand tools not customarily owned by the construction workers, which are provided by Contractor at the Site, whether rented from Contractor, a Contractor Affiliate or others, shall be the lowest of at least two (2) bona fide price quotations provided to Contractor from reputable equipment suppliers to validate the reasonableness of the rental rates charged. The projected usage for each item under this Paragraph 5.4.2 proposed to be rented and estimated total rentals therefor shall be submitted to Owner in advance of usage of such equipment so that Owner may make an informed decision on whether to rent or purchase such equipment. Such rental charges shall be inclusive of, and no additional costs shall be charged to Owner for, costs of transportation, installation, maintenance (including, without limitation,

INITIALS [initials] INITIALS [initials]
Edition: February, 2010/Rev.4.11

cleaning and oil), minor repairs (including, without limitation, painting) and replacements (including, without limitation, tire replacement), dismantling and removal from the Site. For any lease/purchase arrangement where any of the lease/purchase charges were charged to Owner as a reimbursable Cost of Work, appropriate credit adjustments will be made for an appropriate pro rata share of the fair market value of the equipment at the time it was last used for the Work. Under no circumstances shall the aggregate rentals chargeable for any item under this Paragraph 5.4.2 that is owned by the Contractor or any Contractor Affiliate exceed 75% of the fair market value thereof at the time of its first use on the Project, which fair market value must be mutually agreed to by Contractor and Owner prior to the first use thereof for the Work. The cost of major repairs or the overhaul of rented equipment or machinery, whether owned by Contractor, a Contractor Affiliate or others, shall be deemed a cost of business of the lessor/owner of such equipment or machinery and shall not be reimbursable as a Cost of Work.

    5.4.3    Contractor shall, as a condition of its right to reimbursement for any item under this Section 5.4 that is purchased, either as part of a purchase/sale or lease/purchase arrangement, maintain and submit to Construction Manager, no less frequently than monthly, an inventory of each such item stating: (1) the original acquisition price; (2) the acquisition date; (3) the salvage value and/or fair market value, as applicable, that has been approved by Owner; and (4) the current location and intended future disposition of such item.

    5.4.4    If mutual agreement to a salvage value and/or fair market value is required by this Section 5.4 prior to initial use of an item for the Work, it shall be the obligation of Contractor to specifically declare its opinion of the reasonable value(s) and request Owner's approval of such declared value(s) prior to such initial use, which agreement by Owner shall not be unreasonably withheld. If Contractor fails to do so, then the Owner shall have the right to unilaterally establish a reasonable salvage value and/or fair market value, as may be applicable, at any time after such initial use or upon Final Completion, which determination by Owner if made in good faith shall be final and binding upon Contractor.

    5.4.5    Vehicles (purchased or rental) used by supervisory personnel, if approved in advance by Owner in the exercise of its sole and absolute discretion.

    5.4.6    All Losses from lost, damaged or stolen materials, supplies, temporary facilities, tools, machinery, vehicles or equipment, (purchased or rented), regardless of the cause of the Loss, whether due to the fault of the Contractor, Subcontractors or others, shall be paid by Contractor at Contractor's Own Expense.

## 5.5    MISCELLANEOUS COSTS

    5.5.1    Costs of removal of debris from the Site in a manner that complies with Applicable Laws.

    5.5.2    Reproduction costs for copying Construction Documents or Contract Documents for: (1) submission by Contractor to Owner; or (2) for distribution by Contractor to Subcontractors.

    5.5.3    Costs of: (1) facsimile transmissions, long distance telephone calls, postage and express delivery charges; (2) telephone service at the Site; (3) use of cellular telephones (not including the purchase cost of the phone and only to the extent of rates that Contractor demonstrates are the most competitive rates available); (4) purchase or rental price of radios as permitted in accordance with Section 5.4, above; and (5) consumable supplies for offices located on the Site.

    5.5.4    To the extent reasonable and approved by Owner in writing in advance, costs of transportation (at the lowest available economy rate) and related subsistence expenses (at standard, business class rates), in connection with travel outside of the State in which the Project is located in

INITIALS ___  INITIALS ___
Edition: February, 2010/Rev.4.11

discharge of duties connected with the Work, but excluding travel to Contractor's out-of-state offices, if any.

5.5.5   Costs of premiums for insurance and bonds required by the Contract Documents; provided, however, that reimbursement of actual costs for premiums for such insurance shall not exceed a maximum amount derived by multiplying one percent (1%) times the sum of all Costs of Work incurred and paid (exclusive of Contractor's actual costs of premiums for insurance and bonds); provided, further, that (1) the amount of Contractor's costs of premiums for insurance and bonds shall be subject to audit by Owner in accordance with the provisions of Article 11, below, including, without limitation, audit to verify that Contractor's actual costs of insurance for which Contractor is seeking reimbursement are equal to or less than said maximum percentage; and (2) if the Contractor Fee is based on a percentage of Costs of Work, amounts that are reimbursable pursuant to this Paragraph 5.5.5 (whether charged by the Contractor or a Subcontractor) shall not be included in the computation of the Contractor Fee.

5.5.6   Except as otherwise provided in Paragraph 6.1.12, below, sales, use or similar taxes imposed by a Governmental Authority that are related to the Work and for which Contractor or Subcontractors are liable; provided, however, that if the Contractor Fee is based on a percentage of Costs of Work, such amounts shall not be included in the computation of the Contractor Fee. Contractor shall pay only those sales, use, or similar taxes that are required to be paid by Applicable Law, including seeking a refund from the applicable Governmental Authority of any estimated payments or prepayments of such taxes in excess of the actual taxes due. If Owner has made any estimated payments or prepayments of such taxes, Contractor shall take appropriate action, as permitted by law, to avoid duplicate payment of such taxes. Any such taxes paid by Contractor that are in excess of those taxes legally required to be paid shall not constitute Costs of Work.

5.5.7   Royalties and license fees paid for the use of a particular design, process or product expressly required by the Contract Documents, provided that Contractor has notified Owner, in writing and in advance of commencement of construction, that a royalty payment or license fee would be necessary to use the design, process or product and that Owner has approved in writing of such use.

5.5.8   Deposits lost for causes solely attributable to Owner's failure, within a reasonable time after receipt of written notice from Contractor, to fulfill a specific responsibility of Owner set forth in this Construction Contract or General Conditions.

5.5.9   Utilities, including, without limitation, electrical, water, sewer and other utilities until installation and energizing of the permanent power system to the Project.

5.5.10   Governmental fees for permits, approvals, or inspections for which Contractor is responsible under the Contract Documents; provided, however, that where the Contractor Fee is based on a percentage of Costs of Work, such amounts shall not be included in the computation of the Contractor Fee.

5.5.11   Costs of purchase or rental of individual personal computers and other special equipment (such as plotters for scheduling) while in full use at the Site for the sole benefit of the Project; provided, however, that in the case of rental, the aggregate rental cost for any item thereof shall not exceed the fair market value of the item at the time of its first use on the Site. If the aggregate rentals for any such item at any time equal such fair market value, then such item shall be turned over to Owner when it is no longer needed for the Work or, at the Owner's option, the Contractor may retain the item, in which latter event the Costs of Work shall be credited with a mutually agreeable amount based on the fair market value of the item at the time that it was no longer needed for the Work.

INITIALS ____ INITIALS ____
Edition: February, 2010/Rev.4.11

**5.6    OTHER COSTS**

Other costs incurred in the performance of the Work if and to the extent approved in advance in writing by Owner, which approval may be granted or withheld in the sole and absolute discretion of Owner.

**ARTICLE 6**
**COSTS NOT TO BE REIMBURSED**

The Costs of Work shall not include, and Contractor shall not be reimbursed for, the following:

**6.1    GENERAL ADMINISTRATIVE AND CAPITAL EXPENSES**

6.1.1    Except as permitted by Paragraph 5.1.1, above, through Paragraph 5.1.3, above, salaries and other compensation of personnel stationed at Contractor's principal or branch office or offices, including, without limitation, employees' salaries and related expenses of supervision and administration of progress, schedule, estimating, employee training, value engineering and cost control.

6.1.2    Except as permitted by Paragraph 5.1.3, above, payments under collective bargaining agreements, payments to employees or personnel assigned to the Project, whether located or working on the Site or at other locations, for merit or incentive bonuses, 401(k) plans, IRA plans, profit sharing plans or pension plans.

6.1.3    Except as permitted by Paragraph 6.1.2, above, or Paragraph 5.1.3, above, expenses of principal, branch and district offices, including, without limitation, costs of copying, electronic transmissions, office equipment and supplies, meals/food and expenses related to personnel training and other meetings, whether or not related to the Project.

6.1.4    Profit, overhead and general and administrative expenses, of any kind, including, without limitation, general accounting, auditing, tax preparation, advertising and promotions and insurance administration.

6.1.5    Except as permitted by Paragraph 5.5.4, above, costs and expenses for travel, subsistence or relocation, including, without limitation, toll road charges, and all costs of meals and food.

6.1.6    Capital expenses, including, without limitation, interest on capital employed for the Work.

6.1.7    Attorney's fees and expenses of litigation, mediation or arbitration, except to the extent permitted under the terms of this Construction Contract.

6.1.8    Except as permitted by Paragraph 5.5.11, above, costs and expenses of computers and computer media (hardware and software) and internet service costs.

6.1.9    Except as permitted by Paragraph 5.4.2, above, rental costs of machinery and equipment.

6.1.10    Costs (1) of business and professional licenses, (2) of dues, assessments and contributions to technical or trade associations, or (3) for representation in collective bargaining.

6.1.11    Costs of insurance on tools or equipment owned or rented that are not furnished to or used for the Work.

INITIALS ___ INITIALS ___
Edition: February, 2010/Rev.4.11

**6.1.12**  Taxes (1) assessed against property, (2) imposed on the sale or use of equipment or other items not incorporated into the Work or (3) on gross income.

**6.1.13**  Governmental Authority fees not related to the permitting of construction of the Work.

**6.1.14**  Costs listed in Article 5, above, that are (1) covered and paid or payable by insurance proceeds from policies of insurance maintained by Contractor or by a Subcontractor, of any Tier, or (2) not covered or paid for by insurance proceeds as result of a failure by Contractor or a Subcontractor, of any Tier, to comply with an obligation set forth in the Contract Documents.

**6.2     NEGLIGENCE, BREACH AND NONCOMPENSABLE DELAY**

**6.2.1**  Costs due to negligence, willful misconduct or violation of an Applicable Law by Contractor or a Subcontractor, of any Tier, the failure of Contractor to fulfill any of its responsibilities set forth in the Contract Documents or the failure of a Subcontractor to fulfill any of its responsibilities set forth in its subcontract or the Contract Documents, including, without limitation, any costs incurred in performance of any warranty or guarantee obligation under the Contract Documents.

**6.2.2**  Expenditures from Contingency that are not approved by Owner in accordance with Section 2.3, above, in advance of their being incurred.

**6.2.3**  Costs arising from Changes, other than Compensable Changes.

**6.2.4**  Costs arising from Delay, other than Compensable Delay.

**6.2.5**  Costs for late charges, penalties or interest charged by a Subcontractor, of any Tier, resulting from the failure of Contractor or a Subcontractor of a higher Tier relative to such Subcontractor to pay or timely pay amounts due to or claimed by such Subcontractor; provided, however, that nothing stated in this Paragraph 6.2.5 shall be interpreted to relieve the Owner of any obligation it may have under the Contract Documents or Applicable Laws to pay interest to Contractor in the event of a breach by Owner of its payment obligations under the Contract Documents.

**6.3     OTHER NON-REIMBURSABLE COSTS**

**6.3.1**  Costs (including, without limitation, Costs of Work) incurred by Contractor for performance of the Work that when added to Contractor Fee due to Contractor for such Work would exceed the Contract Price, as adjusted for Contract Adjustments authorized and permitted in accordance with the requirements of the General Conditions.

**6.3.2**  General Conditions Costs that are incurred by Contractor (1) after expiration of the Contract Time for Final Completion as set forth in Section 3.3, above, or (2) in excess of the General Conditions Costs Maximum, as adjusted for Contract Adjustments authorized and permitted by the General Conditions.

**6.3.3**  Costs or expenses with respect to which the Construction Contract and General Conditions state that they: (1) shall not be a Cost of Work; (2) shall not be reimbursable by Owner; (3) shall be paid by Contractor to Owner; (4) shall be paid or borne by Contractor at Contractor's Own Expense; (5) are chargeable or recoverable by Owner from Contractor; (6) may be withheld by Owner from payments due to Contractor; (7) may be deducted from the Contract Sum; or (8) form the basis for a reduction in the Contract Price.

INITIALS ⟨⟨⟩ INITIALS ⟨⟨⟩
Edition: February, 2010/Rev.4.11

6.3.4    The cost for any item not specifically and expressly listed as a Cost of Work in Article 6, above.

## ARTICLE 7
### DISCOUNTS, REBATES AND REFUNDS

**7.1    CASH DISCOUNTS**

Except as otherwise provided herein, cash discounts (i.e., discounts for prompt payment) on payments made by Contractor shall accrue to Owner and Owner shall not be charged a Contractor Fee thereon if: (1) before making the payment, Contractor included the undiscounted cost of the item(s) in an Application for Payment and received payment therefor; or (2) the Owner has deposited funds with the Contractor with which to make payments; otherwise, such cash discounts shall accrue to the Contractor; provided, however, that cash discounts that exceed two percent (2%) shall, to the extent of such excess only, accrue solely and unconditionally to Owner.

**7.2    TRADE DISCOUNTS**

Trade discounts, rebates and refunds (i.e., discounts, rebates and refunds extended to buyers in a particular industry or trade) and amounts received from sales of surplus materials or equipment shall accrue to Owner and Owner shall not be charged a Contractor Fee thereon. Contractor shall make provision so that such discounts, rebates and refunds can be obtained.

**7.3    VOLUME DISCOUNTS**

Any discounts, rebates or refunds provided by vendors or suppliers to Contractor or any Subcontractor that are based upon the volume of purchases by Owner or other circumstances related to the purchasing activities of Owner not related to the Work shall accrue solely to Owner and Owner shall not be charged a Contractor Fee thereon. Contractor shall make provision so that such discounts, refunds and rebates can be obtained.

**7.4    DISCLOSURE AND SUBSTANTIATION**

Costs of Work included in an Application for Payment shall, whenever possible, reflect all discounts that accrue to Owner under this Article 7. If Costs of Work are included in a current Application for Payment at undiscounted rates for Work for which Contractor has or later obtains a cash, trade or volume discount that under the terms of this Article 7 accrues to Owner, such discounts shall be disclosed and appropriate credits to Costs of Work and Contractor Fee included by Contractor in the next month's Application for Payment. Contractor shall, upon request, make documentation available to Owner to confirm to Owner's satisfaction that discounts, rebates and refunds have been properly accounted for by Contractor in accordance with the requirements of the Contract Documents. With respect to discounts, refunds or rebates provided for under Section 7.3, above, Contractor shall, if requested, provide Owner with such additional information concerning the quantities and prices of materials, equipment, appliances or other products purchased for the Work, as Owner may reasonably require, so that Owner can secure the benefits of such discounts, refunds or rebates directly from Owner's vendors and suppliers.

## ARTICLE 8
### CONTRACTOR FEE

Except as otherwise expressly provided in this Construction Contract or elsewhere in the Contract Documents, Owner shall pay Contractor a Contractor Fee for performance of the Work in accordance with the Contract Documents of _____ percent (__ %) of the Costs of Work. The Contractor Fee is the total

INITIALS ____ INITIALS _____
Edition: February, 2010/Rev.4.11

compensation payable to Contractor for its profit, general administrative overhead and other costs for which Contractor is not entitled to reimbursement as a Cost of Work.

## ARTICLE 9
## PROGRESS PAYMENTS

### 9.1   PAYMENTS BY OWNER

Based upon Applications for Payment submitted by the Contractor to the Construction Manager in accordance with the Contract Documents, the Owner shall make payment of undisputed sums earned, due and payable on account of the Contract Sum to the Contractor as provided for in this Article 9 and the General Conditions.

### 9.2   PERIOD OF APPLICATION FOR PAYMENT

The period covered by each Application for Payment shall be the period beginning on and including the first Day of the month and ending on and including the last Day of that same month.

### 9.3   SUBMISSION OF APPLICATIONS FOR PAYMENT

9.3.1   **Monthly Applications.** One Application for Payment shall be submitted monthly by Contractor.

9.3.2   **Time of Submission.** Applications for Payment shall be properly prepared in accordance with the requirements of this Article 9 and Article 9 of the General Conditions and submitted by Contractor to the Construction Manager once a month on the last calendar day of the month. Applications for Payment submitted prior to that time, regardless of the reason, shall be deemed submitted and received on the last calendar day of the month.

9.3.3   **Lender Requirements.** Owner and Contractor agree that the dates for submission and approval of Applications for Payment shall, without the necessity of any further agreement by Contractor, be subject to change upon notice by Owner to Contractor as necessary to conform to the requirements of any Lender.

9.3.4   **Form of Application.** Contractor shall use the form of Application for Payment attached hereto as Exhibit "L" – Application for Payment Form in requesting Progress Payments and Final Payment, or such other form as may be requested by Owner.

### 9.4   SCHEDULE OF VALUES

9.4.1   **Basis.** Each Application for Payment shall be based upon a Schedule of Values prepared and submitted by the Contractor in accordance with the Contract Documents and approved by Owner and, if required, by Lender.

9.4.2   **Format.** For each categorical line item of Work referred to in Subparagraph 9.4.3.1, above, the Schedule of Values shall include: (1) the budgeted value assigned to that line item in the Schedule of Values attached to the GMP Amendment, along with a designation disclosing whether the budgeted amount so assigned is based on an "estimate" or "actual contract value"; and (2) for each trade line item of Work, the information required by Subparagraph 9.4.3.3, below, concerning the status of the Buy Out of the Work, and each portion of the Work, comprising that trade line item.

INITIALS [signature]  INITIALS [signature]
Edition: February, 2010/Rev.4.11

**9.4.3    Content.** Each Schedule of Values shall comply with the following:

.1    **Categorical Allocations.** The Schedule of Values shall include a fair and balanced allocation of the Contract Price in into separate line item descriptions that include, without limitation to any other categories requested by Owner, the following categories or portions of the Work: (1) Preconstruction Services; (2) mobilization; (3) trade items of Work; (4) General Conditions Costs; (5) sales tax imposed by the State in which the Project is located; (6) Contractor Fee; (7) Buy Out Account; and (8) Contingency.

.2    **Budgeted Allocations.** For each categorical line item of Work referred to in Subparagraph 9.4.3.1, above, the Schedule of Values shall include: (1) the budgeted value assigned to that line item in the Exhibit "F" – "Schedule of Values" attached hereto, along with a designation disclosing whether the budgeted amount so assigned is based on an "estimate" or "actual contract value"; and (2) for each trade line item of Work, the information required by Subparagraph 9.4.3.3, below, concerning the status of the Buy Out of the Work, and each portion of the Work, comprising that trade line item.

.3    **Buy Out Status.** With respect to each trade line item in the Schedule of Values and in each updated Schedule of Values, Contractor shall, based on all current information available to Contractor, state:

(1) , whether the Buy Out of the Work covered by that trade line item is complete and if not a description of the portions of such trade line item of Work for which Buy Out is complete and incomplete;

(2)    the actual subcontract value(s) resulting the Buy Out of such trade line item or any portion thereof;

(3)    a comparison of (a) the original budgeted allocation assigned to the trade line item in the Schedule of Values attached to the executed GMP Amendment, (b) the actual subcontract value(s) established in the course of conducting the Buy Out, and (c) the amount of any Buy Out Losses or Buy Out Savings resulting from the Buy Out of such trade line item or any portion thereof; and

(4)    a summary line item, titled the Buy Out Account, into which the cumulative Buy Out Savings from the Buy Out of individual trade line items are transferred and from which the cumulative Buy Out Losses from the Buy Out of individual trade line items are funded or covered in the course of the Buy Out of the individual trade line items of Work. Buy Out Losses and Buy Out Savings in a trade line item of Work shall be shown and tracked exclusively through the Buy Out Account and shall not be reflected as an adjustment to any other trade line item amounts.

.4    **Contingency Status.** Amounts reserved in the Schedule of Values as Contingency shall be fully disclosed, including identification of the agreed dollar amount of the Contingency, monthly tracking of the utilization of Contingency based on increasing or declining Contingency balances and a listing by description and dollar amount of all Owner-approved expenditures of Contingency funds.

**9.4.4    Buy Out Completion.**

.1    **Timing.** Contractor shall proceed promptly after execution by Contractor and Owner of a GMP Amendment to complete the Buy Out of the trade line items in the Schedule of Values. Buy Out of all trade line items of the Work shall be completed no later than Thirty (30) Days after execution by Contractor and Owner of the GMP Amendment.

INITIALS _____ INITIALS _____
Edition: February, 2010/Rev.4.11

.2    **Contingency Use.**  No portion of the Contingency shall be disbursed for any purpose, including, without limitation, to cover any Buy Out Loss, unless and until Buy Out of the entire Work has been completed.

.3    **Disposition.**   Disposition of the Buy Out Account shall be determined in accordance with Section 2.4, above, following completion of the Buy Out of all of the Work.

9.4.5    **Updating.** The Schedule of Values shall be updated by the Contractor, as often as necessary and without the necessity of a prior request by the Owner, in order to ensure that such Schedule of Values accurately reflects the current status of the Contractor's contracting of the Work and that it at all times complies with the requirements of this Section 9.4 based on the most current information available to the Contractor.  Updates shall be submitted to Owner, for Owner's approval in writing, in advance of submission of an Application for Payment in order to allow Owner time to review and evaluate any new information. The updated Schedule of Values approved by Owner shall be submitted with the Contractor's Application for Payment. Only an updated Schedule of Values approved by Owner shall be used as the basis for Applications for Payment. Contract Adjustments pursuant to executed Prime Contract Change Orders or Provisional Prime Contract Change Orders shall, as directed by Construction Manager, be reflected in such Schedule of Values either as adjustments to the affected trade line items of Work or as separate line items for the Change that is covered by the Contract Adjustment.

9.4.6    **Basis for Payments.**  Except as approved in advance by Owner in writing, no payment for any line item of Work (including, without limitation, Contractor Fee and General Conditions Costs) shown in a Schedule of Values shall exceed the dollar amount for that line item in the Schedule of Values that is set forth in the latest, updated Schedule of Values approved by Owner.

9.4.7    **Substantiation.**   The Contractor shall produce for the Owner upon request such data substantiating the accuracy of a Schedule of Values and verifying Contractor's compliance with this Section 9.4 as the Owner may, in the exercise of its sole and absolute discretion, require.

9.4.8    **No Changes.**  No changes shall be made by Contractor in an updated Schedule of Values that has been approved by Owner without the prior written approval of Owner. Failure by Contractor to comply with this requirement shall constitute grounds for Owner to reject an Application for Payment in its entirety and to refuse to make payment until the Schedule of Values is corrected.

**9.5    PERCENTAGE COMPLETION**

Applications for Payment shall indicate the percentage of completion of each portion of the Work, as established in accordance with Article 9 of the General Conditions, as of the end of the period covered by the Application for Payment.

**9.6    PROGRESS PAYMENT AMOUNT**

9.6.1    Subject to the provisions of the Contract Documents, the amount of each Progress Payment shall be computed as follows:

.1    take the Costs of Work incurred and paid by Contractor that are reimbursable pursuant to Paragraph 4.1.11, above, for performance of Preconstruction Services, less a retention of Ten percent (10%);

.2    add the Costs of Work, other than General Conditions Costs, incurred and paid by Contractor for Work that is installed and in permanent place at the Site, not to exceed for any line item

INITIALS ___ INITIALS ___
Edition: February, 2010/Rev.4.11

of Work that is listed in the current Owner-approved Schedule of Values a pro rata share of the line item dollar amount for such portion of the Work, determined by multiplying (1) such line item dollar amount by (2) the percentage completion established pursuant to Article 9 of the General Conditions of such portion of the Work, less a retention of Ten percent (10%);

.3     add the General Conditions Costs incurred and paid by Contractor, other than Costs of Work reimbursable for Preconstruction Services, not to exceed a pro rata share of the General Conditions Costs Maximum, as determined by multiplying (1) the General Conditions Costs Maximum by (2) the percentage completion of the Work, as established pursuant to Article 9 of the General Conditions, less a retention of Ten percent (10%);

.4     add those Costs of Work, if any, approved by Owner in accordance with Article 8 of the General Conditions for payment for materials and equipment to be used in the performance of the Work that are delivered and suitably stored at the Site for subsequent incorporation in the completed construction or suitably stored off the Site at a location agreed upon in writing, less a retention of Ten percent (10%);

.5     add an amount for Contractor Fee, calculated as follows: (1) if the Contractor Fee is an agreed percentage, by multiplying the Costs of Work properly reimbursable to Contractor in accordance with Subparagraph 9.6.1.2 through Subparagraph 9.6.1.4, above, by the percentage set forth in Article 8, above; or (2) if the Contractor Fee is a fixed amount, by multiplying the amount of the Contractor Fee by the percentage completion of the overall Work as established pursuant to Article 9 of the General Conditions, less a retention of Ten percent (10%);

.6     subtract the aggregate of previous payments made by the Owner; and

.7     subtract amounts, if any, that Construction Manager or Owner has determined will be withheld pursuant to an exercise of the right to withhold as set forth in Section 9.8 of the General Conditions.

## 9.7     APPROVAL/DISAPPROVAL OF APPLICATION FOR PAYMENT

Approval by the Construction Manager of the Contractor's Application for Payment shall be a condition to the Owner's obligation to make payment to the Contractor. As soon as practicable, but not earlier than seven (7) Days after the Construction Manager's receipt of an undisputed and properly submitted Application for Payment requesting Progress Payment, the Construction Manager will either approve the Application for Payment or notify the Contractor in writing of the reasons for withholding approval, in whole or in part, of the Application for Payment. Subject to Contractor's right to suspend performance and terminate the Construction Contract under Section 9.8 and Section 14.4 of the General Conditions, failure by Construction Manager to timely reject an Application for Payment or specify any grounds for rejection shall not constitute a waiver of any rights by the Owner. An Application for Payment that is rejected shall be corrected and resubmitted within seven (7) Days after receipt by the Contractor of the statement of reasons for rejection.

## 9.8     PROGRESS PAYMENTS

9.8.1     Monthly Progress Payments. Owner shall make payment to Contractor of undisputed amounts approved by the Construction Manager for payment to Contractor as Progress Payments no later than thirty (30) Days after receipt of a properly prepared and submitted Application for Payment.

9.8.2     Substantial Completion. The Progress Payment amount determined in accordance with Section 9.6, above, shall be further modified by adding, upon Substantial Completion of the Work, a sum

INITIALS _____ INITIALS _____
Edition: February, 2010/Rev.4.11

sufficient to increase the total payments to Ninety-five percent (95%) of the Contract Sum, less amounts, if any, that Owner is permitted to withhold as stated in Section 9.6 of the General Conditions or elsewhere in the Contract Documents.

## 9.9   LIEN WAIVER AND PAYMENT RELEASES

**9.9.1   Payment Releases.** Each Application for Payment shall be accompanied by signed releases as required by the terms of Article 9 of the General Conditions using the forms included in Exhibit "G" – "Release Forms". Owner and Contractor agree that the terms and conditions set forth in the Contract Documents governing the form, timing and frequency of submission of such releases shall, without the necessity of any further agreement by Contractor, be subject to change upon notice by Owner to Contractor as necessary to conform to the requirements of any Lender.

**9.9.2   Lien Waiver.** Contractor hereby waives and releases any and all mechanic's liens, and other claims or liens upon the land upon which the Project is located and the improvements thereon for work performed or to be performed pursuant to this Contract and further agrees to include a similar waiver and release in all of its subcontracts on the Project, and to require each Subcontractor to include a similar waiver and release in its sub-subcontracts of any tier on the Project.

## 9.10   INTEREST

If the Owner defaults in the performance of its payment obligation it shall pay interest to the Contractor on the amount due and unpaid at the Interest Rate commencing from the date that Owner is adjudged in default of its payment obligation under the Construction Contract. No other amount shall be paid or payable by Owner in the form of interest or late charges on unpaid sums due. No interest shall be due on retention or other amounts properly held by Owner.

### ARTICLE 10
### FINAL PAYMENT

Approval by the Construction Manager of the Contractor's Application for Payment requesting Final Payment shall be a condition to the Owner's obligation to make Final Payment to the Contractor. As soon as practicable, but not earlier than seven (7) Days after the Construction Manager's receipt of an undisputed and properly submitted Application for Payment requesting Final Payment, the Construction Manager will either issue an approval authorizing Final Payment to the Contractor, for such amount as the Construction Manager determines is properly due, or notify the Contractor of the reasons for withholding approval. Subject to Owner's right of withholding set forth in Section 9.6 of the General Conditions, Final Payment upon an undisputed Application for Payment requesting Final Payment that has been properly prepared and submitted in accordance with the requirements of this Construction Contract and Article 9 of the General Conditions shall become due and payable by Owner forty-five (45) Days after the receipt by Owner of an Application for Payment requesting Final Payment that has been submitted by Contractor following Close-Out Completion and that has been prepared in accordance with the requirements of this Construction Contract and Article 9 of the General Conditions.

### ARTICLE 11
### BOOKS AND RECORDS

## 11.1   FINANCIAL MANAGEMENT

Contractor shall establish and exercise accounting and control systems for the proper financial management of the Work that are satisfactory to Owner, comply with the prevailing custom and practice

Page 35 of 48

INITIALS [initials]   INITIALS [initials]
Edition: February, 2010/Rev.4.11

for similar projects and afford Owner the ability to verify all charges and duplicate all calculations made by the Contractor and Subcontractors.

## 11.2   RECORD KEEPING

**11.2.1  Books and Records.**  Contractor shall keep full and detailed books and records concerning the Project, including, without limitation, all documents (including, all hard copies and computer readable data, if it exists) that comprise or relate or refer to any of the following:   (1) agreements, purchase orders, leases, contracts, proposals, commitments, invoices, billings, statements, delivery tickets, bills of lading, shipping documents, inventories, receipts, checks, certificates, releases, waivers, plans, specifications, notes, schedules, reports, studies, test data, approvals, permits, applications, diaries, logs, photographs, videos, shop drawings, samples, product data, job reports, change orders, field orders, directives, orders, bulletins, requests for information, addenda, receipts, vouchers, correspondence, memoranda, messages, minutes, accounting records, job cost reports and files, settlement agreements, back charges, and general ledgers; (2) any charge, cost or expense for which Contractor seeks reimbursement or payment by Owner as part of any Application for Payment, Claim or other demand; and (3) any other documents that Owner, in its reasonable judgment, deems relevant to the Project or the Work.

**11.2.2  Maintenance and Retention.**  Contractor shall at all times maintain such books and records in an organized and systematic form that allows for reasonably easy access and review and shall retain and preserve such books and records for a period of ten (10) years after the earlier of either termination of the Construction Contract or Close-Out Completion of the Work, or for such longer period as may be required by Applicable Laws.

## 11.3   INSPECTION, PRODUCTION AND AUDITING

**11.3.1  General Audit Right.**  Contractor shall allow Owner and its authorized representatives, auditors, and attorneys, not later than the third business day after written notice to Contractor, full access at Contractor's offices nearest to the Project to inspect, audit and copy any or all of Contractor's books and records as described in Section 11.2, above. Contractor shall, at Contractor's Own Expense, furnish facilities and staff assistance for, and cooperate fully with, such inspection or audit. Upon request, Contractor shall provide reproducible copies of such books and records for reproduction by or on behalf of Owner. Except as otherwise provided in Section 11.4, below, such reproduction shall be at Owner's own expense and shall not be a Cost of Work. Owner's rights under this Section 11.3 may be exercised at any time and as often, as Owner deems, in its sole and absolute discretion, necessary during performance of Work and as often as necessary, before and/or after Final Completion and Final Payment, in order to conduct and complete a full accounting and audit of all Costs of Work, Contractor Fee and Claims by Contractor.

**11.3.2  Wage and Salary Audits.**  As part of the accounting and audit process provided for in Paragraph 11.3.1, above, Contractor shall, if requested, submit to Owner a detailed breakdown of any wages, salaries and burden expenses included by Contractor in an Application for Payment for which Contractor is seeking reimbursement as Costs of Work (1) under Paragraph 6.1.1 through Paragraph 6.1.3, above, (2) under Subparagraph 3.6.2, above, or (3) for Work constituting extra work under a Subcontractor's subcontract with Contractor that has been authorized by Owner to be performed by the Subcontractor on a time and materials basis under Section 6.2, above. Such breakdown shall be accompanied by an explanation of how such Costs of Work have been computed for purposes of billing. Owner shall have the right at any time and as a condition of its approval of any such Application for Payment to conduct an audit of any such Costs of Work by reviewing Contractor's or Subcontractor's records of actual costs, including, without limitation, its records of actual wages, salaries and payroll expenses. Any amount billed for such Costs of Work, including, without limitation, any amount that is

INITIALS [initials]   INITIALS [initials]
Edition: February, 2010/Rev.4.11

based on a maximum rate set forth in Exhibit "J" – "Maximum Labor/Salary Rates" attached hereto (as adjusted in accordance with Subparagraph 3.8.2.1 or Paragraph 6.1.6, above) or that is based on a maximum Subcontractor rate or adjusted rate for wages, salaries or associated burden that has been approved by Owner pursuant to Subparagraph 4.1.4.13, above, which is in excess of the lesser of (a) verifiable actual costs or (b) the applicable maximum rate permitted under the applicable provision of Section 6.1 or Section 6.2, above, shall be returned to Owner or may be withheld by Owner from other payments due to Contractor. Without limitation to Owner's other rights and remedies under this Article 11, compliance by Contractor and the Subcontractors with the provisions of this Paragraph 11.3.2 with respect to a request contained in an Application for Payment for reimbursement of such Costs of Work is required as a condition of Contractor's right to reimbursement for such Costs of Work and any Contractor Fee thereon.

## 11.4   NONCOMPLIANCE BY CONTRACTOR

11.4.1   Cost of Audit. If an inspection or audit pursuant to Section 11.3 discloses that any amount cannot be verified by Owner due to a failure by Contractor or any Subcontractor to comply with this Article 11, has been improperly, inaccurately or excessively charged to Owner by Contractor or any Subcontractor or has been overpaid by Owner, and if the total of such amounts for any calendar year audited is five percent (5%) or more of the total amount invoiced to Owner for Costs of Work and Contractor Fee during such year, then Contractor shall pay, at Contractor's Own Expense, 100% of the actual cost to Owner of such inspection or audit and any resulting report.   If such inspection, audit or report is by Owner using in-house staff, then such actual cost to Owner shall be computed on the basis of two (2) times the direct payroll of the staff completing such inspection, audit or report.

11.4.2   Owner Remedies.   Without limitation to any of Owner's rights or remedies for recovery or withholding of any amounts from Contractor as may be permitted by Applicable Laws or elsewhere in this Section 11.4 or the Contract Documents, if an inspection or audit pursuant to Section 11.3, above, discloses that an amount has been overpaid by Owner, then Owner shall have the right to withhold such amount from any payments due to Contractor or if no payments are due Contractor shall, whether or not Final Payment has been made by Owner, immediately reimburse such amount to Owner.   Amounts overpaid by Owner shall earn interest at the Interest Rate from the date of overpayment until the date reimbursed by Contractor to Owner.

11.4.3   Withholding.   In addition, and without limitation upon any of the other provisions for retention of funds or withholding set forth in this Section 11.3 or elsewhere in the Contract Documents, Owner shall have the right to withhold from any payment to Contractor an additional sum of up to ten percent (10%) of any amount claimed due by Contractor until Contractor has fully complied with any outstanding and unsatisfied request by Owner for performance by Contractor of any obligation under this Article 11.   Upon Contractor's full compliance, such sum withheld under this Paragraph shall be released to Contractor.

11.4.4   Legal Proceedings. Contractor's compliance with the requirements of this Article 11 shall be a condition precedent to maintenance by Contractor of any legal action or arbitration against Owner relating to Contractor's or Owner's performance under or related to the Contract Documents.

## 11.5   SUBCONTRACTORS

Contractor shall ensure that the provisions of this Article 11 are included in all contracts entered into by Subcontractors, of every Tier, who provide Work for the Project; provided, however, that Contractor shall have the right to limit the scope of a Subcontractor's obligation to allow for inspection or audit of books and records concerning actual costs of performance to costs that are related to: (1) Work that is performed on a time and materials basis; (2) Allowances; (3) Changes; and (4) Claims.

INITIALS _____ INITIALS _____
Edition: February, 2010/Rev.4.11

**11.6    SPECIFIC ENFORCEMENT**

Any failure by Contractor or a Subcontractor to provide access to inspect, copy or audit its books and records as provided in this Article 11 shall be specifically enforceable by issuance of a provisional and/or permanent injunction by a court of competent jurisdiction. Any application by Owner for such a court order may be based on affidavits submitted to the court, without the necessity of oral testimony. Commencement and prosecution of a legal action for such injunctive relief shall not constitute a binding election by Owner under Article 13, below, to submit to litigation, rather than arbitration, other disputes or as a waiver by Owner of its right to elect to proceed with arbitration of such other disputes under Article 13, below.

**ARTICLE 12**
**TERMINATION OR SUSPENSION**

This Construction Contract may be suspended or terminated by the parties as provided in Article 14 of the General Conditions.

**ARTICLE 13**
**DISPUTE RESOLUTION**

**13.1    LITIGATION**

Except for claims and disputes subject to arbitration pursuant to Section 13.2, below, all claims, disputes or other matters in question between Contractor and Owner shall be resolved by litigation. **WITH RESPECT TO ANY CLAIM, DISPUTE OR OTHER MATTER IN QUESTION BETWEEN CONTRACTOR AND OWNER THAT OWNER DOES NOT ELECT TO ARBITRATE PURSUANT TO SECTION 13.2, BELOW, AND THAT IS SUBMITTED TO LITIGATION FOR RESOLUTION, OWNER AND CONTRACTOR EACH HEREBY FREELY, VOLUNTARILY, AND INDEPENDENTLY WAIVES ITS RIGHT TO A TRIAL BY JURY.**

**13.2    ARBITRATION**

Any claim or dispute arising between Owner and Contractor that Owner elects, in its sole and absolute discretion, to be decided by arbitration shall be submitted to final and binding arbitration in accordance with the provisions of Paragraphs 13.2.1 through 13.2.4, below.

   **13.2.1    Election by Owner.** Owner shall have the unilateral right, exercised or not exercised in Owner's sole and absolute discretion, to elect to submit any claim or dispute between Owner and Contractor to final and binding arbitration in accordance with the provisions of this Section 13.2, Further, in the event that Owner files a claim in arbitration and Contractor thereafter and at any time prior to entry of final award in said arbitration files a claim or asserts a defense against Owner either in the same or a different arbitration seeking recovery of money or damages, either affirmatively or by way of set off, and such claim is permitted by the arbitrator(s) to be filed, then Owner shall have the right, in its sole discretion, to thereafter elect by written notice to Contractor either: (1) to dismiss the Owner's claim in arbitration, which dismissal shall be deemed to be without prejudice and without limitation to Owner's right to litigate such claim and in which case litigation shall be the exclusive means of adjudicating both Owner's and Contractor's claims; or (2) to proceed with arbitration of both Owner's claim and Contractor's claim, in which case the claims of both Owner and Contractor shall be arbitrated in accordance with the provisions of this Section 13.2.

   **13.2.2    Administration of Arbitration.** Arbitration shall be commenced by the Owner's or Contractor's (with Owner's consent or pursuant to a court order staying litigation commenced by Contractor) filing a demand for arbitration in writing. Demands for arbitration shall be filed with the

INITIALS ___ INITIALS ___
Edition: February, 2010/Rev.4.11

American Arbitration Association. Arbitration shall be administered by the American Arbitration Association at its regional office closest to the Site and in accordance with its Construction Industry Arbitration Rules. The fees for filing of a demand or cross-demand for arbitration shall be paid in accordance with the rules of the American Arbitration Association. Any claim by Owner or Contractor which is arbitrable shall not be allowed after the date when institution of legal or equitable proceedings based upon such claim or dispute would be barred by the applicable statute of limitations, except that if Owner elects to litigate a claim which was timely initiated in arbitration pursuant to Paragraph 13.2.1, above, and the applicable statute of limitations has expired in the interval between the initiation of such arbitration and Owner's election to litigate such claim pursuant to Paragraph 13.2.1, above, Contractor agrees that such litigation will not be barred by such applicable statute of limitations, which will be deemed tolled from the date the arbitration was initiated.

13.2.3 Joinder. No arbitration shall include, by consolidation or joinder or in any other manner, parties other than the Owner, Contractor and any other person or entity substantially involved in a common question of fact or law whose presence is required if complete relief is to be accorded. No person or entity other than the Owner or Contractor shall be included as an original third party or additional third party to arbitration whose interest or responsibility is insubstantial. Consent to arbitration involving an additional person or entity shall not constitute an agreement to arbitrate a dispute not described in such consent or with a person or entity not named or described therein.

13.2.4 Award. The award rendered by the arbitrator(s) shall be final, and judgment may be entered upon it in accordance with Applicable Laws in any court having jurisdiction thereof.

13.3 MEDIATION

If agreed by Owner and Contractor, Claims by Owner or Contractor shall be submitted to mediation under the auspices of a recognized, neutral third-party professional mediation service, or other method acceptable to Owner and Contractor. The cost of the mediation services shall be divided equally among Owner, Contractor and each of the Subcontractors who either participate in the mediation or on whose behalf Contractor has submitted a Claim. Payment of mediation costs allocable to a Subcontractor shall, if not paid by such Subcontractor, be advanced by Contractor on the Subcontractor's behalf.

13.4 ATTORNEY'S FEES AND COSTS

If any legal action, arbitration or other legal proceeding is brought in connection with or related to the interpretation, performance or enforcement of this Construction Contract or any other provision of the Contract Documents, including, but not limited to, an action to rescind this Construction Contract, the prevailing party therein shall be entitled to recover its actual costs, expenses and attorney's fees (both outside and in-house counsel), court costs (statutory and non-statutory), professional, expert and consultant fees, paralegal fees, investigative costs, postage costs, document copying costs, telecopy costs and any and all other costs and expenses, of mediation, arbitration, trial and on appeal. The determination of the "prevailing party" shall be based upon the party who prevails upon the matters actually litigated or arbitrated and shall not be determined solely based on which, if any, party receives a net monetary recovery.

ARTICLE 14
NOTICES

14.1 NOTICES

14.1.1 Delivery. All notices, demands or requests required to be given under the Contract Documents shall be given in writing and shall be conclusively deemed received when: (1) delivered

Page 39 of 48

INITIALS ____ INITIALS ____
Edition: February, 2010/Rev.4.11

INITIALS ____ INITIALS ____
Edition: February, 2010/Rev.4.11

### 16.14   EXECUTION

Execution of this Construction Contract by means of the signature of a party hereto on a facsimile copy shall be binding to the same extent as execution of an original.

### 16.15   COUNTERPARTS

This Construction Contract may be executed in separate counterparts, any one of which need not contain the signature of more than one party, but all of which taken together shall constitute the same agreement.

### 16.16   LIMITATION OF LIABILITY

Contractor acknowledges and understands that this Construction Contract is being managed by Owner's Representative and Owner's Agent (if any) as agents of the Owner.  Contractor agrees to look to Owner as its sole remedy and recourse for performance of all obligations owing to Contractor by Owner under this Construction Contract and for recovery of all costs, expenses, losses and damages occurring in connection with the performance of this Construction Contract and agrees that under no circumstances shall Owner's Representative or Owner's Agent have any liability to Contractor for any costs, expenses, losses and damages due to any act or omission by any of them, or by anyone retained by them as a consultant or contractor, regardless of the cause, reason or circumstance (including, without limitation, the passive or active negligence of any of them, a nonpayment of an amount due Contractor or a breach of any other obligation owing to Contractor under the terms of this Construction Contract).

### 16.17   LIMITED RECOURSE

The aggregate liability of Owner under and with respect to this Construction Contract shall be limited to Owner's interest in the real estate upon which the Project is to be constructed and the improvements thereon and no other real or personal property or other asset of Owner, or of any partner of Owner, or any partner of any partner of Owner, whether an individual or entity, will be subject to liability or personally liable hereunder, nor shall the deficit capital account of any partner, or partner of a partner, be deemed an asset of Owner.

### 16.18   PROVISIONS MANDATED BY APPLICABLE LAWS

Any "Provision Mandated by Applicable Laws" (as defined hereinbelow) shall be deemed inserted in the Contract Documents and the Contract Documents shall be enforced accordingly. If any Provision Mandated by Applicable Laws conflicts with a contractual provision contained in the Contract Documents, then the latter shall be interpreted and applied so as to preserve, to the greatest extent permitted by Applicable Laws, the non-conflicting portions of the contractual provision, their plain meaning and the apparent original intent of the Contract Documents.  If any time period stated in the Contract Documents is shorter or longer than a corresponding time period required by a Provision Mandated by Applicable Laws, then the former shall be deemed modified so that it coincides with the mandated time period. If Provisions Mandated by Applicable Laws mandate the use of a particular form of document to the exclusion of others, then such mandated form shall be used in lieu of the form provided by the Contract Documents (subject, however, to the Owner's right to supplement such mandated form with any provisions of the contractual form that are not proscribed by Applicable Laws). The phrase "Provision Mandated by Applicable Laws" as used in this Section shall mean and include any term, right, obligation, condition or requirement that Applicable Laws: (1) mandate must be stated or included in, or must govern performance of, a construction contract in order for the contract, a portion thereof or a right thereunder, to be legally enforceable; and (2) prohibit the contracting parties from omitting, waiving or modifying by consent or agreement.

INITIALS ____ INITIALS ____
Edition: February, 2010/Rev.4.11

**16.19   WORK PERFORMED BY CONTRACTOR OR AFFILIATES**

Contractor shall not enter into any subcontract, contract, agreement, purchase order or other arrangement ("Arrangement") for the furnishing of any portion of the materials, services, equipment or Work with any party or entity if such party or entity is a Contractor Affiliate, unless such Arrangement has been approved in writing by the Owner after full disclosure in writing by the Contractor to the Owner of such affiliation or relationship and all details relating to the proposed Arrangement.

**16.20   REBATES, KICKBACKS**

Contractor represents and warrants that it has neither paid, or agreed to pay, nor will it pay, any sums or any other consideration to any Owner Affiliate in connection with this Construction Contract or any Work hereunder, nor has any such payment or agreement for payment been requested or solicited by any director, officer, employee, agent or representative of Owner or any Owner Affiliate. Contractor hereby acknowledges that it understands that any such payment or agreement would violate Owner's firm and undeviating policy, and that this representation and warrant constitute a material inducement upon which Owner is relying in entering into and performing this Construction Contract.

**16.21   CONFIDENTIALITY**

Contractor shall treat all information and data furnished to it by Owner or Construction Manager or otherwise obtained or prepared by Contractor concerning the Project as strictly confidential and shall not disclose any of the same to any other person or entity unless required to do so in order to perform its obligations under this Construction Contract or in connection with any filings or applications with Governmental Authorities relating to the design or construction of the Project. Contractor shall not engage in or permit any publicity with respect to the Project, Owner or Contractor's services or work hereunder including, without limitation, referring to the same in any advertising or promotional brochures or materials or granting interviews to broadcast, print or other media, without the prior written approval of Owner, which may be granted or withheld in Owner's sole discretion. Contractor shall instruct all of its employees of this obligation and take such steps as are necessary to ensure full compliance. Contractor shall include provisions in its contracts with the Subcontractors requiring them to abide by, and requiring them to assure that their subcontractors abide by, the confidentiality requirements of this Section 16.21.

**16.22   CROSS-DEFAULT**

Contractor agrees that any breach of the Contract Documents by Contractor and/or a breach by Contractor of any other agreement between the Contractor and the Owner or between Contractor and an entity that is an affiliate or subsidiary of The Macerich Company or that is managed by The Macerich Company or an affiliate or subsidiary of The Macerich Company (herein referred to as a "Related Macerich Company"), whether related or unrelated to the Work or Project, that is not cured in accordance with the terms of the governing agreement between Contractor and Owner or a Related Macerich Company under which such breach occurred shall be deemed a breach by Contractor of this Construction Contract as well as any and all such other agreements between Contractor and Owner or between Contractor and any Related Macerich Company, thereby entitling the Owner and/or any such Related Macerich Company to assert all its rights and remedies for breach under this Construction Contract and any or all such other agreements, including, without duplication, the right of set-off or to withhold from amounts due thereunder the amount of any Loss suffered by, or threatened against, Owner, a Related Macerich Company or any third person or entity to whom Owner or a Related Macerich Company may be liable as a result of such breach.

INITIALS ____ INITIALS ____
Edition: February, 2010/Rev.4.11

## 16.23   PROJECT WEBSITE

If requested by Owner, Contractor shall, without Contract Adjustment, comply with all requirements necessary for the operation of a Project extranet website established by Owner for the furnishing, storage, exchange and transmission of electronic documentation and communications including, without limitation, the following: (1) obtaining for Contractor's use hardware and software that is compatible with that used by the Owner and extranet site operator; (2) utilizing e-mail for communications, wherever possible; (3) utilizing of electronic versions of Contract Documents on the extranet site for distribution for bidding or other purposes; (4) scanning documents to reduce the volume of paper associated with the Project; and (5) cooperating in maintaining a common file and an electronic archive for Project records. Owner shall have no liability or responsibility to Contractor, and there shall be no Contract Adjustment, for any Delay or additional costs associated with the operation or use of the Project extranet site. Owner shall have the right, in the exercise of its sole discretion and without liability to Contractor, to cease operation of the extranet site at any time upon notice to Contractor if Owner determines that its continued operation is not in the best interests of the Project.

### ARTICLE 17
### EXHIBITS

The following exhibits are attached hereto and incorporated in this Construction Contract by this reference as part of the terms of this Construction Contract:

| Exhibit "A" | - | Property Description |
| Exhibit "B" | - | General Conditions |
| Exhibit "C" | - | Key Personnel List |
| Exhibit "D" | - | Preliminary Project Schedule |
| Exhibit "E" | - | Drawings, Specifications and Reference Documents |
| Exhibit "F" | - | Schedule of Values |
| Exhibit "G" | - | Release Forms |
| Exhibit "H" | - | Other Indemnitees/Additional Insureds |
| Exhibit "I" | - | GMP Amendment Form |
| Exhibit "J" | - | Maximum Labor/Salary Rates |
| Exhibit "K" | - | General Conditions Costs |
| Exhibit "L" | - | Application for Payment Form |

In the event of an irreconcilable conflict between the provisions of any of the above-listed exhibits and the terms and conditions of this Construction Contract, the latter shall control.

INITIALS [initials] INITIALS [initials]
Edition: February, 2010/Rev.4.11

WHEREFORE, this Construction Contract, duly executed and negotiated by the parties hereto after the review and advice of their respective legal counsel, is entered into as of the Effective Date.

"OWNER"

Tysons Corner Hotel I LLC

By: Robert R. Jones
Title: VP, Construction

By: Don Foster
Title: Sr. VP, Design & Construction

"CONTRACTOR"

Harvey-Cleary Builders

By: Joseph A. Cleary, Jr.
Title: President

By: Kevin Rogge
Title: Vice President

Employer State
Tax ID #: 76-0238902
State Contractor License #: VA#2701031837

Page 48 of 48

INITIALS _____ INITIALS _____
Edition: February, 2010/Rev.4.11

# EXHIBIT "A"

## Construction of Hotel @ Tysons Corner Center

**PROPERTY DESCRIPTION**

- The Property Description is as recorded in the Office of the Assessor in the County of Fairfax as Assessor Parcel Number (APN) # 0294-01-0035-L2.

Edition: December, 2012          Page 1 of 1          INITIALS UM INITIALS WOM

# Exhibit "B"

# GENERAL CONDITIONS

### (COST PLUS FEE WITH GMP AMENDMENT)

## TABLE OF CONTENTS

Page

ARTICLE 1 GENERAL PROVISIONS ....................................................................1

1.1    DEFINITIONS ...................................................................................1

1.1.1    Acceptance. .....................................................................1
1.1.2    Act of God. ......................................................................1
1.1.3    Added Benefit Recommendation. ....................................1
1.1.4    Addendum. .......................................................................1
1.1.5    Additional Insureds. ........................................................1
1.1.6    Allowable Markups. .........................................................1
1.1.7    Allowance. ........................................................................1
1.1.8    Applicable Laws. ..............................................................1
1.1.9    Application for Payment. ..................................................1
1.1.10   Architect. ..........................................................................1
1.1.11   As-Built Documents. ........................................................2
1.1.12   As-Built Drawings and Specifications. .............................2
1.1.13   Buy Out. ...........................................................................2
1.1.14   Buy Out Account. .............................................................2
1.1.15   Buy Out Loss. ..................................................................2
1.1.16   Buy Out Savings. .............................................................2
1.1.17   Change. ............................................................................2
1.1.18   Change Order Request. ...................................................2
1.1.19   Claim. ...............................................................................2
1.1.20   Close-Out Completion. .....................................................2
1.1.21   Close-Out Documents. .....................................................2
1.1.22   Compensable Change. .....................................................2
1.1.23   Compensable Delay. ........................................................3
1.1.24   Construction Change Directive. ........................................3
1.1.25   Construction Contract. ......................................................3
1.1.26   Construction Documents. ..................................................3
1.1.27   Construction Manager. ......................................................3
1.1.28   Construction Schedule. ......................................................3
1.1.29   Contingency. ......................................................................3
1.1.30   Contract Adjustment. .........................................................3
1.1.31   Contract Documents. .........................................................3
1.1.32   Contract Price. ...................................................................3
1.1.33   Contract Sum. ....................................................................4
1.1.34   Contract Time. ...................................................................4
1.1.35   Contractor. .........................................................................4
1.1.36   Contractor Affiliate. ...........................................................4
1.1.37   Contractor Amount. ...........................................................4
1.1.38   Contractor Fee. ..................................................................4

Contract Code: _____

Reimbursable Code: _____

INITIALS [initials] INITIALS [initials]

Edition: February, 2010/Rev.4.11

1.1.39   Contractor's Own Expense. ........................................................................ 4
1.1.40   Contractor's Statement of Qualifications and Exclusions. ....................... 4
1.1.41   Cost(s) of (the) Work. .............................................................................. 4
1.1.42   Date of Commencement. ......................................................................... 4
1.1.43   Day. ........................................................................................................ 4
1.1.44   Defective Work. ...................................................................................... 4
1.1.45   Delay. ...................................................................................................... 5
1.1.46   Deleted Work. ......................................................................................... 5
1.1.47   Design Documents. ................................................................................. 5
1.1.48   Design Intent. .......................................................................................... 5
1.1.49   Differing Site Conditions. ........................................................................ 5
1.1.50   Disability Laws. ....................................................................................... 5
1.1.51   Discovery Date. ....................................................................................... 5
1.1.52   Drawing. .................................................................................................. 5
1.1.53   Effective Date. ......................................................................................... 5
1.1.54   Environmental Laws. ............................................................................... 5
1.1.55   Event of Contractor Default. .................................................................... 6
1.1.56   Excusable Delay. ..................................................................................... 6
1.1.57   Existing Improvements. ........................................................................... 6
1.1.58   Extra Work. ............................................................................................. 6
1.1.59   Final Completion, Finally Complete. ........................................................ 6
1.1.60   Final Completion Punch List. ................................................................... 6
1.1.61   Final Payment. ........................................................................................ 6
1.1.62   Force Majeure Event. .............................................................................. 7
1.1.63   Fragnet. ................................................................................................... 7
1.1.64   General Conditions. ................................................................................. 7
1.1.65   General Conditions Costs. ....................................................................... 7
1.1.66   General Conditions Costs Maximum. ...................................................... 7
1.1.67   GMP Amendment. ................................................................................... 7
1.1.68   GMP Effective Date. ................................................................................ 7
1.1.69   GMP Proposal. ........................................................................................ 7
1.1.70   GMP Savings. .......................................................................................... 7
1.1.71   Good Faith Determination. ...................................................................... 7
1.1.72   Governmental Authority. .......................................................................... 7
1.1.73   Governmental Authority Review Period. .................................................. 8
1.1.74   Guarantee to Repair Period. .................................................................... 8
1.1.75   Guaranteed Maximum Price, GMP. ......................................................... 8
1.1.76   Hazardous Substance. ............................................................................ 8
1.1.77   Indemnitees. ........................................................................................... 8
1.1.78   Installation Subcontractor. ...................................................................... 8
1.1.79   Intellectual Property Rights. .................................................................... 8
1.1.80   Interest Rate. .......................................................................................... 8
1.1.81   Key Milestone. ........................................................................................ 8
1.1.82   Key Personnel, Key Person. .................................................................... 8
1.1.83   Lender. .................................................................................................... 8
1.1.84   Loss, Losses. .......................................................................................... 8
1.1.85   Minor Change. ........................................................................................ 9
1.1.86   Modification. ............................................................................................ 9
1.1.87   Mold. ....................................................................................................... 9
1.1.88   Notice of Change. ................................................................................... 9
1.1.89   Notice of Delay. ...................................................................................... 9
1.1.90   Notice of Final Completion. ..................................................................... 9
1.1.91   Notice of Substantial Completion. ........................................................... 9
1.1.92   Notice of Tenant-Ready Completion. ....................................................... 9
1.1.93   Notice to Proceed. .................................................................................. 9
1.1.94   Owner. .................................................................................................... 9
1.1.95   Owner Affiliate. ....................................................................................... 9
1.1.96   Owner Amount. ....................................................................................... 10

ii

INITIALS ___ INITIALS ___

Edition: February, 2010/Rev.4.11

1.1.97    Owner Consultant. ......................................................................10
1.1.98    Owner Review Date. ...................................................................10
1.1.99    Owner Review Period. ................................................................10
1.1.100   Owner's Agent. ..........................................................................10
1.1.101   Owner's Representative. ............................................................10
1.1.102   Payment Bond, Performance Bond. ...........................................10
1.1.103   Preconstruction Services. ..........................................................10
1.1.104   Preliminary Project Schedule. ....................................................10
1.1.105   Prime  Contract Change Order. ..................................................10
1.1.106   Product Data. .............................................................................10
1.1.107   Progress Payment. .....................................................................10
1.1.108   Project. .......................................................................................11
1.1.109   Project Documents. ....................................................................11
1.1.110   Project Team. .............................................................................11
1.1.111   Provisional Prime Contract Change Order. .................................11
1.1.112   Record Documents. ....................................................................11
1.1.113   Record Drawings, Record Specifications. ...................................11
1.1.114   Reference Documents. ...............................................................11
1.1.115   Request for Extension. ...............................................................11
1.1.116   Request for Information. ..............................................................11
1.1.117   Safety Program. ..........................................................................11
1.1.118   Samples. .....................................................................................11
1.1.119   Schedule of Values. ...................................................................11
1.1.120   Self-Performed Work. .................................................................11
1.1.121   Separate Contractors. ................................................................12
1.1.122   Shop Drawings. ..........................................................................12
1.1.123   Site. ............................................................................................12
1.1.124   Specifications. ............................................................................12
1.1.125   Standard of Performance. ..........................................................12
1.1.126   Storm Water Permit. ...................................................................12
1.1.127   Subconsultant. ...........................................................................12
1.1.128   Subcontractor. ...........................................................................12
1.1.129   Submittal. ...................................................................................12
1.1.130   Submittal Schedule. ...................................................................12
1.1.131   Substantial Completion, Substantially Complete. .......................12
1.1.132   Substantial Completion Punch List. ...........................................12
1.1.133   Surety. ........................................................................................13
1.1.134   Tenant-Ready Completion, Tenant-Ready Complete. ..................13
1.1.135   Tenant-Ready Completion Punch List. ........................................13
1.1.136   Tenant Spaces. ..........................................................................13
1.1.137   Tier. ............................................................................................13
1.1.138   Time Impact Analysis. ................................................................13
1.1.139   Unexcused Delay. .......................................................................13
1.1.140   Weather Delay Allowance. ..........................................................13
1.1.141   Work. ..........................................................................................13

1.2    CORRELATION, INTERPRETATION AND INTENT OF CONTRACT
       DOCUMENTS ...............................................................................13

1.2.1     Design Intent. .............................................................................13
1.2.2     Complementary. .........................................................................14
1.2.3     Technical Words. ........................................................................14
1.2.4     Trade Names. .............................................................................14
1.2.5     Incidental Items. .........................................................................14
1.2.6     Applicable Laws. ........................................................................14
1.2.7     Modifiers. ....................................................................................14
1.2.8     Singular, Gender, Captions. .......................................................14
1.2.9     Cross-References. ......................................................................14
1.2.10    Demolition. .................................................................................14

(ii)

INITIALS ᵂᴸ INITIALS ᴹᵂᴹ

Edition: February, 2010/Rev.4.11

| | | | |
|---|---|---|---|
| | 1.2.11 | Omissions. | 14 |
| | 1.2.12 | Diagrammatic Portions. | 14 |
| | 1.2.13 | Conflicts. | 15 |
| | 1.2.14 | Conditions Precedent. | 15 |
| 1.3 | OWNERSHIP AND USE OF DOCUMENTS | | 15 |
| | 1.3.1 | Property of Owner. | 15 |
| | 1.3.2 | Assignment of Rights. | 15 |
| | 1.3.3 | Contractor's Warranty. | 15 |
| | 1.3.4 | Non-Exclusive License. | 15 |
| | 1.3.5 | Reproduction. | 15 |
| | 1.3.6 | Delivery to Owner. | 15 |
| | 1.3.7 | Subcontractors. | 16 |

ARTICLE 2 OWNER ... 16

| | | | |
|---|---|---|---|
| 2.1 | INFORMATION, APPROVALS AND SERVICES REQUIRED OF OWNER | | 16 |
| | 2.1.1 | Conditions at Site. | 16 |
| | 2.1.2 | Legal Descriptions. | 16 |
| | 2.1.3 | Owner Approvals. | 16 |
| | 2.1.4 | Not a Release. | 16 |
| | 2.1.5 | Owner-Furnished Items. | 17 |
| 2.2 | OWNER'S RIGHT TO STOP THE WORK | | 17 |
| 2.3 | OWNER'S RIGHT TO CARRY OUT THE WORK | | 17 |
| 2.4 | OWNER'S ADDITIONAL RIGHTS | | 17 |

ARTICLE 3 CONTRACTOR. 17

| | | | |
|---|---|---|---|
| 3.1 | CONTRACTOR STATUS | | 17 |
| | 3.1.1 | Independent Contractor. | 17 |
| | 3.1.2 | Licenses. | 17 |
| | 3.1.3 | Responsibility for Employees. | 17 |
| 3.2 | REVIEW OF PROJECT-RELATED DOCUMENTS, SITE AND EXISTING IMPROVEMENTS | | 18 |
| | 3.2.1 | Project-Related Documents. | 18 |
| | 3.2.2 | Site and Existing Improvements. | 18 |
| | 3.2.3 | Continuing Obligation. | 19 |
| | 3.2.4 | Requests for Information. | 19 |
| | 3.2.5 | No Warranty by Owner. | 20 |
| 3.3 | SUPERVISION AND PROCEDURES | | 20 |
| | 3.3.1 | General Obligation. | 20 |
| | 3.3.2 | Supervisory Staff. | 20 |
| | 3.3.3 | Supplementary Personnel. | 20 |
| | 3.3.4 | Means, Methods, Procedures. | 20 |
| 3.4 | SERVICES, LABOR, MATERIALS AND EQUIPMENT | | 21 |
| | 3.4.1 | Costs. | 21 |
| | 3.4.2 | Coordination. | 21 |
| | 3.4.3 | Field Conditions. | 21 |
| | 3.4.4 | Layout. | 21 |
| | 3.4.5 | Materials, Equipment. | 21 |

iv

INITIALS ___ INITIALS ___

Edition: February, 2010/Rev.4.11

| 3.5 | CONTRACTOR'S WARRANTIES | 22 |
| | 3.5.1 General Representations and Warranties. | 22 |
| | 3.5.2 General Warranty. | 23 |
| | 3.5.3 Repair, Replacement. | 23 |
| | 3.5.4 No Limitation. | 23 |
| | 3.5.5 Assignment. | 23 |
| | 3.5.6 Close-Out. | 24 |
| 3.6 | TAXES | 24 |
| 3.7 | PERMITS AND NOTICES | 24 |
| | 3.7.1 Permits. | 24 |
| | 3.7.2 Applicable Laws, Notices. | 24 |
| | 3.7.3 Bonds, Undertakings. | 24 |
| | 3.7.4 Notice of Violations. | 24 |
| | 3.7.5 Governmental Authority Approvals. | 24 |
| 3.8 | DOCUMENTS AT SITE, REPORTING, MEETINGS | 25 |
| | 3.8.1 Documents at Site | 25 |
| | 3.8.2 Daily Reports. | 25 |
| | 3.8.3 Progress Meetings. | 26 |
| | 3.8.4 Notice Requirements. | 26 |
| 3.9 | SHOP DRAWINGS, PRODUCT DATA AND SAMPLES | 26 |
| | 3.9.1 Not Contract Documents. | 26 |
| | 3.9.2 Submission by Contractor. | 26 |
| | 3.9.3 Review of Submittals. | 27 |
| | 3.9.4. No Contract Adjustment. | 27 |
| | 3.9.5 Compliance with Contract. | 27 |
| | 3.9.6 Separate Contractors. | 27 |
| 3.10 | USE OF SITE | 27 |
| | 3.10.1 Staging Area. | 27 |
| | 3.10.2 Existing Improvements. | 27 |
| | 3.10.3 Operations at Site. | 28 |
| | 3.10.4 Coordination. | 28 |
| | 3.10.5 Unauthorized Use. | 28 |
| | 3.10.6 Uses, Activities and Functions. | 28 |
| | 3.10.7 Security. | 28 |
| | 3.10.8 Persons on Site. | 28 |
| | 3.10.9 Dust, Fumes, Noise. | 28 |
| | 3.10.10 Confinement of Operations. | 28 |
| | 3.10.11 Prohibited Substances. | 28 |
| | 3.10.12 Survey Markers. | 28 |
| | 3.10.13 Drainage, Erosion. | 28 |
| | 3.10.14 Storm Water Permitting. | 28 |
| 3.11 | CUTTING AND PATCHING | 29 |
| 3.12 | UTILITIES AND SANITARY FACILITIES | 29 |
| | 3.12.1 Existing and New Utilities. | 29 |
| | 3.12.2 Temporary Utilities. | 29 |
| | 3.12.3 Sanitary Facilities. | 30 |
| 3.13 | CLEANING UP | 30 |
| | 3.13.1 Contractor Responsibility. | 30 |
| | 3.13.2 Cleanup by Owner. | 30 |

v

INITIALS ꟼꟼ INITIALS WDM

Edition: February, 2010/Rev.4.11

3.14   ACCESS TO THE WORK.............................................................................. 30
    3.14.1   By Owner.......................................................................................... 30
    3.14.2   By Separate Contractors, Owner's Own Forces. ................................... 30
    3.14.3   Delivery Routes. ............................................................................... 30

3.15   INTELLECTUAL PROPERTY RIGHTS ........................................................... 30

ARTICLE 4 CONTRACT ADMINISTRATION .................................................................. 30
4.1   ADMINISTRATION OF THE CONSTRUCTION CONTRACT ........................... 30
    4.1.1   Duration. .......................................................................................... 30
    4.1.2   Observations of Work. ....................................................................... 31
    4.1.3   Contractor Responsibility. ................................................................. 31
    4.1.4   Communications. .............................................................................. 31
    4.1.5   Review of Submittals. ....................................................................... 31
    4.1.6   Decisions on Aesthetic Effect. ........................................................... 31
    4.1.7   Acceptance of Work. ......................................................................... 31

4.2   CLAIMS ...................................................................................................... 31
    4.2.1   Submission of Claims. ....................................................................... 31
    4.2.2   Arising of Claim. ............................................................................... 31
    4.2.3   Notice of Intent. ............................................................................... 31
    4.2.4   Content. ........................................................................................... 32
    4.2.5   Failure to Submit. ............................................................................. 33
    4.2.6   Submission. ...................................................................................... 33
    4.2.7   Noncompliance. ................................................................................ 33
    4.2.8   Owner's Decision. ............................................................................. 33
    4.2.9   Continuous Performance. .................................................................. 33

4.3   CLAIMS BASED ON DIFFERING SITE CONDITIONS ..................................... 33
    4.3.1   Contractor Responsibility. ................................................................. 33
    4.3.2   Differing Site Conditions. .................................................................. 33
    4.3.3   Notice of Change. ............................................................................. 34
    4.3.4   Investigation by Owner. .................................................................... 34
    4.3.5   Change Order Request. ...................................................................... 34
    4.3.6   Contract Adjustments. ...................................................................... 34
    4.3.7   Waiver by Contractor. ....................................................................... 34
    4.3.8   Final Completion. ............................................................................. 34

4.4   CONTINUOUS WORK................................................................................... 34

ARTICLE 5 SUBCONTRACTORS................................................................................... 34
5.1   SUBCONTRACTUAL RELATIONS .................................................................. 34
    5.1.1   Subcontract Agreements. .................................................................. 34
    5.1.2   No Brokering. ................................................................................... 35
    5.1.3   Third-Party Rights. ............................................................................ 36
    5.1.4   All Subcontractor Tiers. ..................................................................... 36

5.2   CONTINGENT ASSIGNMENT OF SUBCONTRACTS ....................................... 36
    5.2.1   Contingent Assignment. .................................................................... 36
    5.2.2   Acceptance by Owner. ...................................................................... 36
    5.2.3   Owner Obligation. ............................................................................ 36

5.3   COMMUNICATIONS BY OWNER .................................................................. 36

5.4   AVAILABILITY OF CONTRACT DOCUMENTS ................................................ 36

vi

INITIALS _WM_  INITIALS _MDM_

Edition: February, 2010/Rev.4.11

5.5     NO LIABILITY OF OWNER ............................................................................................... 37

ARTICLE 6 CONSTRUCTION BY OWNER'S OWN FORCES OR SEPARATE CONTRACTORS .......... 37

6.1     OWNER'S RIGHT TO PERFORM CONSTRUCTION WITH ITS OWN FORCES
        AND TO AWARD SEPARATE CONTRACTS ..................................................................... 37

        6.1.1   Right of Owner ................................................................................................. 37
        6.1.2   Separate Contractors. ...................................................................................... 37
        6.1.3   Coordination. ................................................................................................... 37
        6.1.4   Disputes. .......................................................................................................... 37
        6.1.5   Remedy. ........................................................................................................... 37

6.2     MUTUAL RESPONSIBILITY ........................................................................................... 38

        6.2.1   Use of Site. ...................................................................................................... 38
        6.2.2   Adjoining Work. ............................................................................................... 38
        6.2.3   Damage. ........................................................................................................... 38
        6.2.4   Disputes. .......................................................................................................... 38
        6.2.5   Settlement of Disputes. .................................................................................... 38

6.3     OWNER'S RIGHT TO CLEANUP ................................................................................... 38

ARTICLE 7 CHANGES IN THE WORK ....................................................................................... 38

7.1     CHANGES .................................................................................................................... 38

        7.1.1   General. ............................................................................................................ 38
        7.1.2   Adjustments. .................................................................................................... 38
        7.1.3   Exclusive Rights. .............................................................................................. 38
        7.1.4   No Written Authorization. ................................................................................. 39
        7.1.5   Prompt Performance. ....................................................................................... 39

7.2     WRITTEN AUTHORIZATION ......................................................................................... 39

        7.2.1   Parties. ............................................................................................................. 39
        7.2.2   Form. ................................................................................................................ 39
        7.2.3   Writing of Essence. .......................................................................................... 39

7.3     PRIME CONTRACT CHANGE ORDERS .......................................................................... 39

        7.3.1   Purpose. ........................................................................................................... 39
        7.3.2   Content. ............................................................................................................ 39

7.4     PROVISIONAL PRIME CONTRACT CHANGE ORDERS .................................................. 40

        7.4.1   Purpose. ........................................................................................................... 40
        7.4.2   Good Faith Determination. ............................................................................... 40
        7.4.3   Claim by Contractor. ........................................................................................ 40
        7.4.4   Response by Contractor. .................................................................................. 40

7.5     CONSTRUCTION CHANGE DIRECTIVES ....................................................................... 40

        7.5.1   Purpose. ........................................................................................................... 40
        7.5.2   Authorization. ................................................................................................... 40
        7.5.3   No Waiver by Owner. ........................................................................................ 40
        7.5.4   Basis of Compensation. ................................................................................... 41
        7.5.5   Notice by Contractor. ....................................................................................... 41
        7.5.6   Disputed Work. ................................................................................................ 41
        7.5.7   Waiver by Contractor. ...................................................................................... 41

7.6     PROCEDURES .............................................................................................................. 41

        7.6.1   Notice of Change. ............................................................................................. 41
        7.6.2   Change Order Request. .................................................................................... 42
        7.6.3   Formal Notice of Essence. ............................................................................... 42

vii

INITIALS ⟨⟨⟨ INITIALS MDM

Edition: February, 2010/Rev.4.11

7.7     PRICING ..................................................................................... 43
        7.7.1    Basis of Calculation ................................................... 43
        7.7.2    Time and Materials Documentation. ........................... 44
        7.7.3    Costs of Work. ............................................................ 45
        7.7.4    Additive Costs Not Allowed. ...................................... 45
        7.7.5    Allowable Markups. .................................................... 45
        7.7.6    Review of Markups. .................................................... 47
        7.7.7    Exclusions and Limitations. ....................................... 47
        7.7.8    Net Calculations. ........................................................ 48
        7.7.9    Unit Prices. ................................................................. 48
        7.7.10   Final Payment. ............................................................ 48
        7.7.11   Prompt Pricing. ........................................................... 48
        7.7.12   Full Resolution. .......................................................... 49
        7.7.13   Reserved Rights. ......................................................... 49
        7.7.14   No "Total Cost" Calculations. .................................... 49
        7.7.15   No Abandonment. ....................................................... 49
        7.7.16   Continuous Performance. ........................................... 49

7.8     ALLOWANCES ............................................................................ 49
        7.8.1    Contract Price. ............................................................ 49
        7.8.2    Selection by Owner. ................................................... 49
        7.8.3    Allowance Adjustments. ............................................. 50

ARTICLE 8 CONTRACT TIME ................................................................. 50
8.1     COMMENCEMENT AND COMPLETION ...................................... 50
        8.1.1    Commencement. ......................................................... 50
        8.1.2    Contract Time. ............................................................ 50
        8.1.3    Adjustments. ............................................................... 50
        8.1.4    Early Completion. ....................................................... 50

8.2     DELAYS, EXTENSIONS AND CONTRACTIONS OF CONTRACT TIME ..................... 51
        8.2.1    Adjustments to Contract Time. ................................... 51
        8.2.2    Notice of Delay. .......................................................... 51
        8.2.3    Request for Extension. ............................................... 52
        8.2.4    Approval by Owner. .................................................... 52
        8.2.5    Formal Notice of Essence. ......................................... 52
        8.2.6    Compensable Delay and Deleted Work. ..................... 52
        8.2.7    Acceleration of the Work. ........................................... 53
        8.2.8    Concurrent Delays. ..................................................... 54
        8.2.9    Delay Claims. .............................................................. 54

ARTICLE 9 PAYMENTS AND COMPLETION .......................................... 54
9.1     CONTRACT PRICE ..................................................................... 54

9.2     SCHEDULE OF VALUES ............................................................. 54

9.3     PREPARATION OF APPLICATIONS FOR PAYMENT .................. 55
        9.3.1    Pencil Draft Review. ................................................... 55
        9.3.2    Compensable Changes. .............................................. 55
        9.3.3    Stored Materials. ........................................................ 55

9.4     CONDITIONS TO PROGRESS PAYMENTS ................................ 55
        9.4.1    Conditions and Substantiation. ................................... 55

9.5     TITLE TO WORK .......................................................................... 56

viii

INITIALS [illegible] INITIALS [illegible]

Edition: February, 2010/Rev.4.11

9.6     APPROVALS FOR PAYMENT ............................................................... 57

    9.6.1    Approval by Owner. ............................................................. 57
    9.6.2    Limitation on Approvals. ..................................................... 57
    9.6.3    Withholding Approval or Payment. ..................................... 57
    9.6.4    Application of Withholding. ................................................. 57
    9.6.5    Release of Withholding. ..................................................... 58
    9.6.6    Additional Rights. ............................................................... 58

9.7     PAYMENTS TO SUBCONTRACTORS ............................................... 58

    9.7.1    Contractor Certification. ..................................................... 58
    9.7.2    Applications for Payment. .................................................. 59
    9.7.3    Payments in Trust. ............................................................. 59
    9.7.4    Information to Subcontractors. ........................................... 59
    9.7.5    No Payment Obligation. ..................................................... 59
    9.7.6    No Acceptance. ................................................................. 59
    9.7.7    Joint Payment. ................................................................... 59
    9.7.8    Direct Negotiation. ............................................................. 59
    9.7.9    Release of Liens. ............................................................... 59

9.8     FAILURE OF APPROVAL OR PROGRESS PAYMENT ....................... 60

9.9     CONTINUOUS PERFORMANCE ....................................................... 60

9.10    TENANT-READY COMPLETION, SUBSTANTIAL COMPLETION ....... 60

    9.10.1   Contract Time. ................................................................... 60
    9.10.2   Tenant-Ready Completion. ................................................. 60
    9.10.3   Substantial Completion. ..................................................... 61

9.11    PARTIAL BENEFICIAL OCCUPANCY OR USE ................................ 62

9.12    FINAL COMPLETION ........................................................................ 63

    9.12.1   Final Completion Punch List. ............................................. 63
    9.12.2   Final Completion. ............................................................... 63
    9.12.3   Request for Final Inspection. ............................................. 63
    9.12.4   Notice of Final Completion. ................................................ 63
    9.12.5   Acceptance by Owner. ....................................................... 64

9.13    CLOSE-OUT COMPLETION ............................................................. 64

9.14    NO WAIVER BY OWNER .................................................................. 64

9.15    FINAL PAYMENT .............................................................................. 64

    9.15.1   Submission. ....................................................................... 64
    9.15.2   Conditions to Final Payment. ............................................. 64
    9.15.3   Withholding by Owner. ....................................................... 65
    9.15.4   Waiver by Contractor. ........................................................ 65
    9.15.5   No Waiver by Owner. ......................................................... 65
    9.15.6   Early Release of Retention. ............................................... 65

ARTICLE 10 INSPECTIONS AND SAFETY ....................................................... 65

10.1    INSPECTIONS .................................................................................. 65

    10.1.1   Right to Inspect. ................................................................. 65
    10.1.2   Coordination. ..................................................................... 65
    10.1.3   Required Inspections. ........................................................ 66
    10.1.4   Uncovering of Work. .......................................................... 66
    10.1.5   Off-Hours Inspections. ....................................................... 66

ix

INITIALS _____ INITIALS _____

Edition: February, 2010/Rev.4.11

10.1.6   Contractor Responsibility..................................................66
10.1.7   Access to Work...............................................................66
10.1.8   No Owner Duty...............................................................66

10.2   SAFETY PRECAUTIONS AND PROGRAMS ..................................66

10.2.1   General Safety Obligation................................................66
10.2.2   Contractor's Safety Program............................................67
10.2.3   Safety Orders.................................................................67
10.2.4   Safety Representative......................................................67

10.3   SAFETY OF PERSONS AND PROPERTY......................................67

10.3.1   Protection, Safety...........................................................67
10.3.2   Protection......................................................................67
10.3.3   Safeguards, Warnings, Disabled Access............................67
10.3.4   Fire, Explosives, Hazardous Substances...........................68
10.3.5   First Aid........................................................................68
10.3.6   Correction of Unsafe Conditions......................................68
10.3.7   Responsibility for Loss....................................................68
10.3.8   Loading, Storage............................................................68
10.3.9   Separate Contractors......................................................68

10.4   EMERGENCIES........................................................................69

ARTICLE 11 BONDS, INSURANCE.......................................................69

11.1   CONTRACTOR BONDS...............................................................69

11.1.1   Performance and Payment Bonds.....................................69
11.1.2   Changes.......................................................................69
11.1.3   Replacement..................................................................69
11.1.4   Duration........................................................................69
11.1.5   Condition of Payment......................................................69
11.1.6   Surety Rating.................................................................69
11.1.7   Premiums......................................................................69
11.1.8   Obligee.........................................................................69
11.1.9   No Exoneration..............................................................69
11.1.10  Communications.............................................................69
11.1.11  No Waiver by Owner.......................................................70

11.2   INSURANCE.............................................................................70

11.2.1   Contractor Insurance Coverages.......................................70
11.2.2   Subcontractor Insurance..................................................71
11.2.3   Proof of Insurance..........................................................73
11.2.4   Deductibles....................................................................73
11.2.5   Builder's Risk Insurance By Owner....................................73
11.2.6   Insurer Rating................................................................74
11.2.7   Mandatory Insurance Provisions.......................................74
11.2.8   Material Breach..............................................................74
11.2.9   No Waiver by Owner.......................................................75

ARTICLE 12 UNCOVERING AND CORRECTION OF WORK.......................75

12.1   UNCOVERING OF THE WORK.....................................................75

12.2   CORRECTION OF THE WORK......................................................75

12.3   GUARANTEE TO REPAIR PERIOD................................................75

12.3.1   Guarantee to Repair Period.............................................75
12.3.2   Repair by Contractor......................................................75

x

INITIALS ___ INITIALS ___

|        | 12.3.3   | Notice by Owner. | 76 |
|        | 12.3.4   | Correction by Owner. | 76 |
|        | 12.3.5   | Sale. | 76 |
|        | 12.3.6   | No Limitation. | 76 |
| 12.4   | ACCEPTANCE OF NONCONFORMING WORK. | | 77 |

| ARTICLE 13 HAZARDOUS SUBSTANCES, MOLD | | | 77 |
| 13.1   | HAZARDOUS SUBSTANCES. | | 77 |
|        | 13.1.1   | Release by Contractor. | 77 |
|        | 13.1.2   | Existing Conditions. | 77 |
| 13.2   | REMEDIATION BY CONTRACTOR. | | 77 |
|        | 13.2.1   | Advance Submissions to Owner. | 78 |
|        | 13.2.2   | Contractor Responsibility. | 78 |
|        | 13.2.3   | Reporting Requirements. | 78 |
|        | 13.2.4   | Samples. | 78 |
|        | 13.2.5   | Verification. | 78 |
| 13.3   | MOLD. | | 78 |
| 13.4   | RELEASE OF LIABILITY. | | 79 |
| 13.5   | COMMUNICATIONS WITH GOVERNMENTAL AUTHORITIES. | | 79 |
| 13.6   | SUBCONTRACTORS. | | 79 |

| ARTICLE 14 DEFAULT, TERMINATION AND SUSPENSION | | | 79 |
| 14.1   | OWNER REMEDIES FOR DEFAULT. | | 79 |
|        | 14.1.1   | Event of Default. | 79 |
|        | 14.1.2   | Owner's Remedies. | 80 |
|        | 14.1.3   | Contractor Tools, Equipment. | 80 |
|        | 14.1.4   | Contractor Obligations. | 80 |
|        | 14.1.5   | Accounting and Payment. | 81 |
|        | 14.1.6   | Surety. | 83 |
|        | 14.1.7   | Conversion. | 83 |
|        | 14.1.8   | Substantial Performance Waived. | 83 |
|        | 14.1.9   | Rights Cumulative. | 83 |
|        | 14.1.10  | Materiality. | 83 |
|        | 14.1.11  | Owner Action. | 83 |
| 14.2   | SUSPENSION BY OWNER FOR CONVENIENCE. | | 83 |
|        | 14.2.1   | Suspension Order. | 83 |
|        | 14.2.2   | Resumption. | 83 |
|        | 14.2.3   | Limitation. | 84 |
| 14.3   | TERMINATION BY OWNER FOR CONVENIENCE. | | 84 |
|        | 14.3.1   | Right to Terminate for Convenience. | 84 |
|        | 14.3.2   | Contractor Obligations. | 84 |
|        | 14.3.3   | Contractor Compensation. | 84 |
|        | 14.3.4   | Exclusive Compensation. | 84 |
|        | 14.3.5   | Subcontractors. | 84 |
| 14.4   | TERMINATION BY CONTRACTOR. | | 84 |
|        | 14.4.1   | Contractor's Remedies. | 84 |
|        | 14.4.2   | Notice of Intention to Terminate. | 85 |

xi

INITIALS ᴡᴡ INITIALS ᴍᴅᴍ

14.4.3    Continuous Performance.......................................................................85

14.5    WARRANTIES ...................................................................................................85

xii

INITIALS ___ INITIALS ___

Edition: February, 2010/Rev.4.11

# GENERAL CONDITIONS

### (COST PLUS FEE WITH GMP AMENDMENT)

## ARTICLE 1
## GENERAL PROVISIONS

**1.1   DEFINITIONS**

**1.1.1   Acceptance.** "Acceptance" means the point that the entire Work is accepted by Owner.  Acceptance shall not constitute evidence or confirmation of Substantial Completion, Final Completion or Close-Out Completion if in fact the Work is not so completed on the date of Acceptance.

**1.1.2   Act of God.**  "Act of God" means earthquake, inclement weather, or other natural phenomena occurring at the Site.

**1.1.3   Added Benefit Recommendation.**  "Added Benefit Recommendation" means a value engineering recommendation conceived by Contractor as a way to redesign the Project, or some portion of the Project, that will reduce costs to Owner without reducing the quality of the Work or any materials, products or equipment that comprise the Work.

**1.1.4   Addendum.** "Addendum" means written or graphic information (including, without limitation, Drawings or Specifications) issued prior to execution of the GMP Amendment, which modifies or interprets by additions, deletions, clarifications or corrections the documents provided to Contractor.

**1.1.5   Additional Insureds.** "Additional Insureds" means those individuals or entities identified in the Construction Contract, its exhibits or in <u>Section 11.2</u>, below, as individuals or entities required to be named as additional insureds to Contractor's and its Subcontractors' policies of insurance.

**1.1.6   Allowable Markups.** "Allowable Markups" means those percentage markups listed in <u>Paragraph 7.7.5</u>, below, used in calculating Contract Adjustments for Compensable Changes and Deleted Work.

**1.1.7   Allowance.**  "Allowance" means an estimated amount included in the Contract Price for a portion of the Work that Contractor is unable to definitively price at the time of execution of the GMP Amendment due to lack of sufficient design or other information possessed by the Owner.  No portion of the Work shall constitute an Allowance unless expressly identified as an "Allowance" in the Construction Contract or its exhibits or the GMP Amendment or its exhibits.

**1.1.8   Applicable Laws.** "Applicable Laws" means all statutes, ordinances, regulations, policies and guidelines (including, without limitation, Environmental Laws and Disability Laws) enacted by Governmental Authorities, codes adopted or promulgated by Governmental Authorities (including, without limitation, building and health and safety codes), lawful orders of Governmental Authorities and common law, including, but not limited to, principles of equity applied by the courts of the State in which the Project is located, which are in effect at the time that the Work or other obligation under the Contract Documents is required to be performed.

**1.1.9   Application for Payment.** "Application for Payment" means Contractor's itemized application for Progress Payment or Final Payment prepared, submitted and substantiated for review and approval by Owner in accordance with the requirements of the Contract Documents.

**1.1.10   Architect.**  "Architect" means the design professional identified in the Recitals to the Construction Contract, including any other design professional as may be retained to replace said design professional, retained by Owner that is primarily responsible for the preparation of the Drawings and Specifications for the Project.

INITIALS ⟨⟨ ⟩⟩ INITIALS ⟨⟨ ⟩⟩

Edition: February, 2010/Rev.4.11

**1.1.11 As-Built Documents.** "As-Built Documents" means the collection of Record Documents with the Contractor's notations and indications of the condition of the Work as actually built.

**1.1.12 As-Built Drawings and Specifications.** "As-Built Drawings and Specifications" means the Drawings and Specifications comprising the As-Built Documents.

**1.1.13 Buy Out.** "Buy Out" means the process by which the budgeted Costs of Work for the various trade work line items of Work listed in the Schedule of Values (exclusive of Work involved in Contract Adjustments arising from Compensable Changes, Deleted Work, Compensable Delay or relating to Allowances) are replaced with actual contract values as and when Contractor enters into a contract with a Subcontractor for the performance of such Work or obtains Owner's approval to perform such Work as Self-Performed Work.

**1.1.14 Buy Out Account.** "Buy Out Account" means a line item account maintained by Contractor in the Schedule of Values to track the progressed status of Buy Out Losses and Buy Out Savings.

**1.1.15 Buy Out Loss.** "Buy Out Loss" means the difference that remains if in the course of the Buy Out the actual contract price (or, the value approved by Owner to be assigned for approved Self-Performed Work) for a trade work line item or portion thereof is greater than the budgeted amount therefor set forth in the Schedule of Values.

**1.1.16 Buy Out Savings.** "Buy Out Savings" means the difference that remains if in the course of the Buy Out the actual contract price (or, the value approved by Owner to be assigned for approved Self-Performed Work) for a trade line item or portion thereof is less than the budgeted amount therefor set forth in the Schedule of Values.

**1.1.17 Change.** "Change" means a modification, change, addition, substitution or deletion in the Work or in Contractor's means, methods, manner, time or sequence of performing the Work arising from any cause or circumstance, whether at the request of Owner or by reason of any other circumstance. Use of the term "Change," in any context, in the Contract Documents shall not be interpreted as implying that Contractor is entitled to a Contract Adjustment on any basis other than the budgeted amount therefor set forth in the Schedule of Values.

**1.1.18 Change Order Request.** "Change Order Request" means Contractor's written request pursuant to Paragraph 7.8.2, below, for a Contract Adjustment.

**1.1.19 Claim.** "Claim" means a written demand or assertion by Owner or, Contractor seeking, as a matter of right, an interpretation of the Contract Documents, a Contract Adjustment, payment of money, recovery of a Loss or other relief.

**1.1.20 Close-Out Completion.** "Close-Out Completion" means the point at which: (1) the entire Work is Finally Complete; (2) Contractor has delivered to Owner all Close-Out Documents; and (3) all conditions set forth in the Contract Documents for Substantial Completion and Final Completion of the Work have been, and continue to be, fully satisfied.

**1.1.21 Close-Out Documents.** "Close-Out Documents" means all As-Built Documents, warranties, guarantees, technical information, operations manuals, replacement parts, excess and attic stock and other documents (including, without limitation, electronic versions and hard copies), and things required to be submitted by Contractor under the Contract Documents as a condition of Final Completion, Close-Out Completion or Final Payment.

**1.1.22 Compensable Change.** "Compensable Change" means circumstances involving the performance of Extra Work (1) that are the result of (a) Differing Site Conditions, (b) amendments or additions to Applicable Laws which are enacted after the date of execution of the GMP Amendment by Owner and Contractor, (c) a Change requested in a writing signed by the Owner's Representative after execution of the GMP Amendment by Owner and Contractor, or (d) other circumstances involving a Change in the Work for which Contractor is given under the Contract Documents a specific and express right to a Contract Adjustment of the Contract Price; (2) that are not caused, in whole or in part, by (a) an act or omission of Contractor or a Subcontractor or any Tier, constituting negligence, willful misconduct, or a violation of an Applicable Law, or (b) a failure by Contractor to comply with the Contract Documents; (3) for which a Contract Adjustment is not prohibited by nor waived under the terms of the Contract Documents; and

INITIALS: _____

Edition: February, 2010/Rev.4.11

(4) that if performed would require Contractor to incur additional and unforeseeable Costs of Work that would not have been required to be incurred in the absence of such circumstances.

**1.1.23   Compensable Delay. .** "Compensable Delay" means a Delay to the critical path of activities affecting Contractor's ability to achieve Substantial Completion of the entirety of the Work within the Contract Time: (1) that is the result of (a) a Compensable Change, (b) the active negligence of Owner, Owner's Representative, Construction Manager, an Owner Consultant or a Separate Contractor, (c) a breach by Owner of an obligation under the Contract Documents, or (d) other circumstances involving Delay for which Contractor is given under the Contract Documents a specific and express right to a Contract Adjustment to the Contract Price and General Conditions Costs Maximum; (2) that is not caused, in whole or in part, by (a) an act or omission of Contractor or a Subcontractor, of any Tier, constituting negligence, willful misconduct, or a violation of an Applicable Law, or (b) a failure by Contractor to comply with the Contract Documents; and (3) for which an adjustment to the Contract Time is neither prohibited nor waived under the terms of the Contract Documents.

**1.1.24   Construction Change Directive.**   "Construction Change Directive" means a written instrument signed in accordance with the requirements of the General Conditions that: (1) directs the performance of a Minor Change; (2) directs performance of Work or a Change with respect to which there exists a dispute or question regarding a Contract Adjustment; or (3) involves performance of a Change that the parties mutually believe constitutes a Compensable Change, but with respect to which performance of the Change needs to proceed in advance of complete substantiation and evaluation of the impact thereof on the Contract Price or Contract Time.

**1.1.25   Construction Contract.** "Construction Contract" means the Standard Form of Construction Contract between Owner and Contractor, inclusive of exhibits, to which these General Conditions are attached as an exhibit.

**1.1.26   Construction Documents.** "Construction Documents" means the Drawings and Specifications submitted to Contractor for review leading up to, and including, the final Drawings and Specifications approved by Owner and identified in the GMP Amendment as comprising in part the Contract Documents for the Project.

**1.1.27   Construction Manager.**   "Construction Manager" means the person having the authority to provide and receive communications on behalf of Owner in respect to the day-to-day management of the Project in the manner set forth in Section 1.6 of the Construction Contract.

**1.1.28   Construction Schedule.** "Construction Schedule". means the detailed, critical path schedule prepared by Contractor in accordance with the requirements of the Contract Documents showing Contractor's plan for performance of the Work within the Contract Time.

**1.1.29   Contingency.** "Contingency" means the reserve fund that is a component part of the Guaranteed Maximum Price for payment of unforeseen Costs of Work, as provided in Section 2.3 of the Construction Contract.

**1.1.30   Contract Adjustment.**   "Contract Adjustment" means an adjustment, additive or deductive, to the Contract Price, General Conditions Costs Maximum and/or Contract Time.

**1.1.31   Contract Documents.** "Contract Documents" means the following collection of documents:   (1) the Construction Contract executed by Owner and Contractor; (2) the GMP Amendment executed by Owner and Contractor; (3) the Drawings and Specifications listed in the GMP Amendment or its exhibits; (4) Addenda; (5) these General Conditions; (6) Modifications; (7) the Reference Documents; (8) Prime Contract Change Orders, Provisional Prime Contract Change Orders and Construction Change Directives (including, without limitation, any Drawings and Specifications furnished by Architect or Owner Consultants that describe a Change approved by Owner for use by Contractor in performing a Change that is the subject of a duly authorized and executed Prime Contract Change Order, Provisional Prime Contract Change Order or Construction Change Directive); and (9) other documents that comprise exhibits, attachments or riders to the documents listed in Clauses (1) through (8) of this Paragraph.

**1.1.32   Contract Price.** "Contract Price" means the maximum sum that Owner is obligated to pay to Contractor for performance in accordance with the Contract Documents.  The term "Contract Price" is synonymous with "Guaranteed Maximum Price."

3 of 85

INITIALS_____ INITIALS_____

Edition: February, 2010/Rev.4.11

**1.1.33 Contract Sum.** "Contract Sum" means the total amount payable by Owner under the Construction Contract to Contractor for the Costs of Work and Contractor Fee. The Contract Sum may be less than, but shall never exceed, the Contract Price as adjusted pursuant to authorized Contract Adjustments.

**1.1.34 Contract Time.** "Contract Time" means, individually and collectively, the deadlines or time periods referred to in the Construction Contract and GMP Amendment for achievement of Key Milestones, Tenant-Ready Completion, Substantial Completion, Final Completion and Close-Out Completion of the Work, as extended or shortened by Contract Adjustments. References in the Contract Documents to adjustments (extensions or shortenings) of the Contract Time refer not only to the Contract Time as a whole, but to each of the time periods or deadlines identified as Key Milestones, Tenant-Ready Completion, Substantial Completion, Final Completion and Close-Out Completion that comprise the Contract Time, the intent being that each such deadline or time period shall (with due consideration to any interdependancies between or among them) be separately administered, evaluated and, if appropriate and permitted by the Contract Documents, extended or shortened by Contract Adjustment.

**1.1.35 Contractor.** "Contractor" means the individual or firm identified in the Construction Contract as the "Contractor."

**1.1.36 Contractor Affiliate.** "Contractor Affiliate" means any of Contractor's parent companies, subsidiaries, affiliates, agents, officers, directors, board members, employees, attorneys, accountants or internal investment counselors, or any family member of any of them, including, without limitation, any person or entity (1) substantially involved in the management of the business affairs of Contractor, (2) having a greater than 10% ownership interest in Contractor or in any of Contractor's managing members or owners, or (3) which, directly or indirectly, controls or is controlled (whether such control is by means of contract, ownership of voting securities or otherwise) by Contractor or any person or entity described in Clauses (1) or (2) of this Paragraph.

**1.1.37 Contractor Amount.** "Contractor Amount" means the amount calculated on behalf of Contractor pursuant to Paragraph 14.1.6, below, that is used to determine the amount, payable to Contractor or Owner in the event of a partial or full termination or discontinuance of the Work.

**1.1.38 Contractor Fee.** "Contractor Fee" means the total compensation payable to Contractor pursuant to Article 8 of the Construction Contract for its profit, general administrative overhead and other costs for which Contractor is not entitled to reimbursement under the Construction Contract as a Cost of Work.

**1.1.39 Contractor's Own Expense.** "Contractor's Own Expense" means that Contractor agrees to assume sole responsibility to pay and be responsible for any resulting or associated Loss and Delay, without any Contract Adjustment and without any other form of compensation or reimbursement, of any kind, by Owner.

**1.1.40 Contractor's Statement of Qualifications and Exclusions.** "Contractor's Statement of Qualifications and Exclusions" means the Contractor's statement of exceptions, qualifications and exclusions to the Contract Price that are mutually agreed to by Owner and Contractor and attached as an exhibit to the GMP Amendment.

**1.1.41 Cost(s) (of the) Work.** "Cost of Work," "Costs of Work" and "Costs of the Work" mean the costs for performance of the Work that are reimbursable to Contractor as listed in Article 6 of the Construction Contract and excludes non-reimbursable costs listed in Article 6 of the Construction Contract.

**1.1.42 Date of Commencement.** "Date of Commencement" means (1) the next business day after receipt by Contractor of the Notice to Proceed or (2) if Contractor commences the construction portions of the Work prior to receipt of a Notice to Proceed, the date that the Contractor and Owner execute the GMP Amendment.

**1.1.43 Day.** "Day" means calendar day, including weekends and legal holidays, unless otherwise specifically stated to be a working or business day.

**1.1.44 Defective Work.** "Defective Work" means materials, equipment, goods, labor, workmanship, construction services or other construction work comprising the Work by Contractor or a Subcontractor that (1) is

4 of 86

INITIALS: [signature]

Edition: February, 2011/Rev.4.11

faulty, omitted, incomplete, or deficient, or (2) does not conform to Applicable Laws, the Contract Documents, or the requirements of any inspection, reference standard, test, code or approval specified in the Contract Documents.

**1.1.45  Delay.**   "Delay" means any circumstances involving delay, disruption, hindrance or interference in the performance of the Work.

**1.1.46  Deleted Work.**   "Deleted Work" means Work that is eliminated or the scope or cost of which is reduced pursuant to a Prime Contract Change Order or Provisional Prime Contract Change Order.

**1.1.47  Design Documents.**   "Design Documents" means all originals, copies and drafts of plans, drawings, tracings, specifications, programs, reports, calculations, presentation materials, models and other writings or materials containing designs, specifications or engineering information related to the Work or Project prepared by Architect or its Subconsultants or by Contractor or its Subcontractors including, without limitation, computer-aided design materials, electronic data files, and paper copies.

**1.1.48  Design Intent.**   "Design Intent" means the general intended design objectives of the Design Documents prepared by Architect, Subconsultants and Owner Consultants, as further described in Paragraph 1.2.1, below.

**1.1.49  Differing Site Conditions.**   "Differing Site Conditions" means those unforeseen conditions described in Section 4.3, below, which constitute grounds for Contractor to seek a Contract Adjustment.

**1.1.50  Disability Laws.**   "Disability Laws" means all applicable federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, or requirements of any Governmental Authority, which regulate, relate to, or impose liability or standards of conduct with respect to, or accessibility for, persons with disabilities, including, without limitation, the Americans With Disabilities Act (42 USCA §§ 12101 et seq.) and the Fair Housing Amendments Act of 1988 (42 USCA §§ 3604 et seq.).

**1.1.51  Discovery Date.**   "Discovery Date," generally used in reference to Contractor's obligation to give written notice of certain facts, conditions or circumstances, means the earlier of the dates that Contractor or any Subcontractor either: (1) discovered such facts, conditions or circumstances; or (2) should have discovered such facts, conditions or circumstances in the exercise of the level of care required by the Standard of Performance.

**1.1.52  Drawing.**   "Drawing" means graphic and pictorial documents showing the design, location and dimensions of the Project, and generally includes plans, elevations, details, schedules and diagrams.   The term "Drawings" is used interchangeably with "Plans."

**1.1.53  Effective Date.**   "Effective Date" means the date that is stated in the Preamble of the Construction Contract.

**1.1.54  Environmental Laws.**   "Environmental Laws" means all applicable federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, or requirements of any Governmental Authority, which regulate, relate to, or impose liability or standards of conduct concerning, any Hazardous Substance (including, without limitation, the use, handling, transportation, production, disposal, discharge or storage thereof), occupational or environmental conditions on, under, or about the Site or Existing Improvements (including, without limitation, soil, groundwater, and indoor and ambient air conditions), or occupational health or industrial hygiene (but only to the extent related to Hazardous Substances on, under, or about the Site or Existing Improvements), as now or may at any later time be in effect, including without limitation, the following: the Comprehensive Environmental Response, Compensation and Liability Act of 1980 [42 U.S.C.A. §§ 9601 et seq.]; the Resource Conservation and Recovery Act of 1976 [42 U.S.C.A. §§ 6901 et seq.]; the Clean Water Act (also known as the Federal Water Pollution Control Act) [33 U.S.C.A. §§ 1251 et seq.]; the Toxic Substances Control Act [15 U.S.C.A. §§ 2601 et seq.]; the Hazardous Substances Transportation Act [49 U.S.C.A. §§ 1801 et seq.]; the Insecticide, Fungicide, Rodenticide Act [7 U.S.C.A. §§ 136 et seq.]; the Superfund Amendments and Reauthorization Act [42 U.S.C.A. §§ 6901 et seq.]; the Clean Air Act [42 U.S.C.A. §§ 7401 et seq.]; the Safe Drinking Water Act [42 U.S.C.A. §§ 300f et seq.]; the Solid Waste Disposal Act [42 U.S.C.A. §§.6901 et seq.]; the Surface Mining Control and Reclamation Act [30 U.S.C.A. §§ 1201 et seq.]; the Emergency Planning and Community Right to Know Act [42 U.S.C.A. §§ 11001 et seq.]; the Occupational Safety and

INITIALS ___  INITIALS ___

Edition: February, 2010/Rev.4.11

**1.1.62   Force Majeure Event.** "Force Majeure Event" means, and is restricted to, any of the following if and to the extent not caused by an act or omission of Contractor or a Subcontractor, of any Tier, constituting negligence, willful misconduct, a violation of an Applicable Law or a failure by Contractor to comply with the Contract Documents: (1) Acts of God occurring at the Site, other than inclement weather; (2) Acts of God constituting inclement weather occurring at the Site and the Site conditions that result therefrom that affect Work at the Site, but only if and to the extent such inclement weather and its effects result in Delays that over the entire period of Contractor's performance of the Work cumulatively exceed the number of Days included in the Weather Delay Allowance; (3) terrorism or other acts of a public enemy; (4) orders of, or unreasonable and unforeseeable failures to act by, Governmental Authorities (including, without limitation, unreasonable and unforeseeable Delay in the issuance of permits or approvals by Governmental Authorities that are required for the Work); (5) epidemics or quarantine restrictions; (6) strikes and other organized labor actions occurring at the Site and the effects thereof on the Work to the extent such strikes and other organized labor actions are beyond the control of Contractor and its Subcontractors and to the extent the effects thereof cannot be avoided by use of replacement workers or implementation of a dual gate system or other reasonable and customary accommodations at the Site; or (7) unusual shortages in materials that are supported by documented proof that (a) Contractor made every effort to obtain such materials from all available sources, (b) such shortage is due to the fact that such materials are not physically available from single or multiple sources or could have been obtained only at exorbitant prices entirely inconsistent with current rates taking into account the quantities involved and the usual industry practices in obtaining such quantities, and (c) such shortages and the difficulties in obtaining alternate sources of materials could not have been known or anticipated at the time the GMP Amendment was entered into by Owner and Contractor.

**1.1.63   Fragnet.** "Fragnet" means a contemporaneous, fragmentary scheduling network, which graphically identifies the sequencing of all critical and non-critical new activities and/or activity revisions affected by a Compensable Delay or Excusable Delay with logic ties to all affected existing activities noted on the Construction Schedule. Its objective is to isolate and quantify any time impact of a specific issue, determine and demonstrate any such specific Delay in relation to past and/or other current Delays and provide a method for incorporating all Contract Adjustments to the Contract Time into an update of the approved Construction Schedule.

**1.1.64   General Conditions.** "General Conditions" means the herein set forth general terms and conditions for construction of the Work.

**1.1.65   General Conditions Costs.** "General Conditions Costs" means and is restricted to the costs listed in Exhibit "K" – General Conditions Costs attached to the Construction Contract that are incurred and paid by Contractor (not by Subcontractors) in connection with the performance of Work other than Self-Performed Work.

**1.1.66   General Conditions Costs Maximum.** "General Conditions Costs Maximum" means the maximum amount payable to Contractor pursuant to Section 2.1 of the Construction Contract and the GMP Amendment for its General Conditions Costs incurred and paid in complete performance of the Work.

**1.1.67   GMP Amendment.** "GMP Amendment" means a Modification, in the form attached to the Construction Contract as an exhibit, executed by the parties following acceptance of Contractor's GMP Proposal, setting forth, among other things, the agreed Contract Price, General Conditions Costs Maximum and Contract Time.

**1.1.68   GMP Effective Date.** "GMP Effective Date" means the date that the GMP Amendment is executed by both Owner and Contractor.

**1.1.69   GMP Proposal.** "GMP Proposal" means the Contractor's proposal submitted to Owner pursuant to Paragraph 4.1.6 of the Construction Contract setting forth its proposed Contract Price, General Conditions Costs Maximum, Contract Time and other terms that, if approved by Owner, form the basis of the GMP Amendment.

**1.1.70   GMP Savings.** "GMP Savings" means the amount, if any, by which the Contract Price, as adjusted for Contract Adjustments permitted by the Contract Documents, exceeds the total of the Costs of Work and Contractor Fee earned at the time of Close-Out Completion.

**1.1.71   Good Faith Determination.** "Good Faith Determination" means a determination by the Owner or Construction Manager, which he/she believes in good faith to be a proper exercise of the Owner's rights and to have a

INITIALS ___ INITIALS ___

Edition: February, 2010/Rev.4.11

reasonable basis in fact, whether or not such determination is in fact proper, reasonable or correct or adjudged to be so.  Contractor shall comply with the terms of all Good Faith Determinations; but unless the Contract Documents expressly provide otherwise, Good Faith Determinations shall not be interpreted as precluding the Contractor from exercising its rights to seek adjudication of its rights in the manner permitted by the Contract Documents or Applicable Laws.

**1.1.72  Governmental Authority.** "Governmental Authority" means the United States, the State, County and City in which the Site is located, any other local, regional, state or federal political subdivision, authority, agency, department, commission, board, bureau, court, judicial or quasi-judicial body, and any legislative or quasi-legislative body, or instrumentality of any of them, which exercises jurisdiction over the Project, Work, Site, Contractor or Owner, including, without limitation, jurisdiction to review and approve or reject the Contract Documents or the Work based on compliance or non-compliance with Applicable Laws.

**1.1.73  Governmental Authority Review Period.**  "Governmental Authority Review Period" means a period of time set forth in the Construction Schedule or Submittal Schedule for Governmental Authority review, and issuance of approval, of the Work.

**1.1.74  Guarantee to Repair Period.** "Guarantee to Repair Period" means the period of time set forth in Section 12.3, below, for repair or replacement of Defective Work.

**1.1.75  Guaranteed Maximum Price, GMP.**  "Guaranteed Maximum Price" and "GMP" mean the maximum sum that Owner is obligated to pay to Contractor for performance in accordance with the Contract Documents.  The terms "Guaranteed Maximum Price" and "GMP" are synonymous with "Contract Price."

**1.1.76  Hazardous Substance.**  "Hazardous Substance" means either of the following: (1) any chemical, material or other substance defined as or included within the definition of "hazardous substances," "hazardous wastes," "extremely hazardous substances," "toxic substances," "toxic material," "restricted hazardous waste," "special waste," "contamination" or words of similar import under any Environmental Law, including, without limitation, the following: petroleum (including crude oil or any fraction thereof), asbestos, asbestos-containing materials, polychlorinated biphenyls ("PCBs") and PCB-containing materials, whether or not occurring naturally; or (2) any substance that because of its quantity, concentration or physical or chemical characteristics poses a significant present or potential hazard to human health and safety or to the environment, and which has been determined by any Governmental Authority to be a hazardous waste or hazardous substance.

**1.1.77  Indemnitees.** "Indemnitees" means those individuals or entities defined in Article 16 of the Construction Contract as "Indemnitees".

**1.1.78  Installation Subcontractor.** "Installation Subcontractor" means a Subcontractor who performs a portion of the Work that includes providing substantial, rather than minor and incidental, services for the installation of temporary or permanent materials, equipment or facilities at the Site.

**1.1.79  Intellectual Property Rights.** "Intellectual Property Rights" means all intellectual property rights, including, without limitation, patent, trademark, trade dress, copyright, industrial design rights, priority rights and trade secrets.

**1.1.80  Interest Rate.** "Interest Rate" means the lesser of: (1) the "prime rate" reported in the Wall Street Journal from time to time; or (2) the rate permitted under Applicable Laws for calculating prejudgment interest on principal amounts awarded by judgment of a court.

**1.1.81  Key Milestone.** "Key Milestone" means a mutually agreed milestone that Contractor is required to achieve as part of its performance of the Work within the Contract Time.

**1.1.82  Key Personnel, Key Person.** "Key Personnel" and "Key Person" mean those individuals employed by Contractor and identified in the Construction Contract or its exhibits as its Key Personnel whose personal performance is of the essence to the Construction Contract, and any additions or replacements thereof approved by Owner.

INITIALS _____ INITIALS _____

Edition: February, 2010/Rev.4.11

**1.1.83. Lender.** "Lender" means any bank(s), institution(s) or other source(s) of funding for construction or permanent financing of the Project or any portion thereof, including, without limitation, capital partners of Owner.

**1.1.84. Loss, Losses.** "Loss" and "Losses" mean any and all economic and non-economic losses, costs, liabilities, claims, demands, debts, obligations, damages, actions, judgments, settlements, insurance deductibles and self-insured retentions, expenses, fines, penalties and punitive damages and attorneys' fees and costs (including, without limitation, attorneys' fees, court costs, expert and consultant costs and costs of litigation, mediation, arbitration and judicial reference proceedings), whether based on tort, contract, equitable principles or any other legal theory of liability; provided, however, that the use of either term shall not be interpreted to (1) waive a party's right to recovery of attorney's fees or costs which a party is entitled to recover under Section 13.4 of the Construction Contract, or (2) alter the agreed allocation of mediation and mediator fees provided for under Section 13.3 of the Construction Contract.

**1.1.85 Minor Change.** "Minor Change" means a Change in the Work that does not involve either performance of Extra Work or a Contract Adjustment.

**1.1.86 Modification.** "Modification" means a document, other than a Prime Contract Change Order, approved and signed by Owner and Contractor after execution of the Construction Contract, agreeing to alter, amend or modify the Contract Documents.

**1.1.87 Mold.** "Mold" means mold, mildew, spores or other microorganisms of any type, nature or description, or any by-product thereof, the presence of which poses an actual or potential threat to human health, including, without limitation, any species of organisms of the kingdoms of fungi or mycota, including yeasts, smuts, ruts, mildews, mold and mushrooms, or any microbial contamination, either airborne or surface, which arises out of or is related to the presence of fungi or spores (including, without limitation, aspergillus, cladosporium, penicillium and stachybortrys chartarum).

**1.1.88 Notice of Change.** "Notice of Change" means a formal written notice required to be submitted by Contractor pursuant to Paragraph 7.6.1, below, notifying the Owner of circumstances that Contractor believes may give rise to a Contract Adjustment based on Compensable Change or Deleted Work.

**1.1.89 Notice of Delay.** "Notice of Delay" means a formal written notice required to be submitted by Contractor pursuant to Paragraph 8.2.2, below, notifying the Owner of circumstances that Contractor believes may give rise to a Contract Adjustment to the Contract Time for Excusable Delay or Compensable Delay or a Contract Adjustment to the Contract Price for Compensable Delay.

**1.1.90 Notice of Final Completion.** "Notice of Final Completion" means a notice prepared by Owner establishing the date that the Work is Finally Complete.

**1.1.91 Notice of Substantial Completion.** "Notice of Substantial Completion" means a notice prepared by Owner establishing the date that the Work is Substantially Complete.

**1.1.92 Notice of Tenant-Ready Completion.** "Notice of Tenant-Ready Completion" means a notice prepared by Owner establishing the date that the Work is completed to the point of Tenant-Ready Completion.

**1.1.93 Notice to Proceed.** "Notice to Proceed" means a written notice issued by Owner authorizing Contractor to begin the portions of the Work other than the Preconstruction Services.

**1.1.94 Owner.** "Owner" means the entity identified as "Owner" in the Preamble to the Construction Contract.

**1.1.95 Owner Affiliate.** "Owner Affiliate" means: (1) The Macerich Partnership LP, The Macerich Company, Macerich Property Management Company LLC and the officers, directors, board members, constituent partners, members and employees of each or any of them, (2) any entity (including, without limitation, any company, corporation, LLC, joint venture or partnership) that is directly or indirectly owned, managed or controlled (whether such ownership, management or control is by means of contract, ownership of voting securities or otherwise) by Owner, The

INITIALS _____ INITIALS _____

Edition: February, 2010/Rev.4.11

Macerich Partnership LP, The Macerich Company or Macerich Property Management Company LLC (including, without limitation, non-controlled subsidiaries; (3) any person or entity (including, without limitation, any company, corporation, LLC, joint venture or partnership) that owns, manages or controls (whether such ownership, management or control is by means of contract, ownership of voting securities or otherwise) or has a greater than 10% ownership in Owner, The Macerich Partnership LP, The Macerich Company or Macerich Property Management Company LLC; or (4) any person or entity (including, without limitation, any company, corporation, LLC, joint venture or partnership) substantially involved in the management of the business affairs of Owner, The Macerich Partnership LP, The Macerich Company or Macerich Property Management Company LLC.

**1.1.96  Owner Amount.**  "Owner Amount" means the amount calculated on behalf of Owner pursuant to Paragraph 14.1.5, below, that is used to determine the amount payable to Contractor or Owner in the event of a partial or full termination or discontinuance of the Work.

**1.1.97  Owner Consultant.**  "Owner Consultant" means a professional, of any Tier, retained by Owner to provide professional design, engineering or management services for the Project.

**1.1.98  Owner Review Date.**  "Owner Review Date" means an end date set forth in the Preliminary Project Schedule, Construction Schedule or Submittal Schedule within which Owner, Owner's Representative, Construction Manager or an Owner Consultant is to provide information, review documents or render decisions, approvals or disapprovals.

**1.1.99  Owner Review Period.**  "Owner Review Period" means a period of time set forth in the Preliminary Project Schedule, Construction Schedule or Submittal Schedule within which Owner, Owner's Representative, Construction Manager or an Owner Consultant is to provide information, review documents or render decisions, approvals or disapprovals.

**1.1.100  Owner's Agent.**   "Owner's Agent" means the entity identified in the Preamble to the Construction Contract as having authority as agent of Owner to enter into the Construction Contract and to otherwise bind Owner contractually in respect to all matters relating to the Project.

**1.1.101  Owner's Representative.**   "Owner's Representative" means any individual among those designated in Section 1.6 of the Construction Contract as authorized to act on behalf of Owner and Owner's Agent pursuant to, and with the authority set forth in, Section 1.6 of the Construction Contract.

**1.1.102  Payment Bond, Performance Bond.**  "Payment Bond" and "Performance Bond" mean the bonds purchased and provided by Contractor pursuant to Section 11.1, below.

**1.1.103  Preconstruction Services.**  "Preconstruction Services" means the services to be performed by Contractor pursuant to Section 4.1 of the Construction Contract.

**1.1.104  Preliminary Project Schedule.**   "Preliminary Project Schedule" means the preliminary schedule for performance of the Work prepared by Contractor and attached as an exhibit to the Construction Contract.

**1.1.105  Prime Contract Change Order.** "Prime Contract Change Order" means a written instrument, signed in accordance with the requirements of the General Conditions, setting forth the agreement of the Owner and Contractor on the terms of a Contract Adjustment.

**1.1.106  Product Data.** "Product Data" means illustrations, standard schedules, performance charts, instructions, brochures, diagrams and other information furnished by Contractor to illustrate a material, product or system for some portion of the Work.

**1.1.107  Progress Payment.** "Progress Payment" means a monthly payment of a portion of the Contract Sum prior to Final Completion based on Contractor's progressed performance of the Work.

INITIALS ___ INITIALS ___

Edition: February, 2010/Rev.4.11

**1.1.108 Project.** "Project" means the totality of improvements comprising, or necessary or appurtenant to the use of, the work of improvements described generally in the Construction Contract, of which the Work may only be a part.

**1.1.109 Project Documents.** "Project Documents" means all writings (hard copy and electronic) in the possession of Contractor at the Site or elsewhere that relate in any way to the Project or Work.

**1.1.110 Project Team.** "Project Team" means the Owner, Owner's Agent, Owner's Representative, Construction Manager, Contractor, Subcontractors, Subconsultants, Owner Consultants, Separate Contractors and other individuals or firms retained by Owner, or retained by others with Owner's approval, participating in the planning, programming, design or construction of the Project.

**1.1.111 Provisional Prime Contract Change Order.** "Provisional Prime Contract Change Order" means a writing signed by Owner in accordance with the General Conditions, in which Owner unilaterally sets forth its determination of the undisputed portion of an otherwise disputed Contract Adjustment.

**1.1.112 Record Documents.** "Record Documents" means the Drawings and Specifications issued by Architect and its Subconsultants for use by Contractor in performing the Work, including any updated versions thereof.

**1.1.113 Record Drawings, Record Specifications.** "Record Drawings" and "Record Specifications" mean the Drawings and Specifications that comprise the Record Documents.

**1.1.114 Reference Documents.** "Reference Documents" means, and is limited to, those documents identified or referenced in the GMP Amendment, containing information describing surface and subsurface conditions at the Site or the as-built conditions of Existing Improvements, that were relied upon by Contractor in preparing its GMP Proposal, including, without limitation, those documents listed as Reference Documents in Exhibit "E" – "Drawings, Specifications and Reference Documents" attached to the Construction Contract.

**1.1.115 Request for Extension.** "Request for Extension" means a formal written request submitted by Contractor pursuant to Paragraph 8.2.3, below, setting forth the justification and support for Contractor's request for a Contract Adjustment to the Contract Time.

**1.1.116 Request for Information.** "Request for Information" means a written request by Contractor for clarification of what it perceives to be a discrepancy in the Contract Documents (including, without limitation, information in the Contract Documents constituting errors, omissions, conflicts, ambiguities, lack of coordination, noncompliance with Applicable Laws or a variance between the information in the Contract Documents and conditions at the Site or in Existing Improvements).

**1.1.117 Safety Program.** "Safety Program" means the formal, written program prepared by Contractor setting forth detailed procedures and precautionary measures for protecting persons and property from injury or damage.

**1.1.118 Samples.** "Samples" means physical examples which illustrate materials, equipment or workmanship and establish standards by which the Work will be judged.

**1.1.119 Schedule of Values.** "Schedule of Values" means a detailed, itemized breakdown of the Contract Price, approved by Owner, which provides for an allocation of the dollar values comprising the Contract Price to each of the various parts of the Work, including, without limitation, some or all of the following as required by the Construction Contract: Subcontractor trade Work; Self-Performed Work; General Conditions Costs; Contractor Fee; Buy Out Account; and Contingency.

**1.1.120 Self-Performed Work.** "Self-Performed Work" means Work, other than Work for which costs are incurred that constitute General Conditions Costs, that is approved by Owner for performance by Contractor or a Contractor Affiliate.

INITIALS ___ INITIALS ___

Edition: February, 2010/Rev.4.11

**1.1.121 Separate Contractors.** "Separate Contractors" means contractors, subcontractors, suppliers or vendors under contract directly to Owner or Owner's tenants to provide services, materials, labor, equipment or other work to the Project.

**1.1.122 Shop Drawings.** "Shop Drawings" means drawings, diagrams, schedules and other data specifically prepared by Contractor or a Subcontractor to illustrate a portion of the Work.

**1.1.123 Site.** "Site" means: (1) the parcel of land identified in the Construction Contract on which the Project is to be constructed and such additional parcels as may be purchased by Owner for such construction; (2) all areas adjacent to such parcels that may be used by Contractor or the Subcontractors for staging, storage, parking or temporary offices; and (3) all land areas, both private and public, adjacent to such parcels on which Work is required to be performed under the Contract Documents, Applicable Laws or permits relating to the Project.

**1.1.124 Specifications.** "Specifications" means the portion of the Contract Documents consisting of the written requirements for materials, equipment, standards and workmanship for the Work and the performance of related services. Specifications may also be referred to in the Contract Documents as the "Project Manual".

**1.1.125 Standard of Performance.** "Standard of Performance" means the general standards governing Contractor's performance of its obligations under the Construction Contract and General Conditions as set forth in Section 1.2 of the Construction Contract.

**1.1.126 Storm Water Permit.** "Storm Water Permit" means a permit for discharge or runoff of waste or storm water associated with construction activity that is issued by the Governmental Authority having jurisdiction over such matters.

**1.1.127 Subconsultant.** "Subconsultant" means a person or firm that has a contract with Architect to provide professional services to the Project.

**1.1.128 Subcontractor.** "Subcontractor" means a person or entity, other than a Contractor Affiliate, that has a contract to perform a portion of the Work, including, without limitation, subcontractors, sub-subcontractors, suppliers, manufacturers, equipment lessors and vendors, of any and every Tier.

**1.1.129 Submittal.** "Submittal" means Shop Drawings, Samples, Product Data and other detailed designs, fabrication and installation drawings, lists, graphs, operating instructions, exemplars and similar documents required to be submitted by Contractor under the Contract Documents for review by Owner, Construction Manager or an Owner Consultant.

**1.1.130 Submittal Schedule.** "Submittal Schedule" means the schedule prepared by Contractor showing the timing for submission and review of Submittals during construction.

**1.1.131 Substantial Completion, Substantially Complete.** "Substantial Completion" and "Substantially Complete" mean the point at which the following conditions have occurred with respect to the entire Work or a portion of the Work designated by Owner in writing to be Substantially Completed prior to Substantial Completion of the entire Work: (1) such Work can be fully enjoyed and beneficially occupied and utilized by Owner for its intended purpose (except for minor items which do not impair Owner's ability to so occupy and use such Work); (2) all permits, approvals and certificates by Governmental Authorities, such as, but not necessarily limited to, a permanent or temporary certificate of occupancy required for the occupancy and use of such Work have been issued free of any conditions that are the result of an act or omission of Contractor or a Subcontractor, of any Tier, constituting negligence, willful misconduct, a violation of an Applicable Law or a failure by Contractor to comply with the Contract Documents; (3) all conditions for Tenant-Ready Completion of such Work have been, and continue to be, fully satisfied; and (4) all systems included in such Work are operational as specified, all designated or required inspections and certifications by Governmental Authorities have been made and posted, and instruction of Owner's personnel in the operation of such systems has been completed.

**1.1.132 Substantial Completion Punch List.** "Substantial Completion Punch List" means the list of items of Work to be completed or corrected by Contractor for Substantial Completion.

INITIALS _____ INITIALS _____

**1.1.133 Surety.** "Surety" means a surety issuing a Performance Bond or Payment Bond.

**1.1.134 Tenant-Ready Completion, Tenant-Ready Complete.** "Tenant-Ready Completion" or "Tenant-Ready Complete" means the point at which all of the Tenant Spaces, or a portion of the Tenant Spaces that is designated in writing by Owner to be Tenant-Ready Complete prior to Tenant-Ready Completion of all Tenant Spaces, are complete such that the Owner's tenants may commence and continue, uninterrupted by any activities of Contractor or the condition of the Work performed by Contractor, installation of their tenant improvements in such Tenant Spaces.

**1.1.135 Tenant-Ready Completion Punch List.** "Tenant-Ready Completion Punch List" means the list of items of Work to be completed or corrected by Contractor for Tenant-Ready Completion.

**1.1.136 Tenant Spaces.** "Tenant Spaces" means those portions of the Work, typically designated in the Drawings by lease lines, intended for occupancy by Owner's ground lessees, tenants or subtenants.

**1.1.137 Tier.** "Tier" means the contractual level of a Subcontractor with respect to Contractor. For example, a "first-tier" Subcontractor is under contract with Contractor. A sub-subcontractor under contract with a first-tier Subcontractor is in the "second tier," and so on. Use of the phrase "of every Tier," or similar phraseology, in the Contract Documents shall not be interpreted as implying that other provisions of the Contract Documents, where such phrases are not used, are intended to be limited in application to only the first Tier or to only certain Tiers of Subcontractors.

**1.1.138 Time Impact Analysis.** "Time Impact Analysis" means a written report evaluating the impact of an Excusable or Compensable Delay, which shall include, at a minimum, the following: (1) a narrative description of the Delay and its impact on the critical path to achievement of a Key Milestone, Tenant-Ready Completion, Substantial Completion, or Final Completion of the Work within the Contract Time; (2) a Fragnet; (3) a detailed breakdown of the Costs of Work, if any, sought by Contractor due to the Delay; (4) the number of Days of extension sought by Contractor as a Contract Adjustment to the Contract Time; (5) a statement that Contractor has complied with the requirements of the General Conditions for written notice of Delays, along with the dates and copies of such notice(s); (6) the measures taken by Contractor and Subcontractors to prevent or minimize the Delay; and (7) Contractor's recommendations for reordering or re-sequencing the Work to avoid or minimize further Delay.

**1.1.139 Unexcused Delay.** "Unexcused Delay" means any Delay that is not a Compensable Delay or Excusable Delay or that constitutes a Compensable Delay or Excusable Delay for which Contractor is not entitled to a Contract Adjustment to the Contract Time, including, without limitation, the following: (1) Delay caused by an act or omission of Contractor or a Subcontractor, of any Tier, constituting negligence, willful misconduct, a violation of an Applicable Law or a failure by Contractor to comply with the Contract Documents; (2) Delay for which Contractor has failed to provide a timely and complete Notice of Delay and Request for Extension; or (3) Delay associated with any circumstances where the costs or risk associated with such circumstances are designated in the Contract Documents as being at Contractor's risk or Contractor's Own Expense.

**1.1.140 Weather Delay Allowance.** "Weather Delay Allowance" means the number of Days stated in the Construction Contract that Owner and Contractor have estimated for foreseeable and seasonal inclement weather (including, without limitation, dry out time) affecting Work at the Site at any time during the duration of the time that Contractor is performing Work at the Site.

**1.1.141 Work.** "Work" means all labor, materials, equipment, services, permits, licenses, taxes and other things necessary for Contractor to perform its obligations under the Contract Documents, including, without limitation, any Changes requested by Owner, in accordance with the Contract Documents and all Applicable Laws. The Work may constitute the whole or a part of the Project.

**1.2 CORRELATION, INTERPRETATION AND INTENT OF CONTRACT DOCUMENTS**

**1.2.1 Design Intent.** The intent of the Contract Documents is for Contractor to provide all items necessary to produce a work of improvement that is complete as a whole and that is, in all of its parts, suitable for use and occupancy for its intended purpose, including, without limitation, all equipment, casework, mechanical, electrical and similar devices of whatever nature, completely installed, hooked-up and made fully operational and functional.

INITIALS _____ INITIALS _____

Edition: February, 2010/Rev.4.11

**1.2.2   Complementary.**   Contract Documents are complementary, and what is called for by one shall be as binding as if called for by all. Any Work called for on the Drawings and not mentioned in the Specifications, or vice versa, shall be performed as though fully set forth in both.

**1.2.3   Technical Words.**   Unless otherwise stated in the Contract Documents, technical words and abbreviations contained in the Contract Documents are used in accordance with commonly understood construction industry meanings and non-technical words and abbreviations are used in accordance with their commonly understood meanings.

**1.2.4   Trade Names.**   It is not the intention of the Contract Documents to go into detailed descriptions of any materials or methods commonly known to the trade under a "trade name" or "trade term." The mere mention or notation of such "trade name" or "trade term" shall be considered a sufficient notice to the Contractor that it will be required to complete the Work so named with all its appurtenances according to first-class practices of the trade.

**1.2.5   Incidental Items.**   The naming of any material or equipment shall mean the furnishing and installation of the same, including all incidental and accessory items thereto and labor therefor, in accordance with first-class practices of the trade involved, unless specifically noted otherwise.

**1.2.6   Applicable Laws.**   Compliance with Applicable Laws shall be considered as a part of the Work.  In the event of a conflict between or among Applicable Laws governing performance of the Work, the more stringent shall govern.

**1.2.7   Modifiers.**   The Contract Documents may omit modifying words such as "all" and "any," and articles such as "the" and "an."  If a modifier or an article is not included in one statement and appears in another, it is not intended to affect the interpretation of either statement. The use of the word "including," when following any general statement, shall not be construed to limit such statement to specific items or matters set forth immediately following such word or to similar items or matters whether or not non-limiting language (such as "without limitation," "but not limited to," or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that could reasonably fall within the broadest possible scope of such general statement.

**1.2.8   Singular, Gender, Captions.**   When appropriate to the context, the use of the singular number shall be deemed to include the plural and vice versa. Each gender shall be deemed to include any other gender, and each shall include corporation, partnership, trust or other legal entity whenever it is appropriate to the context.  The captions and headings of the various subdivisions of the Contract Documents are intended only as a matter of reference and convenience and in no way define, limit, or prescribe the scope or intent of the Contract Documents or any subdivision thereof.

**1.2.9   Cross-References.**   Any cross-references indicated between various paragraphs or other portions of the Specifications, Drawings or other Contract Documents are provided for the convenience of Contractor and shall not be deemed to be all-inclusive.

**1.2.10   Demolition.**   Existing improvements at the Site of which no specific description is made in the Contract Documents, but which could be reasonably assumed to interfere with the satisfactory completion of the Work, shall be removed and disposed of by Contractor without Contract Adjustment.  If Contractor is unsure whether a specific Existing Improvement at the Site which is not specifically described in the Contract Documents should be removed and disposed of, Contractor shall promptly ask the Construction Manager whether such Existing Improvement is to be removed or remain in place, and shall comply with any directive given in response.

**1.2.11   Omissions.**   Items missing from the Contract Documents shall nevertheless be provided by Contractor, without Contract Adjustment, to the extent reasonably inferable from the Contract Documents as being necessary to satisfy the Design Intent.

**1.2.12   Diagrammatic Portions.**   Drawings and diagrams for mechanical, plumbing, electrical, fire sprinkler, fire alarm and low voltage Work shall be considered as diagrammatic only and shall not be used for any structural guidance or physical layout. Contractor shall be responsible to provide any and all numbers and lengths of fittings, wire, conduit, connections, attachments or similar materials or devices needed to complete the Work, without Contract

INITIALS ____  INITIALS ____

Edition: February, 2010/Rev.4.11

Adjustment, whether or not they exceed the numbers of pieces or the lengths indicated by the Drawings. Contractor is solely responsible to carefully plan and coordinate in advance by means of coordination drawings the installation of any Work shown diagrammatically so as to make maximum use of the space available and so as to anticipate and avoid wherever possible conflict and interferences among such portions of the Work and with other portions of the Work, including structural members.

**1.2.13  Conflicts.**  In the event of conflict between any of the Contract Documents, the provision placing a more stringent requirement or greater burden on Contractor or requiring the greater quantity or higher quality material or workmanship shall prevail, unless otherwise directed by Owner in writing.

**1.2.14  Conditions Precedent.**  Wording used in the Contract Documents indicating that a right of Contractor or an obligation of Owner is subject to or conditioned upon the occurrence of a condition or event, whether or not such condition or event is within the control of Contractor, Owner or others and whether or not such condition or event is designated to be a condition precedent, shall be understood and interpreted to mean that the stated condition or event is a condition precedent to the existence, arising, performance and exercise of such right or obligation.

## 1.3    OWNERSHIP AND USE OF DOCUMENTS

**1.3.1    Property of Owner.** All Design Documents, Contract Documents and Project Documents that are prepared by Contractor or any Subcontractor, of any Tier, for use in connection with the Project, including any designs, building designs or other depictions underlying or shown in them, and the intellectual Property Rights thereto, shall be deemed the sole and exclusive property of Owner and ownership thereof is irrevocably vested in Owner, whether the Project is executed or not.

**1.3.2    Assignment of Rights.** Contractor shall, without further consideration, obtain and if necessary transfer in writing any and all intellectual Property Rights in the Design Documents, Contract Documents and Project Documents prepared by Contractor or any Subcontractor for use on the Project, including any designs, building designs or other depictions underlying or shown in them, free and clear of any liens or other encumbrances, claims or rights of third parties, to Owner and cooperate with Owner in securing and registering such rights, such that Owner shall own all intellectual Property Rights and any other tangible and/or intangible property rights associated with such Project Documents. Such transfer and assignment will be effective for the entire duration of the copyrights and include, but are not limited to, all rights in related plans, specifications, documentation, derivative works and moral rights.

**1.3.3    Contractor's Warranty.** Contractor represents and warrants that the Design Documents, Contract Documents and Project Documents prepared by Contractor or any Subcontractor for use on the Project, and the use of such Design Documents, Contract Documents or Project Documents in the ordinary course, are free of any claim of infringement or any other violation of any intellectual Property Right or other right of any third party.

**1.3.4    Non-Exclusive License.**  Without derogation of Owner's rights under this Section 1.3, Contractor and Subcontractors, of every Tier, are granted a limited, non-exclusive license, revocable at will of Owner, to use and reproduce applicable portions of the Design Documents, Contract Documents and Project Documents as appropriate to and for use in the execution of the Work and for no other purpose.

**1.3.5    Reproduction.** Contractor shall do all reproduction and distribution of such reproducible prints of Contract Documents and Design Documents as are necessary for the complete pricing and performance of the Work, including, without limitation, all Changes.  Except as otherwise provided in Article 6 of the Construction Contract, the costs of such reproduction shall be at Contractor's Own Expense.

**1.3.6    Delivery to Owner.**  All Design Documents and Contract Documents (including originals and copies, both paper and electronic) in the possession of Contractor or Subcontractors shall be delivered to Owner at any time upon request by Owner and without request upon the earlier of Final Completion of the Work or termination of the Construction Contract; provided, however, that Contractor shall have the right to retain one (1) copy of the Contract Documents and Submittals as a permanent record.

INITIALS _____ INITIALS _____

Edition: February, 2010/Rev.4.11

**1.3.7   Subcontractors.** Contractor shall take all necessary steps to ensure that a provision is included in all contracts with Subcontractors, of every Tier, who perform Work on the Project protecting and preserving Owner's rights as set forth in this Section 1.3.

## ARTICLE 2
## OWNER

**2.1   INFORMATION, APPROVALS AND SERVICES REQUIRED OF OWNER**

**2.1.1   Conditions at Site.** The Owner shall furnish, within a reasonable time after written request by Contractor, any known and materially relevant information in its custody, possession and control concerning the physical characteristics and conditions of the Site or in Existing Improvements at the Site, including, without limitation, reports concerning surface and subsurface soils and geotechnical conditions, locations of utilities, as-built plans and surveys. The Owner does not expressly or impliedly warrant or make any representations regarding the accuracy, completeness or suitability of the information furnished pursuant to this Paragraph 2.1.1.

**2.1.2   Legal Descriptions.** The Owner shall furnish, within a reasonable time after written request by Contractor, a legal description of the Site and information describing legal limitations affecting the Site that are recorded with applicable Governmental Authorities, such as, but not limited to, easements.

**2.1.3   Owner Approvals.** Information, approvals and decisions required of the Owner, Owner's Representative, Construction Manager or an Owner Consultant for which an Owner Review Period or Owner Review Date is included and approved by Owner in the Construction Schedule shall be provided in accordance with the Construction Schedule. If an Owner Review Period or Owner Review Date is not set forth in the Construction Schedule, then such information, approvals and decisions shall be provided upon written request by Contractor without unreasonable Delay. The Contractor's right to a Contract Adjustment due to a failure or delay in the providing of any such information, approval or decision shall be subject to the following:

   **.1   Schedule Approvals.** In the case of information, an approval or a decision for which there is an Owner-approved Owner Review Period or Owner Review Date in the Owner-approved Construction Schedule, failure by Owner, Architect, Owner's Representative, Construction Manager or an Owner Consultant to provide any information, approval or decision shall not be considered as a basis for Contract Adjustment to the Contract Time unless and until seven (7) Days after the Construction Manager and the individual from whom such information, approval or decision is sought have received from Contractor a written notice containing all the following:  (a) a detailed description of the information, approval or decision required; (b) a statement that the Owner Review Period or Owner Review Date has expired or passed; and (c) a statement, prominently displayed, that: "PURSUANT TO PARAGRAPH 2.1.3 OF THE GENERAL CONDITIONS, THE FAILURE TO PROVIDE THE REQUESTED INFORMATION, APPROVAL OR DECISION WITHIN 7 CALENDAR DAYS FROM THIS NOTICE MAY RESULT IN A REQUEST FOR A CONTRACT ADJUSTMENT".

   **.2   Unscheduled Approvals.** In the case of information, an approval or a decision for which there is no Owner Review Period or Owner Review Date set forth in the Construction Schedule, failure by Owner, Architect, Owner's Representative, Construction Manager or an Owner Consultant to provide any information, approval or decision shall not be considered as a basis for Contract Adjustment to the Contract Time unless and until  thirty (30) Days after the Construction Manager and the individual from whom such information, approval or decision is sought have received from Contractor a written notice that includes the description and statement set forth Clauses (1), (a) and (b) of this Paragraph 2.1.3 and that includes a statement, prominently displayed, that: "PURSUANT TO PARAGRAPH 2.1.3 OF THE GENERAL CONDITIONS, THE FAILURE TO PROVIDE THE REQUESTED INFORMATION, APPROVAL OR DECISION WITHIN 30 CALENDAR DAYS FROM THIS NOTICE MAY RESULT IN A REQUEST FOR A CONTRACT ADJUSTMENT".

**2.1.4   Not a Release.** Without limitation to Contractor's rights to a Contract Adjustment as may be elsewhere provided for in the Contract Documents, Contractor shall not be relieved of its obligations to perform the Work in accordance with the Contract Documents either by the activities or duties of the Owner, Owner's Representative or Construction Manager or by tests, inspections or approvals required or performed by persons other than Contractor.

INITIALS\_\_\_\_ INITIALS\_\_\_\_

**2.1.6   Owner-Furnished Items.** The Owner reserves the right to supply materials to Contractor if necessary for the progress of the Work.  No markup, including Allowable Markups, shall be applied by Contractor or any Subcontractor to any such materials provided by the Owner.

## 2.2    OWNER'S RIGHT TO STOP THE WORK

If Contractor fails to correct Defective Work as required by Section 12.2 of these General Conditions, fails to perform the Work in accordance with the Contract Documents or violates any Applicable Law, Owner may immediately order Contractor to stop the Work, or any portion thereof, until the reason for such direction has been eliminated by Contractor. Contractor shall immediately comply with such order at Contractor's Own Expense. Owner shall have no duty or responsibility to Contractor or any other party to exercise the right to stop the Work.

## 2.3    OWNER'S RIGHT TO CARRY OUT THE WORK

If Contractor (1) fails to carry out the Work in accordance with the Contract Documents, fails to provide sufficient labor, materials, equipment, tools and services to maintain the Construction Schedule, or otherwise fails to comply with any requirement of the Contract Documents, and (2) fails to cure such failure in the manner required by Subparagraph 14.1.1.4, below, Owner may correct such failure.  In such case, Owner shall be entitled to recover from Contractor or deduct from payments then or thereafter due Contractor any Loss resulting from such failure, including compensation for the additional services and expenses of Owner, Owner's Representative, Construction Manager, Owner Consultants and others whose services are reasonably required and made necessary thereby.  If payments then or thereafter due Contractor are not sufficient to cover such amounts, Contractor shall promptly pay the amount of the shortfall to Owner.

## 2.4    OWNER'S ADDITIONAL RIGHTS

The rights stated in this Article 2 are in addition to and not in limitation of any other rights of Owner granted elsewhere in the Contract Documents or under Applicable Laws.

**ARTICLE 3
CONTRACTOR**

## 3.1    CONTRACTOR STATUS

**3.1.1   Independent Contractor.** Contractor is, and shall at all times be deemed to be, an independent contractor and is wholly responsible for the manner in which it performs the obligations required of it by the terms of the Contract Documents. Contractor, its agents and employees shall not be entitled to any rights or privileges of the Owner's employees and nothing contained in the Contract Documents and no course of conduct shall be construed as creating the relationship of employer and employee, or principal and agent, between the Owner and any agent or employee of Contractor or any Subcontractor.  The Owner shall have the right, but not the obligation, to monitor the employment and other activities of Contractor and the Subcontractors to determine compliance with the terms of the Contract Documents.

**3.1.2   Licenses.** Contractor shall maintain, and shall require the Subcontractors, of every Tier, to maintain, such contracting, professional and business licenses as may be required by Applicable Laws for the duration of time that Contractor is performing the Work, including the period of any warranty provided in connection with, or under the terms of, the Contract Documents, covering all or any portion of the Work.

**3.1.3   Responsibility for Employees.** Contractor wholly and without reservation assumes the responsibility for the acts and omissions of its agents and employees and the agents and employees of each Subcontractor, of every Tier, as they relate to the Work.

17 of 85

**3.2     REVIEW OF PROJECT-RELATED DOCUMENTS, SITE AND EXISTING IMPROVEMENTS**

**3.2.1   Project-Related Documents.** Contractor's execution of the GMP Amendment constitutes a representation that it had the opportunity, prior to agreeing to the Contract Price, General Conditions Costs Maximum and Contract Time, to thoroughly and carefully review and evaluate to its satisfaction the Contract Documents, Reference Documents and other documents and information provided by Owner to Contractor prior to the date that Owner and Contractor execute the GMP Amendment concerning the Project, Site or Existing Improvements. Contractor agrees that it shall not be entitled to, and hereby conclusively waives, any right to Contract Adjustment due to additional or unforeseen Losses or Delays on the basis that the Contract Documents, Reference Documents and other documents and information provided by Owner to Contractor prior to the date that Owner and Contractor execute the GMP Amendment concerning the Project, Site or Existing Improvements contained an error, omission, conflict, ambiguity, lack of coordination or noncompliance with Applicable Laws, if prior to execution of the GMP Amendment such error, omission, conflict, ambiguity, lack of coordination or noncompliance with Applicable Laws was either: (1) discovered by Contractor and Contractor, notwithstanding such discovery, failed to report such error, omission, conflict, ambiguity, lack of coordination or noncompliance with Applicable Laws to Owner in writing prior to the date that Owner and Contractor execute the GMP Amendment; or (2) although not actually discovered by Contractor was prior to the date of execution of the GMP Amendment by Owner and Contractor reasonably discoverable by Contractor in accordance with the Standard of Performance.

**3.2.2   Site and Existing Improvements.**

**.1     Contractor Inspection.** Contractor's execution of the GMP Amendment constitutes a representation by Contractor that Contractor has, in order to fully acquaint itself with all conditions, restrictions, obstructions, difficulties and other matters which might affect Contractor's ability to complete the Work within the limitations of the Contract Price, General Conditions Costs Maximum and Contract Time set forth in such GMP Amendment, carefully and thoroughly inspected:

**(1)** the Site and its surroundings, Existing Improvements and their existing uses by Owner or the public, routes of ingress and egress, and local conditions in the vicinity of the Site (including, without limitation, sources and availability of labor, materials and equipment);

**(2)** the status of any construction at the Site concurrently under construction; and

**(3)** all information that either

**(a)** has been provided by Owner to Contractor (including, but not limited to, the Contract Documents and Reference Documents), or

**(b)** is reasonably available for review from the public records of the City or County in which the Project is located, concerning visible and concealed conditions above and below the surface of the ground at the Site and in Existing Improvements (including, without limitation, surveys, reports, data, as-built drawings of Existing Improvements and utility sources, capacities and locations).

**.2     Contractor Waiver.** Contractor agrees that it shall not be entitled to, and hereby conclusively waives, any right to Contract Adjustment (including, without limitation, a Contract Adjustment for Differing Site Conditions) to the Contract Price, General Conditions Costs Maximum or Contract Time set forth in the GMP Amendment for Loss or Delay if and to the extent such Loss or Delay is due to any of the following:

**(1)** a failure by Contractor to fully familiarize itself prior to the date of execution of such GMP Amendment by Contractor with the conditions and information described in Clauses (1) through (3) of Subparagraph 3.2.2.1, above;

**(2)** an error, omission, conflict, ambiguity, lack of coordination or noncompliance with Applicable Laws that is contained in any of the information described in Clause (3) of Subparagraph 3.2.2.1, above, that:

INITIALS ___ INITIALS ___

Edition: February, 2010/Rev.4.11

(a)    was discovered by Contractor and Contractor, notwithstanding such discovery, failed to report such error, omission, conflict, ambiguity, lack of coordination or noncompliance with Applicable Laws to Owner in writing prior to the date of execution of the GMP Amendment by Contractor; or

(b)    although not actually discovered by Contractor was prior to the date of execution by Contractor of the GMP Amendment reasonably discoverable by Contractor in accordance with the Standard of Performance.

**3.2.3   Continuing Obligation.** In addition and without limitation to Contractor's obligations under Paragraph 3.2.1 and Paragraph 3.2.2, above, or elsewhere in the Contract Documents, Contractor shall have the continuing obligation until Final Completion to promptly report to Owner by means of a Request for Information that complies with Paragraph 3.2.4, below, any (1) information contained in the Contract Documents, Reference Documents or other documentation reasonably available to Contractor for review, as well as any visible conditions at the Site, in Existing Improvements or in the vicinity of the Project, that Contractor knows, or in the exercise by Contractor of its duties under the Standard of Performance should have known, may render a portion of the Work in any respect, wholly or partially, unsuitable or incomplete to meet the requirements of the Contract Documents, the Design Intent or Applicable Laws, and (2) conditions in the Work that render all or any portion of the Work to be Defective Work. Without limitation to Owner's other rights under the Contract Documents, any portion of the Work, Existing Improvements or the work of Separate Contractors or Owner's own forces requiring replacement, repair or correction due to a failure by Contractor to comply with its continuing obligation under this Paragraph 3.2.3 shall be promptly replaced, or repaired or corrected to Owner's satisfaction, at Contractor's Own Expense.

**3.2.4   Requests for Information.**

.1    **Time for Submittal.** Requests for Information shall be submitted no later than three (3) Days after the date Contractor learns of the circumstances giving rise to the question contained in the Request for Information.

.2    **Content.** Each Request for Information shall include the following:

(1)    a detailed description of the discrepancy or variance discovered;

(2)    Contractor's request for clarification, including, without limitation, any request for further detailing or correction of the Contract Documents;

(3)    if the Request for Information concerns a discrepancy or variation in the Contract Documents, whether the discrepancy or variation was or was not discovered by Contractor prior to executing the GMP Amendment, and if not discovered, the reasons why the discrepancy or variance was not reasonably discoverable by Contractor or the Subcontractors in the exercise of their duties of review under Paragraph 3.2.1, above, and Paragraph 3.2.2, above; and

(4)    a statement of whether Contractor believes it is entitled to a Contract Adjustment by reason of such discrepancy or variance.

.3    **Form.** Contractor shall submit Requests for Information using forms provided or approved by Owner.

.4    **Unnecessary, Multiple Requests.** Contractor shall carefully review, coordinate and consolidate (where appropriate to prevent piecemeal submission) Requests for Information (whether originating with Contractor or the Subcontractors) prior to submitting them in order to eliminate unnecessary or duplicative Requests for Information.

.5    **Responses.** Responses to Requests for Information shall be furnished with reasonable promptness so as to not unreasonably Delay progress of the Work; provided, however, that the timing of a response by the Architect, Owner, Owner's Representative, Construction Manager or an Owner Consultant to a Request for

INITIALS _____ INITIALS _____

Edition: February, 2010/Rev.4.11

Information shall not constitute grounds for a Contract Adjustment unless Contractor has complied with the requirements set forth in this Paragraph 3.2.4 and, if applicable, Paragraph 2.1.3, above.

.6    **Backcharges by Owner.**   Owner shall have the right to deduct from payments due to Contractor sums expended by Owner for the services of the Architect or Owner Consultants due to failure by Contractor to comply with this Paragraph 3.2.4.

.7    **Waiver by Contractor.**   Failure by Contractor to submit a Request for Information in accordance with this Paragraph 3.2.4 under circumstances in which a Request for Information was required by this Paragraph 3.2.4 shall result in Contractor waiving its right to a Contract Adjustment on account of such circumstances.

**3.2.6    No Warranty by Owner.**   With respect to any error, omission, conflict, ambiguity or violation of Applicable Laws that is present in the information contained in the Contract Documents with respect to which Contractor has not waived its rights to a Contract Adjustment pursuant to Paragraph 3.2.1, above, and Paragraph 3.2.2, above, or pursuant to any other provision of the Contract Documents providing for waiver of rights by Contractor, Contractor's rights in the event such inaccuracy, insufficiency or incompleteness results in Extra Work or Delay are limited to its right to a Contract Adjustment in accordance with the terms of the Contract Documents. Subject to the foregoing, Owner makes no warranty or representation, express or implied, and assumes no other legal duty, obligation or responsibility regarding the accuracy, sufficiency or completeness of the information contained in the Construction Documents or Contract Documents furnished to Contractor by Owner, Architect or Specialty Consultants and the existence of any such inaccuracy, insufficiency or incompleteness shall under no circumstances be interpreted as constituting a breach or violation by Owner of any legal obligation or duty, express or implied, to Contractor.

**3.3    SUPERVISION AND PROCEDURES**

**3.3.1    General Obligation.**   Contractor shall provide competent, fully qualified personnel to supervise, administer, manage and direct the Work, competently and efficiently, at all times devoting their best skill and attention to perform the Work in accordance with the Contract Documents.

**3.3.2    Supervisory Staff.**   Contractor shall employ a competent project manager, superintendent, scheduler, forepersons and necessary assistants during performance of the Work. A sufficient number of supervisory personnel with expertise in relevant areas shall be supplied as appropriate to the level and stage of construction. Contractor's superintendent and forepersons shall be present at the Site at all times that the Work is in progress and at any time that any employee of Contractor or a Subcontractor is present at the Site.   Contractor's project manager and superintendent shall, unless excused from attendance in writing by the Owner, attend all job meetings.   Contractor's project manager and superintendent must be able to fluently read and write in English. Contractor's superintendent shall not perform the Work of any trade, pick up materials, or perform any Work not directly related to the supervision of the Work and shall be available twenty-four (24) hours a Day, seven (7) Days a week, to respond to emergencies.

**3.3.3    Supplementary Personnel.**   Without limitation upon any of the rights or remedies of the Owner under the Contract Documents or under Applicable Laws, in the event that Contractor fails to have personnel or sufficient personnel on Site to supervise the Work, the Owner shall have the right, but not the obligation, upon twenty-four (24) hours' telephonic or e-mail notice by the Owner to Contractor, to provide such supervision on a temporary basis and to deduct from the sums owing to Contractor the actual costs of such temporary supervision.   Contractor shall, notwithstanding the Owner's providing such temporary supervision, remain solely responsible for all actions and omissions of its personnel and of the Subcontractors.

**3.3.4    Means, Methods, Procedures.**   Contractor shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures and coordinating all portions of the Work, unless the Drawings or Specifications included in the Contract Documents give other specific instructions concerning these matters. If the Contract Documents give specific instructions concerning construction means, methods, techniques, sequences or procedures, Contractor shall nonetheless be fully and solely responsible for the adequacy and safe implementation of such means, methods, techniques, sequences or procedures. If Contractor believes that such means, methods, techniques, sequences or procedures may not be safe or adequate, Contractor shall give written notice to Owner and Architect and shall not proceed with that portion of the Work without further written

INITIALS [initials] INITIALS [initials]

Edition: February, 2010/Rev.4.11

Instruction from Owner or Architect. In response to such notice, Owner may order Contractor to improve the character or increase the efficiency of the means, methods, techniques, sequences or procedures employed, and Contractor shall conform to such order; but the failure of Owner to order such improvement or increase of efficiency will not relieve Contractor from its sole responsibility for safety at the Site nor shall it relieve Contractor from its obligation to perform the Work in accordance with the Contract Documents and Applicable Laws and without Contract Adjustment.

## 3.4   SERVICES, LABOR, MATERIALS AND EQUIPMENT

**3.4.1   Costs.** Unless otherwise provided for in the Contract Documents, Contractor shall provide and pay for all professional and non-professional services, labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation and other facilities and work necessary for proper execution and completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated into the Work.

**3.4.2   Coordination.** Contractor shall provide supervision sufficient to ensure proper coordination for the timely and efficient performance and completion of the Work.

**3.4.3   Field Conditions.** Contractor shall take field measurements and verify field conditions and shall carefully compare such field measurements and conditions with the information in the Contract Documents and with other information obtained by or available to Contractor before commencing the Work or any activities on the Site.

**3.4.4   Layout.** Contractor is solely responsible for (1) the accurate layout of all portions of the Work, (2) the accuracy of the Project lines and levels, and (3) erection of the Work square, plumb, level, true to line and grade, in the exact plane, to the correct elevation and sloped to drain where needed.

**3.4.5   Materials, Equipment**

**.1   Delivery, Storage, Inventory.** Materials and equipment shall be: (1) furnished in ample quantities and at such times as to ensure uninterrupted progress of the Work; and (2) if located on the Site, shall be properly stored and protected as necessary, or as directed by the Owner, to prevent Loss from any cause, including, without limitation, theft. In the event that the Owner gives direction as to the location for storage or protection of materials or equipment on the Site, Contractor shall nonetheless remain solely responsible for its safe and secure storage and protection. No part of any such stored materials and equipment shall be removed from its place of storage except for immediate installation in the Work. Contractor shall keep an accurate inventory of all such stored materials and/or equipment in a manner satisfactory to the Owner.

**.2   Purchases.** Contractor shall place orders for materials and/or equipment as specified so that delivery of same may be made without Delay to the Work. Contractor shall, upon request from the Owner, furnish to the Owner documentary evidence showing that orders have been placed. The Owner reserves the right, in the event of Contractor's failure, after three (3) Days written notice by Owner to Contractor, to comply with the requirements of this Subparagraph 3.4.5.2, to place orders for such materials or equipment as it may deem advisable in order that the Work may be completed within the Contract Time and to deduct the Costs of Work paid or payable by Owner associated with such purchases from the Contract Sum otherwise owing to Contractor. Contractor shall, if requested by the Owner, accept assignment of any such contracts entered into by the Owner without a Contract Adjustment.

**.3   Title.** No material, supplies or equipment for the Work shall be purchased subject to any chattel mortgage or under a conditional sale or other agreement by which an interest therein or in any part thereof is retained by seller or supplier. Contractor warrants good title to all material, supplies and equipment installed or incorporated in the Work and agrees upon Final Completion to deliver the Work, including the premises, land, improvements and appurtenances on or to which the Work is placed, located or affixed, to the Owner free from any claims, liens, or charges. Contractor further agrees that neither it nor any person, firm, or corporation furnishing any materials or labor for any of the Work shall have any right of lien upon the Site, or any Existing Improvement or appurtenance thereon, except that: (1) nothing stated in this Subparagraph 3.4.5.3 shall be interpreted as a waiver prohibited under Applicable Laws of Contractor's or any Subcontractor's mechanic's (or, construction) lien rights; and (2) Contractor may install metering devices or other equipment of utility companies or political subdivisions, title to which may be retained by such utility company or political subdivision, provided that in the event of installation of any

INITIALS _____ INITIALS _____

Edition: February, 2010/Rev.4.11

such metering device or utility equipment, Contractor advises Owner in advance of installation as to who will be the owner, and where will be the precise location, thereof.

.4     Substitutions.  No substitution of materials, equipment, articles, processes or other items of the Work required under the Contract Documents will be made without written approval of Owner, which approval may be granted or denied in the sole and absolute discretion of Owner. With respect to any such substitution made or requested by Contractor, neither the occurrence of a substitution made or requested by Contractor nor the approval or disapproval by Owner of a substitution that is made in accordance with this Subparagraph 3.4.8.4 shall give rise to any right of Contractor to a Contract Adjustment. Contractor shall, notwithstanding Owner's or Architect's approval, remain solely responsible for the sufficiency and suitability of all substitutions requested by Contractor and approved by Owner or otherwise made by Contractor.

.5     Parts List.  Contractor will provide a printed parts list for all items which might be subject to replacement and for which parts lists are either expressly required by the Contract Documents or customarily provided according to usual commercial practices.

.6     Manuals.  Four (4) hard copies and one (1) electronic version of operations and maintenance manuals will be prepared and transmitted to Owner within the Contract Time for Close-Out Completion.  Final Payment will not be due until Owner has received all manuals covering the Work that are either required to be provided by the terms of the Contract Documents or if not required are customarily provided according to usual commercial practices applicable to the portion of Work involved.  Operating instructions will be included within the equipment manuals and will state all information necessary for Owner to operate, use, maintain and service the equipment fully and efficiently.

.7     Start Up.  Contractor will be responsible for start-up of all systems and equipment purchased as part of the Work and has included sufficient amounts in the Contract Price to cover contingencies arising out of the start-up of such systems and equipment. Contractor will comply fully with each manufacturer's specifications and instructions.  Systems and equipment specified by the Contract Documents or manufacturer to be furnished with manufacturer's supervision of start-up will be placed in operation only under such supervision.

.8     Owner-Furnished Items.  Contractor assumes complete liability and responsibility for the protection and storage of all property, materials, equipment or other items provided by Owner to Contractor for use or incorporation in the Work.

## 3.5     CONTRACTOR'S WARRANTIES

3.5.1     General Representations and Warranties.  Without limitation upon any of the promises, warranties or representations by Contractor contained in the Contract Documents, Contractor warrants and represents as follows:

.1     Solvency.  Contractor represents and warrants that it is financially solvent, able to pay its debts as they mature and possessed of sufficient working capital to complete the Work and perform its obligations under the Contract Documents.

.2     Capital.  Contractor represents and warrants that it is able to furnish the plant, tools, materials, supplies, equipment and labor required to complete the Work and perform its obligations under the Contract Documents.

.3     Authorization to Do Business.  Contractor represents and warrants that it is authorized to do business in the jurisdiction where the Work will be performed and is properly licensed by all applicable Governmental Authorities.

.4     Authority.  Contractor represents and warrants that its execution of the Construction Contract and GMP Amendment and its performance thereof are within its duly authorized powers.

22 of 85

INITIALS ____   INITIALS ____

Edition: February, 2010/Rev.4.11

.5     **Labor Relations.** Contractor represents and warrants that it presently knows of no facts the existence of which might lead to a labor dispute which might affect the Work.

.6     **Experience.** Contractor represents and warrants that it has performed substantial work in the past that is comparable in kind and complexity to the Work and that it is an experienced general contracting firm having the ability, skill and resources necessary to perform and/or provide the Work required of it under the Contract Documents within the limitations of the Contract Price, General Conditions Costs Maximum and Contract Time.

.7     **Labor Laws.** Contractor represents and warrants that all of the Work will be provided and produced in compliance with Applicable Laws relating to employment of labor.

.8     **Occupational Safety and Health Laws.** Contractor represents and warrants that all of the Work will comply with Applicable Laws relating to occupational safety and health.

.9     **Hazardous Substances.** Contractor represents and warrants that the use and storage of all Hazardous Substances and products containing Hazardous Substances in the course of the Work will comply with Applicable Laws.

.10     **Environmental Laws.** Contractor represents and warrants that it is knowledgeable regarding those Environmental Laws applicable to the Work and that it will conduct itself in full compliance therewith, notifying Owner in the event of any significant environmental occurrence.

**3.5.2     General Warranty.** In addition to other warranties and guarantees required by the Contract Documents, Contractor shall, and hereby does, warrant and guarantee that: (1) the Work will conform to the requirements of Contract Documents, including, without limitation, any performance standards that are part thereof; (2) all Work for which there is not a specific requirement, criterion, specification, or standard set forth in the Contract Documents shall be performed in accordance with the Standard of Performance; (3) the completed Work will conform to the Design Intent; (4) all labor, equipment, materials and other items of Work will be when installed new and free of liens, claims and security interests; (5) without limitation to the other requirements of this warranty, all labor, installation and workmanship will be performed in a good and workmanlike manner; (6) all labor, materials, equipment, services and work shall be free of defects for a period of one (1) year after Final Completion; (7) all parts of the Work will conform to the requirements of Applicable Laws in effect at the time such Work is permanently incorporated into the Project. If required by the Owner, Contractor shall furnish satisfactory evidence as to the kind and quality of services, labor, installation, materials and equipment used. Manufactured items installed in the Work, unless otherwise specifically stated in the Contract Documents, are to be installed in strict accordance with manufacturer's current printed instructions.

**3.5.3     Repair, Replacement.** Without limitation upon the Owner's other rights or remedies under the Contract Documents or Applicable Laws, any and all Work that, for reasons other than (1) ordinary wear and tear or (2) abuse or neglect by persons or entities other than the Contractor or the Subcontractors, is not in conformance with the warranties or guarantees required by the Contract Documents or Applicable Laws shall be repaired or replaced, together with the repair or replacement of any other Work, Existing Improvements or the work of the Separate Contractors, the Owner's own forces or others, which may be removed, displaced or damaged in so doing. The Contractor shall notify the Owner in writing upon completion of such repair or replacement. In the event of failure by the Contractor to commence and pursue with diligence said replacement or repair within ten (10) Days after being notified by the Owner, the Owner is hereby authorized to proceed with such replacement and repair as the Owner deems necessary and expedient and to charge such costs to Contractor at Contractor's Own Expense.

**3.5.4     No Limitation.** The warranties stated in this Section 3.5 are in addition to any other warranties or guarantees that are required under any other provision of the Contract Documents or Applicable Laws. Nothing stated in this Section 3.5 shall be interpreted as a limitation upon the Owner's rights under any warranties or guarantees provided for under any other provision of the Contract Documents or under Applicable Laws that afford the Owner greater rights than the rights afforded to Owner under this Section 3.5.

**3.5.5     Assignment.** Contractor does hereby unconditionally and irrevocably assign to Owner all warranties and guarantees issued or made by any Subcontractor, of any Tier, (including, without limitation, any manufacturer,

INITIALS \_\_\_\_\_  INITIALS \_\_\_\_\_

Edition: February, 2010/Rev.4.11